## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ALLIED SYSTEMS HOLDINGS, INC., *et al.*,[1] | Case No. 12-11564 (CSS) |
| Debtors. | (Jointly Administered) |
| | |
| ALLIED SYSTEMS HOLDINGS, INC. | |
| Plaintiff, | |
| v. | Adv. Proc. No. 12-50947 (CSS) |
| AMERICAN MONEY MANAGEMENT CORP., AVENUE CAPITAL GROUP, BDCM OPPORTUNITY FUND II, LP, BENNETT MANAGEMENT, BLACK DIAMOND CLO 2005-1 LTD., DEL MAR DISTRESSED OPPORTUNITIES MASTER FUND, MJX ASSET MANAGEMENT, LLC, PAR-FOUR INVESTMENT MANAGEMENT, SPECTRUM INVESTMENT PARTNERS LP, TEAK HILL - CREDIT CAPITAL INVESTMENTS, LLC, THE CIT GROUP/BUSINESS CREDIT, INC., THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, YUCAIPA AMERICAN ALLIANCE FUND II, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND II, L.P. | Re:  Adv. Proc. D.I. 73, 74 |
| Defendants. | |
| YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., YUCAIPA AMERICAN ALLIANCE FUND II, L.P., AND YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND II, L.P. | |

---

[1]    The Debtors in these cases, along with the federal tax identification number (business number where applicable) for each of the Debtors, are: Allied Systems Holdings, Inc. (58-0360550); Allied Automotive Group, Inc. (58-2201081); Allied Freight Broker LLC (59-2876864); Allied Systems (Canada) Company (90-0169283); Allied Systems, Ltd. (L.P.) (58-1710028); Axis Areta, LLC (45-5215545); Axis Canada Company (87568828); Axis Group, Inc. (58-2204628); Commercial Carriers, Inc. (38-0436930); CT Services, Inc. (38-2918187); Cordin Transport LLC (38-1985795); F.J. Boutell Driveway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems, LLC (45-4241751); Logistic Technology, LLC (45-4242057); QAT, Inc. (59-2876863); RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582).  The location of the Debtors' corporate headquarters and the Debtors' address for service of process is 2302 Parklake Drive, Bldg. 15, Ste. 600, Atlanta, Georgia 30345.

Counterclaim and Cross-Claim Plaintiffs,

v.

ALLIED SYSTEMS HOLDINGS, INC.

Counterclaim Defendant,

and

AMERICAN MONEY MANAGEMENT CORP., AVENUE CAPITAL GROUP, BDCM OPPORTUNITY FUND II, LP, BENNETT MANAGEMENT, BLACK DIAMOND CLO 2005-1 LTD., DEL MAR DISTRESSED OPPORTUNITIES MASTER FUND, MJX ASSET MANAGEMENT, LLC, PAR-FOUR INVESTMENT MANAGEMENT, SPECTRUM INVESTMENT PARTNERS LP, TEAK HILL - CREDIT CAPITAL INVESTMENTS, LLC, THE CIT GROUP/BUSINESS CREDIT, INC., THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS,

Cross-Claim Defendants.

**OBJECTION BY YUCAIPA AMERICAN ALLIANCE FUND I, LP., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, LP., YUCAIPA AMERICAN ALLIANCE FUND II, LP., YUCAIPA AMERICAN ALLIANCE (PARALLEL) II FUND, LP. TO DEFENDANTS BDCM OPPORTUNITY FUND II, LP'S, BLACK DIAMOND CLO 2005-1 LTD'S AND SPECTRUM INVESTMENT PARTNERS LP'S MOTION <u>TO DISMISS THE AMENDED CROSS-CLAIM IN ITS ENTIRETY</u>**

01:13294116.1

# TABLE OF CONTENTS

Page

I. PRELIMINARY STATEMENT ...........................................................................................1

II. FACTUAL BACKGROUND ............................................................................................2

A.  Yucaipa Rescued Allied Out of Chapter 11 in 2007; the First Lien Credit Agreement Provided Exit Financing for the Yucaipa-Sponsored Allied Plan of Reorganization..........................................................................................2

B.  The Third Amendment to the First Lien Credit Agreement; Yucaipa Never Purchased Any Loans Under the Third Amendment.............................................4

C.  Instead of Purchasing First Lien Loans Under the Third Amendment to the First Lien Credit Agreement, in 2008 Yucaipa Acquired Second Lien Loans Under the Second Lien Credit Agreement ....................................................5

D.  Yucaipa Attempted to Purchase a Majority of First Lien Debt Pursuant to a Tender Offer – With No Objection From Petitioning Lenders ...........................6

E.  Yucaipa Acquires ComVest's Requiste Lender Position Under the First Lien Credit Agreement with the Petitioning Lenders' Full Knowledge and Encouragement ...................................................................................................7

F.  The Fourth Amendment...................................................................................9

G.  Following the Closing of the Fourth Amendment and Purchase of ComVest's Requisite Lender Position, the Petitioning Lenders Reiterated Their Support for and Did Not Object to Yucaipa's Status as Requisite Lender ................................................................................................................10

H.  The Georgia Litigation:  Black Diamond Implements Scheme to Enhance Its Own Position After Inducing Yucaipa to Acquire First Lien Debt .................11

I.  CIT Dismisses With Prejudice its Claims in the Georgia Action With Full Knowledge of the Petitioning Lenders ...............................................................12

J.  During and After the CIT Litigation, Black Diamond Again Recognizes Yucaipa as Requisite Lender To Try to Gain an Advantage Over Allied and Other Creditors............................................................................................14

K.  The New York Litigation – Summary Judgment Without the Benefit of Any Discovery That Would Have Revealed the Petitioning Lenders' Scheme ..............................................................................................................16

L.  In light of the foregoing, Enforcement of the Third Amendment's Restrictions Against Yucaipa Would Effectuate an Unjust Enrichment at Yucaipa's Expense ............................................................................................16

III. ARGUMENT ....................................................................................................................18

A.  The First Lien Credit Documents Do Not bar Yucaipa's Amended Counterclaim.......................................................................................................18

1.   The Third Amendment Does Not Bar Yucaipa's Claims ..........................18

|  | 2. | Yucaipa's Claims Are Permitted Under The Express Exception In Third Amendment § 2.7(e) and the Petitioning Lenders Intentionally Seek to Mislead this Court by Failing to Quote the Provision in its Entirety. | 26 |
|  | 3. | Credit Agreement § 10.6(b) Does Not Bar Yucaipa's Claims | 28 |
| B. |  | Yucaipa's Declaratory Judgment Claim Was Timely Filed | 30 |
|  | 1. | Yucaipa's Declaratory Judgment Action Did Not Accrue in April 2008 | 31 |
|  | 2. | Yucaipa's Declaratory Judgment Action Did Not Accrue Until The New York Court's Colloquy At The Conclusion Of The New York Motion for Summary Judgment Hearing. | 33 |
|  | 3. | New York's Six-Year Statute of Limitations Applies to Yucaipa's Amended Counterclaim. | 36 |

IV. CONCLUSION ... 39

01:13294116.1

# TABLE OF AUTHORITIES

Page

## CASES

American Life Ins. Co. v. Parra,
  25 F. Supp. 2d 467 (D. Del. 1998) ............................................................... 24

Artvale, Inc. v. Rugby Fabrics Corp.,
  363 F.2d 1002 (2d Cir. 1966) ....................................................................... 26

Brown v. United Water Del., Inc.,
  3 A.3d 253 (Del. 2010) ................................................................................. 25

Charney v. North Jersey Trading Corp.,
  172 A.D.2d 390 (N.Y. App. Div. 1991) ....................................................... 35

Christian v. Christian,
  42 N.Y.2d 63 (N.Y. 1977) ............................................................................ 19

Collins & Aikman Products Co. v. Sermatech Eng'g Group, Inc.,
  297 A.D.2d 248 (N.Y. App. Div. 2002) ....................................................... 25

DeWitt v. DeWitt,
  62 A.D.3d 744 (N.Y. App. Div. 2009) ......................................................... 29

Dubovsky & Sons, Inc. v. Honeywell, Inc.,
  454 N.Y.S.2d 329 (N.Y. App. Div. 1982) .................................................... 28

Great N. Assocs., Inc. v. Cont'l Cas. Co.,
  192 A.D.2d 976 (N.Y. App. Div. 1993) ....................................................... 25

Kaufman v. Am. Youth Hostels, Inc.,
  6 A.D.2d 223 (N.Y. App. Div. 1958) ........................................................... 25

Koch v. Greenberg,
  2011 U.S. Dist LEXIS 144605 (S.D.N.Y. 2012) ......................................... 24

Litinov v. Hodson,
  905 N.Y.S. 2d 400, 74 A.D. 3d 1884 (NY App. Div. 2010 .......................... 24

Long Island Lighting Co. v. Allianz Underwriters Ins. Co.,
  35 A.D.3d 253 (N.Y. App. Div. 2006) ......................................................... 33

Mann v. Brenner,
  375 F. App'x 232 (3d Cir. 2010) .............................................................. 1, 20

Moore Corp. v. Wallace Comp. Servs., Inc.,
  898 F. Supp. 1089 (D. Del. 1995) ..................................................... 30, 33, 34

Mott v. State,
    49 A.3d 1186 (Del. 2012) ......................................................................... 38

Muzak Corp. v. Hotel Taft Corp.,
    1 N.Y.2d 42 (N.Y. 1956) ........................................................................... 29

Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v.
    Chinery,
    330 F.3d 548 (3d Cir. 2003) ...................................................................... 32

Phillips v. County of Allegheny,
    515 F.3d 224 (3d Cir. 2008) ........................................................................ 1

PNC Bank v. Turner,
    659 A.2d 222 (Del. Super. Ct. 1995) ......................................................... 31

Saudi Basic Indus. Corp. v. Mobil Yanbu Petrochemical Co. Inc.,
    866 A.2d 1 (Del. 2005) ................................................................... 36, 37, 38

Sheridan v. Sheridan,
    202 A.D.2d 749 (N.Y. App. Div. 1994) ..................................................... 19

Shockley v. Minner,
    2008 U.S. Dist. LEXIS 52596 (D. Del. July 10, 2008) .............................. 33

Smith v. Equicredit Corp.,
    2002 U.S. Dist. LEXIS 19395 (E.D. Pa. Oct. 3, 2002) ......................... 32, 33

Sommer v. Federal Signal Corp.,
    79 N.Y.2d 540 (N.Y. 1992) ....................................................................... 25

Town of Islip v. Zalak,
    165 A.D.2d 83 (N.Y. App. Div. 1991) ....................................................... 33

Turkish v. Kasenetz,
    27 F. 3d, 23 (2d Cir. 1994) ........................................................................ 24

Winstar Commc'ns v. Blackstone Grp., L.P., (In re Winstar Commc'ns, Inc.),
    435 B.R. 33 (Bankr. D. Del. 2010) ............................................................ 38

Youkelsone v. Washington Mutual, Inc. (In re Washington Mutual, Inc.),
    Adv. No. 09-50039 (MFW), 2010 Bankr. LEXIS 2453 (Bankr. D. Del. Aug. 13, 2010).. 37, 38,
    39

## STATUTES

28 USC § 2201 ................................................................................................................... 33

## RULES

Fed. R. Civ. P. 12(b)(6) ................................................................................................. 1, 20

N.Y. C.P.L.R. 203(d) ........................................................................................................ 31

# I.  PRELIMINARY STATEMENT

Yucaipa only became a Lender to Allied under the Fourth Amendment to the First Lien Credit Agreement as a consequence of a transaction which the Petitioning Lenders affirmatively endorsed and encouraged Yucaipa to pursue.  The Petitioning Lenders cannot now be allowed (a) to deceive Yucaipa into becoming a Lender and believing it was subject to a valid Fourth Amendment, (b) then challenge the validity of the Fourth Amendment, and (c) then seek to bind Yucaipa to the Third Amendment when Petitioning Lenders were fully aware that Yucaipa had refused to acquire Allied debt subject to the Third Amendment.  Further, in light of the foregoing, the Petitioning Lenders cannot argue that Yucaipa is barred from challenging the Petitioning Lenders' duplicitous conduct by the very terms of the Third Amendment which Yucaipa had previously refused to accept.  Simply put, Petitioning Lenders' attempt to benefit from this classic "bait and switch" should be rejected

The following facts, which for purposes of the Motion to Dismiss, must be taken by this Court as true,[2] compel denial of the Motion to Dismiss:

1.  Yucaipa did not and would not have acquired debt under the Third Amendment;

2.  Yucaipa, Allied, Black Diamond and all other lenders under the First Lien Credit Agreement never expected that Yucaipa would be bound by the Third Amendment ; thus, any application of the Third Amendment to Yucaipa would be unfair and result in an unjust windfall to Black Diamond and the other lenders;

3.  Black Diamond actively encouraged Yucaipa's purchase of First Lien debt under the Fourth Amendment  and Yucaipa relied on that encouragement to acquire enough First Lien debt to become Requisite Lender under the First Lien Credit Agreement in August 2009;

---

[2]  When considering a motion to dismiss a complaint under Fed. R. Civ. P. 12(b)(6), the court "must accept the plaintiff's well-pleaded allegations as true and draw all reasonable inferences in [its] favor."  Mann v. Brenner, 375 F. App'x 232, 235 (3d Cir. 2010) (citing Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008)).

4.      That encouragement took the form of, among other things, (a) in person meetings where the head of Black Diamond made personal visits to Yucaipa to strategize about what Black Diamond and Yucaipa could do together once Yucaipa become Requisite Lender and (b) a series of encouraging emails from Black Diamond;

5.      For the nearly three years after Yucaipa purchased such First Lien debt, Black Diamond worked with Yucaipa to develop various strategies for Allied, including the potential sale of Allied, and such strategies relied on Yucaipa's status as Requisite Lender;

6.      For nearly three years after Yucaipa purchased such First Lien Debt, Black Diamond never attempted to exercise remedies or request that Yucaipa direct the agent under the First Lien Credit Agreement to exercise remedies on behalf on the First Lien lenders;

7.      Black Diamond acted duplicitously in inducing Yucaipa to purchase First Lien debt under the Fourth Amendment and then surreptitiously encouraging CIT to sue to invalidate the Fourth Amendment as Black Diamond's agent and proxy;

8.      Once CIT (Black Diamond's agent and proxy) settled that litigation with Yucaipa, Black Diamond again reneged on its prior representations and support for Yucaipa's purchase of debt under the Fourth Amendment – and commenced its own litigation in New York seeking to invalidate the Fourth Amendment;

9.      Yucaipa settled litigation with CIT, agent under the First Lien Credit Agreement in December 2011, and had no basis at that point to seek a judicial declaration with respect to Yucaipa's rights under the First Lien Credit Agreement;

10.     In November 2012, Judge Ramos indicated an intention in the New York Action to invalidate the Fourth Amendment without permitting any discovery to occur. Thus, the New York Action did not involve or rely on any of the facts alleged in the Bankruptcy Complaint; and

11.     Further, as of this date – nearly three months after making his statements -- Judge Ramos has not issued a written order in the New York Action; thus, as of this date, no final order exists under applicable state law determining that Yucaipa lacks rights under the Fourth Amendment.

For these reasons, and for those set forth below, the Motion to Dismiss should be denied.

## II.  FACTUAL BACKGROUND

**A.      Yucaipa Rescued Allied Out of Chapter 11 in 2007; the First Lien Credit Agreement Provided Exit Financing for the Yucaipa-Sponsored Allied Plan of Reorganization**

Certain affiliates of the Debtors had previously filed for bankruptcy in 2005 in the United States Bankruptcy Court for the Northern District of Georgia (the "Prior Allied Bankruptcy Case"). As part of the Prior Allied Bankruptcy Case, Yucaipa held approximately $99 million of unsecured note claims issued by those debtors. At the time Yucaipa appeared in the Prior Allied Bankruptcy Case, that case was at an impasse and those Allied Debtors faced liquidation. Yucaipa's involvement in the Prior Allied Bankruptcy Case was encouraged by the International Brotherhood of Teamsters (the "IBT"), which represents most of the Debtors' employees and which was concerned about the viability of the business. Yucaipa made additional loans during the Prior Allied Bankruptcy Case to enable the Debtors in that case to purchase much needed equipment and obtained an unprecedented 17.5% in wage concession (totaling up to $105 million) from the IBT to fund future capital expenditures. In addition, Yucaipa co-sponsored a plan of reorganization with the IBT that enabled Allied Holdings to survive and preserve thousands of jobs. Through that plan of reorganization, which was confirmed in 2007, Allied Holdings emerged from the Prior Allied Bankruptcy Case with a de-levered capital structure and enhanced prospects for competing successfully in the car haul industry. Upon the effective date of the plan of reorganization, Yucaipa converted all of its debt claims into approximately 67% of Allied Holdings, as reorganized. Yucaipa also designated three members of the reorganized Allied Holdings' board of directors; the other two members of the board were independent and not designated by Yucaipa – one of whom was independently designated by the official committee of unsecured creditors' in the Prior Allied Bankruptcy Case (and who remains an independent director today). The non-Yucaipa designated members of the Allied Holdings board of directors make up a special committee (the "Special Committee"), which was formed to independently consider and negotiate on behalf of the Debtors certain matters involving Yucaipa.

(*See,* Yucaipa's Amended Counterclaim and Cross-Claim for Declaratory Judgment and Injunctive and Other Relief and Amended Answer to Debtors' Verified Complaint [Dkt. 65] ("Amended Counterclaim", ¶ 9).

In order to finance its exit from the Prior Allied Bankruptcy Case, Allied Holdings, as borrower, and certain of its affiliates and subsidiaries, as guarantors, entered into the First Lien Credit Agreement.  The First Lien Credit Agreement was an exit facility from the Prior Allied Bankruptcy Case and provided a facility for term loans, revolving loans and lenders deposits to support letters of credit issued to beneficiaries for the benefit of Allied Holdings and certain of its affiliates.  Simultaneously, Allied Holdings also entered into that certain Second Lien Secured Super Priority Debtor-in-Possession and Exit Credit and Guaranty Agreement, dated May 15, 2007 (the "Second Lien Credit Agreement") (Amended Counterclaim, ¶ 10).

**B.      The Third Amendment to the First Lien Credit Agreement; Yucaipa Never Purchased Any Loans Under the Third Amendment.**

Yucaipa was not a Lender under the original First Lien Credit Agreement ("CA"), which contained certain provisions that restricted Lenders from selling debt they held under the First Lien Credit Agreement to Yucaipa.  (Amended Counterclaim, ¶ 11).   The First Lien Credit Agreement was amended over time.  The first and second amendments are not relevant to the matters before the Court (Amended Counterclaim, ¶ 12).

In early 2008, a number of Lenders were concerned about the state of the automotive industry and began looking for strategies to exit their positions in the Allied Holdings debt. Some of these Lenders expressed interest in potentially selling their debt positions to Yucaipa but recognized that doing so would potentially constitute a default under the First Lien Credit Agreement without an amendment to its terms.  To facilitate such potential sales, the Lenders

held discussions with Allied Holdings about potentially amending the First Lien Credit Agreement to allow Yucaipa to be an "Eligible Assignee."  (Amended Counterclaim, ¶ 11, 54)

Consequently, in April 2008, CIT, as Administrative Agent under the First Lien Credit Agreement, coordinated passage of the Third Amendment.  The Third Amendment – approved by Allied Holdings' Special Committee, executed by Allied Holdings, and approved by a majority of the first lien Lenders – authorized the first lien Lenders to sell up to $50,000,000 in principal amount of term loans under the First Lien Credit Agreement to Yucaipa and its affiliates, provided that (a) fifty percent of such acquired term loans would be converted into capital of Allied Holdings and (b) any voting rights that Yucaipa would receive if it acquired any loans under the First Lien Credit Agreement would be restricted pursuant to the Third Amendment.  (*See* 3A §§ 2.7(e)(iii), (iv).) (Amended Counterclaim, ¶12). Yucaipa was not a signatory to the Third Amendment and did not become bound by the First Lien Credit Agreement as amended by the Third Amendment.  Although the Lenders were permitted to sell Yucaipa first lien term loans under the Third Amendment, Yucaipa never purchased any such term loans under the Third Amendment – and never would have acquired any first lien debt while the Third Amendment's restrictions and conditions limiting Yucaipa's potential ownership rights existed.  (Amended Counterclaim, ¶ 13).

**C.      Instead of Purchasing First Lien Loans Under the Third Amendment to the First Lien Credit Agreement, in 2008 Yucaipa Acquired Second Lien Loans Under the Second Lien Credit Agreement**

Yucaipa determined not to purchase loans under the Third Amendment to the First Lien Credit Agreement.  (Amended Counterclaim, ¶ 13). Instead, at or around the same time, the Second Lien Credit Agreement was also amended.  That amendment did not contain any limits on the amount of second lien debt that Yucaipa could purchase or limit Yucaipa's voting rights.  Consequently, Yucaipa acquired two-thirds of the debt under the Second Lien Credit Agreement.

For the next 15 months, Yucaipa held only Loans under the Second Lien Credit Agreement – and no Loans under the First Lien Credit Agreement. (Amended Counterclaim, ¶ 14).

**D.      Yucaipa Attempted to Purchase a Majority of First Lien Debt Pursuant to a Tender Offer – With No Objection From Petitioning Lenders**

By December 2008, the situation in the automotive industry and, by extension, the car haul industry, had become dismal due to the global recession.  As a consequence, Lenders holding a majority of the first lien debt once again approached Yucaipa about acquiring their positions.  Yucaipa  made clear to those Lenders that it would only acquire the first lien debt if the restrictions imposed by the Third Amendment were eliminated and Yucaipa could serve as Requisite Lender (Amended Counterclaim ¶60) .

By February 2009, Yucaipa decided to try to acquire debt under the First Lien Credit Agreement, but not under the existing Third Amendment.  On February 4, 2009, Yucaipa submitted a written tender offer (the "Tender Offer") by email to all Lenders under the First Lien Credit Agreement, including Petitioning Lenders, (the "February 4 Email").  The Tender Offer package included Allied Holdings' proposed fourth amendment to the Credit Agreement (the "Proposed Fourth Amendment") that would have amended the Third Amendment's terms to eliminate any limits on the amount of First Lien debt Yucaipa could purchase, permitted Yucaipa to acquire a majority of Allied Holdings' first-lien debt, and permitted Yucaipa to become the Requisite Lender, among other changes.  The Tender Offer documents, including the Proposed Fourth Amendment, were sent to Black Diamond and Spectrum, as well as all other Lenders. Although some of the Proposed Fourth Amendment's terms varied from the Fourth Amendment that was ultimately enacted on August 21, 2009, the two documents were materially similar. (Amended Counterclaim, ¶ 61).

No Lender expressed any opposition to any aspect of Yucaipa's Tender Offer or the

Proposed Fourth Amendment.  Petitioning Lenders never informed Yucaipa that the changes in

the Proposed Fourth Amendment would violate the letter or the spirit of the First Lien Credit

Agreement, and never stated that such changes could be made only with their consent.[3]

(Amended Counterclaim, ¶ 63).

The Tender Offer was not successful because – while the Tender Offer was pending -- in

February 2009, ComVest acquired the majority of Allied Holdings' first lien debt from Allied

Holdings' then-existing Lenders (Amended Counterclaim, ¶ 64).

**E.    Yucaipa Acquires ComVest's Requisite Lender Position Under the First Lien Credit Agreement with the Petitioning Lenders' Full Knowledge and Encouragement**

Shortly after Comvest acquired the majority of the debt under the First Lien Credit

Agreement, Yucaipa entered into direct negotiations with ComVest to acquire its Requisite

Lender position.  These negotiations played out over several months and involved different

proposals, but every one of them contemplated ComVest enacting certain amendments to the

Third Amendment's terms and Yucaipa acquiring ComVest's majority position in Allied

Holdings' first lien debt and becoming the Requisite Lender (Amended Counterclaim, ¶ 64).

During the time Yucaipa and ComVest were negotiating over Yucaipa's purchase of

Allied Holdings' first lien debt held by ComVest, Yucaipa and Black Diamond spoke frequently

about Yucaipa's negotiations with ComVest  (Amended Counterclaim, ¶ 65).  For example:

> a.  Mr. Ehrlich, a Managing Director of Black Diamond, called Yucaipa several
> times during the summer of 2009 to inquire about the status of the negotiations.
> During these calls, Mr. Ehrlich never expressed opposition to any aspect of
> Yucaipa's plan to become Requisite Lender.  Instead, he encouraged Yucaipa to

---

[3]    Yucaipa specifically relied – to its detriment -- on the Lenders' lack of any objection to the
Proposed Fourth Amendment when it later acquired a majority of Allied Holdings' first lien
debt in reliance on the validity of the Fourth Amendment that ComVest and Allied
Holdings enacted on August 21, 2009.  See discussion infra.

move forward with that plan.  Yucaipa relied on this affirmative endorsement of (and lack of objection to) Yucaipa becoming Requisite Lender, as Yucaipa would not have purchased ComVest's holdings if Black Diamond had objected.

b.  On August 18, 2009, Stephen H. Deckoff, founder and Managing Principal of the parent company of Black Diamond, personally met in Los Angeles with Ronald Burkle and another senior Yucaipa representatives for the sole purpose of meeting to coordinate the strategy going forward with respect to Allied.  At that meeting, Mr. Deckoff proposed a plan for Yucaipa to use its control over Allied Holdings to file for bankruptcy with a DIP loan made by Yucaipa and Black Diamond after which they would do a "low value" plan of reorganization that would give Allied Holdings to them as DIP lenders.  Mr. Burkle was unwilling to participate in Mr. Deckoff's scheme, and instead suggested a different approach.  Mr. Burkle proposed that Yucaipa continue with its plan to buy ComVest's Requisite Lender position and then work to sell Allied Holdings in a way that maximized the value of the Estate.  Mr. Deckoff agreed to work together with Yucaipa and support Yucaipa's plan to acquire the Requisite Lender position from ComVest, including support for the Fourth Amendment.  (Amended Counterclaim, ¶ 65).

c.  The following day, on August 19, 2009, representatives from Black Diamond and Yucaipa spoke again about Yucaipa's plan to acquire ComVest's Requisite Lender position and the execution of the Fourth Amendment as a precursor to that purchase (Amended Counterclaim, ¶ 71).

At no time during any of these communications did Black Diamond express any objection to Yucaipa's proposed acquisition of ComVest's Requisite Lender position or suggest that unanimous Lender consent would be required for the Fourth Amendment to be effective or for Yucaipa to assume Requisite Lender status (Amended Counterclaim, ¶ 71).

Thus, the Petitioning Lenders knew for at least seven months prior to the to Fourth Amendment  – starting at least from the date of the Tender Offer in February 2009 – that Yucaipa intended to spend tens of millions of dollars to acquire a majority of the first lien debt pursuant to an amendment that reversed the restrictions on ownership in the Third Amendment. At no time did Petitioning Lenders inform Yucaipa that they believed such an amendment would

be invalid.  Indeed, Mr. Deckoff and others representing Petitioning Lenders supported

Yucaipa's acquisition of the Requisite Lender position (Amended Counterclaim, ¶ 4).

In reliance on Petitioning Lenders' stated support for Yucaipa's transaction with

ComVest and the passage of the related Fourth Amendment to the First Lien Credit Agreement,

Yucaipa closed on the acquisition of ComVest's debt holdings in Allied Holdings and became

Requisite Lender (Amended Counterclaim, ¶ 6).

### F.    The Fourth Amendment

On August 21, 2009, Allied Holdings and ComVest, as the Requisite Lender under the

First Lien Credit Agreement, executed the Fourth Amendment.  Allied Holdings' Special

Committee – consisting of the Allied Holdings board members who were independent of

Yucaipa –reviewed and voted to approve the Fourth Amendment after being advised by outside

counsel.  Yucaipa (along with the other Lenders under the First Lien Credit Agreement) also was

provided with a written legal opinion from Allied Holdings' counsel in connection with the

Fourth Amendment's enactment (Amended Counterclaim, ¶ 15).

Various sections of the Fourth Amendment amended or deleted certain restrictions and

conditions that sections of the Third Amendment placed on first lien debt that Yucaipa might

acquire, as described above.  The Fourth Amendment permitted Yucaipa to acquire and accept

assignment of Allied Holdings' first lien debt and become Requisite Lender under the First Lien

Credit Agreement.  (*See, e.g.,* 4A §§ 2.1(b), 2.4(e).) (Amended Counterclaim, ¶ 16).  The Fourth

Amendment also eliminated Section 10.5(e) of the First Lien Credit Agreement (the covenant not

to sue) that had been added by Section 2.7(e) of the Third Amendment.  (4A §2.4(a))

In reliance on the validity of the Fourth Amendment, Yucaipa acquired all of ComVest's

majority holdings of Allied Holdings' first lien debt on August 21, 2009. These holdings

consisted of $114,712,088.66 of Term Loans and $30,400,458.40 of LC Commitments, totaling

$145,112,547.06 of the $265,000,000 maximum first lien loans authorized by the First Lien

Credit Agreement (Amended Counterclaim, ¶ 17).

**G.**   **Following the Closing of the Fourth Amendment and Purchase of ComVest's Requisite Lender Position, the Petitioning Lenders Reiterated Their Support for and Did Not Object to Yucaipa's Status as Requisite Lender**

Following the execution of the Fourth Amendment, the Petitioning Lenders continued to

ostensibly support, and not object to, Yucaipa's acquisition of ComVest's Requisite Lender

Position.  For example, on August 22, 2009, immediately after Yucaipa purchased its ComVest's

Requisite Lender position pursuant to the Fourth Amendment, Mr. Walker advised Black

Diamond, through Mr. Ehrlich, by email that Yucaipa "did in fact take an assignment of the

ComVest debt" (emphasis added).  Mr. Ehrlich responded, "OK.  Let me know a good time [to

talk]."  Even after the Fourth Amendment was passed and Yucaipa acquired ComVest's majority

position – permitting Yucaipa to become Requisite Lender – Black Diamond continued to

discuss with Yucaipa a joint plan to sell Allied Holdings and did not object to Yucaipa acting as

Requisite Lender (Amended Counterclaim, ¶ 72).

Mr. Walker of Yucaipa also contacted Jeff Schaffer of Spectrum on August 22, 2009, to

inform him that Yucaipa had taken an assignment of ComVest's first lien loans.  Mr. Schaffer

responded to Mr. Walker's email on September 8, 2009, stating "I am back in the office this

week.  Please call me at your convenience so we can discuss next steps.  Thanks, Jeff."  Yucaipa

also offered to meet in person with Mr. Schaffer later in September 2009, but he was not

available.  Even though Yucaipa attempted to open a line of communication with Mr. Schaffer,

he never objected in any way to Yucaipa's acquisition, never expressed that the Fourth

Amendment was invalid, and never questioned Yucaipa's Requisite Lender status to Yucaipa

before his and Black Diamond's counsel sent a letter to the Lenders' Agent, CIT, on September

18, 2009, as discussed below (Amended Counterclaim, ¶ 73).

01:13294116.1

Yucaipa also contacted the Administrative Agent for all first lien Lenders, CIT, on or about August 22, 2009, to inform CIT that Yucaipa had taken an assignment of ComVest's first lien loans.  CIT entered all of Yucaipa's loans on the Register in compliance with its duties as Administrative Agent under First Lien Credit Agreement Section 10.6(b) shortly after the Fourth Amendment was executed.  As a result, all Lenders are bound by the Credit Agreement to "deem and treat the Persons listed as Lenders in the Register [including Yucaipa] as the holders and owners of the corresponding Commitments, LC Deposits and Loans listed therein for all purposes hereof [of the Credit Agreement]."  (CA § 10.6(b).)  (Amended Counterclaim, ¶ 74).

**H.      The Georgia Litigation:  Black Diamond Implements Scheme to Enhance Its Own Position After Inducing Yucaipa to Acquire First Lien Debt**

Unbeknownst to Yucaipa, only one month after Yucaipa's acquisition of the Requisite Lender position and only one day after Mr. Deckoff of Black Diamond spoke by telephone with Mr. Burkle to further plan a strategy for maximizing the value of the Estate, Petitioning Lenders chose to double-cross Yucaipa to enhance their leverage in the credit.  On September 18, 2009, they surreptitiously sent a letter to CIT (as agent under the First Lien Credit Agreement) (a) questioning the validity Yucaipa's Requisite Lender status and (b) directing CIT to refuse to acknowledge  Yucaipa as Requisite Lender.  Petitioning Lenders did not send this letter to Yucaipa or otherwise disclose to Yucaipa any concerns regarding the validity of the Fourth Amendment or Yucaipa's Requisite Lender status.  To the contrary, Petitioning Lenders continued to work with Yucaipa by proposing and discussing transactions that necessarily relied upon Yucaipa acting as the Requisite Lender (Amended Counterclaim, ¶ 7).

CIT, as Administrative Agent for all Lenders, pressed Petitioning Lenders' dispute with Yucaipa.  In response to that pressure, on November 21, 2009, Yucaipa and Allied Holdings filed suit in Georgia seeking a declaration that the Fourth Amendment was valid and enforceable

and that Yucaipa is the Requisite Lender (the "Georgia Complaint").  In the Georgia Complaint,

Yucaipa and Allied Holdings expressly asserted certain claims against CIT in its capacity as

Administrative Agent (Amended Counterclaim, ¶ 77).

CIT brought a counterclaim in both its representative capacity as Administrative Agent

and in its individual capacity as a Lender (the "CIT Counterclaim").  (The litigation related to the

Georgia Complaint and the CIT Counterclaim is referred to herein as the "Georgia Action").

The CIT Counterclaim included a declaratory judgment claim, which CIT asserted in its

representative capacity as Administrative Agent for all Lenders, that the Fourth Amendment was

ineffective and that Yucaipa was not the Requisite Lender (Amended Counterclaim, ¶ 78).

The Petitioning Lenders participated in the Georgia Action: they produced documents in

response to subpoenas, made themselves available for deposition, and communicated with both

CIT, their Agent, and Yucaipa about the proceedings (Amended Counterclaim, ¶ 79).

While the Georgia Action was pending, as discussed *supra*,  the Petitioning Lenders

continued to engage in a pattern of duplicitous conduct, socializing with Yucaipa's principals

and negotiating potential business strategies that depended on Yucaipa's exercise of its Requisite

Lender powers (Amended Counterclaim, ¶ 80).

**I.     CIT Dismisses With Prejudice its Claims in the Georgia Action With Full
          Knowledge of the Petitioning Lenders**

On December 5, 2011, after more than two years of litigation, CIT, Yucaipa and Allied

Holdings executed a settlement agreement in the Georgia Action (the "Settlement Agreement").

Among other things, the Settlement Agreement expressly stated that the parties "will dismiss

their respective claims in the Action with prejudice upon the execution of this Agreement."  CIT

entered the Settlement Agreement in both its representative capacity as Administrative Agent

and in its individual capacity as a Lender.  Among other things, CIT bound itself in the

Settlement Agreement to various obligations as Administrative Agent and Collateral Agent under the First Lien Credit Agreement's first lien facility (Amended Counterclaim, ¶ 80).

On December 7, 2011, the parties to the Georgia Action filed mutual dismissals with prejudice of all of their claims (the "Dismissals with Prejudice"). In the Dismissals with Prejudice, "Defendant and Counterclaim-Plaintiff The CIT Group/Business Credit Inc." expressly stated that it was dismissing "all claims it asserted in its Verified Answer and Counterclaims," including the claim CIT asserted in its role as Administrative Agent for all Lenders to invalidate the Fourth Amendment and declare that Yucaipa was not the Requisite Lender (Amended Counterclaim, ¶ 81).

Prior to the settlement of the Georgia Action, the Petitioning Lenders were fully aware that settlement negotiations were ongoing between Yucaipa, Allied Holdings and CIT from approximately May 2011 until December 2011. In fact, Mr. Ehrlich called Mr. Walker of Yucaipa repeatedly for updates on the status of the settlement discussions during those months. Mr. Walker understood Mr. Ehrlich's calls were to gauge Yucaipa's settlement posture, and he understood that Mr. Ehrlich also was talking with his agent, CIT, throughout the settlement process. During these calls, Mr. Ehrlich never complained about CIT's handling of the Georgia Action never expressed that a settlement of the Georgia Action would not resolve the claims CIT brought in its representative capacity, never said that his or other Lenders' consent would be required to finalize the settlement, and never suggested that Yucaipa could not be the Requisite Lender (Amended Counterclaim, ¶ 82).

All Lenders under the First Lien Credit Agreement became aware of the settlement on December 5, 2011 at the latest, when CIT posted it to IntraLinks, but no Lender objected to the

settlement between December 5, 2011 and the entry of the Dismissals with Prejudice on December 7, 2011 (Amended Counterclaim, ¶ 83).

Yucaipa intended for CIT to execute the Settlement Agreement and the Dismissals with Prejudice in both its representative capacity and in its individual capacity as a Lender, and Yucaipa understood that CIT did, in fact, act in both capacities in executing both documents (Amended Counterclaim, ¶ 84).

Yucaipa understood that CIT served as the Petitioning Lenders' agent in the Georgia Action, and that CIT was litigating on its own behalf and on behalf of all Lenders, including the Petitioning Lenders, throughout the Georgia Action.  In connection with the action described below between the Petitioning Lenders and Yucaipa, the Petitioning Lenders repeatedly and expressly admitted that CIT acted as their agent during the Georgia Action, including in a statement made under oath in an affidavit filed by one of the Petitioning Creditor's principals, Richard Ehrlich (Amended Counterclaim, ¶ 85).

**J.      During and After the CIT Litigation, Black Diamond Again Recognizes Yucaipa as Requisite Lender To Try to Gain an Advantage Over Allied and Other Creditors**

Although they had instigated the Georgia Action (totally unbeknownst to Yucaipa), the Petitioning Lenders continued to socialize with Yucaipa's principals and negotiate potential business strategies that depended on Yucaipa's exercise of its Requisite Lender powers (Amended Counterclaim, ¶ 8).  For example,

> a.   Mr. Deckoff had dinner with Mr. Burkle on February 23, 2010, at which they discussed Yucaipa's plans as Requisite Lender to increase Allied Holdings' value. Mr. Deckoff expressed support for Yucaipa's plans (Amended Counterclaim, ¶ 8).
>
> b.   Mr. Deckoff and Mr. Burkle met again in New York on January 31, 2011, at which they again discussed Yucaipa's plans as Requisite Lender.  Mr. Deckoff expressed appreciation for the meeting and support for Yucaipa's plans (Amended Counterclaim, ¶ 8).

c.  Then, in March through May, 2011, Black Diamond attempted to broker a transaction whereby Allied Holdings would be sold as a whole or as part of an asset sale to a third party.  Black Diamond proposed to finance this transaction whereby the Lenders in Allied Holdings were to receive a discount to par in connection with the sale of their collateral to a third party.  During this period, Mr. Ehrlich sent Yucaipa numerous proposals, all of which relied on Yucaipa's ability to vote its Allied Holdings' debt and exercise its Requisite Lender powers.  During the aforementioned discussions, Black Diamond never suggested it had any objection to or issue with Yucaipa being Requisite Lender or the Fourth Amendment's validity.  Indeed, Black Diamond's plan recognized and depended on Yucaipa's Requisite Lender status to fulfill its own business objectives.  Black Diamond's actions stand in direct contrast to the positions it has taken in the New York Action and these bankruptcy proceedings.  During this time, Petitioning Lenders professed to have the same goal as Yucaipa – the maximization of the value of the enterprise for its creditors.  At that time, Petitioning Lenders acknowledged that Yucaipa was acting toward that goal and not – as Petitioning Lenders now falsely claim – in Yucaipa's self- interest.  Thus, while Yucaipa was working toward what it believed to be that shared goal, Petitioning Lenders were scheming to challenge Yucaipa's Requisite Lender status.  Their duplicitous conduct should not be rewarded (Amended Counterclaim, ¶ 8).

On or about December 9, 2011, Yucaipa directed CIT as Administrative Agent pursuant to the Settlement Agreement executed by CIT, Yucaipa and Allied Holdings in the Georgia Action to terminate certain letter of credit commitments under the First Lien Credit Agreement.  This direction demonstrated that all of the first lien lenders – including Petitioning Lenders -  had accepted and ratified Yucaipa's Requisite Lender status.  This termination resulted in $16,928,474.40 of deposits that had been made to support the letters of credit being released to the Lenders under the First Lien Credit Agreement.  Each of the Lenders that then had an LC Commitment outstanding (including the Petitioning Lenders) received its pro rata portion of the funds that were released.  None of the Petitioning Lenders or other Lenders complained about this termination, Yucaipa's authority in regard thereto as Requisite Lender, or Yucaipa's acquisition of first lien debt from ComVest under the Fourth Amendment, and each accepted its pro rata share of the released funds (Amended Counterclaim, ¶ 21).

**K.    The New York Litigation – Summary Judgment Without the Benefit of Any Discovery That Would Have Revealed the Petitioning Lenders' Scheme**

Approximately five weeks after the Dismissals with Prejudice were entered in the Georgia Action, on January 18, 2012, the Petitioning Lenders filed the New York Action against Yucaipa in the Supreme Court of the State of New York, Index No. 650150/2012.  The Petitioning Lenders' sole claim in the New York Action seeks, *inter alia*, a judicial declaration that the Fourth Amendment is null and void and that, consequently, Yucaipa is not the Requisite Lender under the First Lien Credit Agreement (Amended Counterclaim, ¶ 86).

On August 27, 2012, before any discovery had been taken in the New York Action, the Petitioning Lenders filed a motion for summary judgment on their declaratory judgment claim, arguing that the Fourth Amendment's change to the term "Term Loan Exposure" had the effect of changing the definition of Requisite Lender without all "affected" Lenders' consent in violation of First Lien Credit Agreement § 10.5(b)(ix).  The New York Court did not permit any discovery on the Petitioning Lenders' scheme to wrongfully induce Yucaipa to purchase debt under the Fourth Amendment, and then to unjustly enrich themselves at Yucaipa's expense. (Amended Counterclaim, ¶ 87)

The New York Court heard oral argument on the Petitioning Lenders' motion for summary judgment on November 19, 2012.  Although the New York Court has not yet issued its written order, at oral argument the Court expressed the intention to grant the Petitioning Lenders' motion for summary judgment (Amended Counterclaim, ¶ 88).  Yucaipa disagrees with the New York Court's anticipated order and intends to take an appeal from it.  Yucaipa continues to contend that the Fourth Amendment was properly implemented and should fully effective (Amended Counterclaim, ¶ 89).

**L.    In light of the foregoing, Enforcement of the Third Amendment's Restrictions Against Yucaipa Would Effectuate an Unjust Enrichment at Yucaipa's Expense**

It would be manifestly inequitable, and result in an impermissible windfall unjustly enriching the Petitioning Lenders, if Yucaipa were to be held to the terms of the Third Amendment to which it never intended to be bound.  As illustrated by the fact that Yucaipa decided not to purchase debt under the Third Amendment, Yucaipa would not have purchased any portion of Allied Holdings' first lien debt, much less a majority of this debt, if it understood that it would be bound by the Third Amendment, or if it understood that any portion of the Fourth Amendment was invalid (Amended Counterclaim, ¶ 90).

If the contribution provisions of the Third Amendment were enforced against Yucaipa – which were expressly removed by the Fourth Amendment on which Yucaipa reasonably relied to its detriment – a significant amount of the otherwise indisputably valid first lien loans purchased by Yucaipa would be converted to capital, resulting in a windfall enhanced recovery to the other Lenders that they would have had absolutely no right to receive if the indebtedness purchased by Yucaipa was in the hands of any other entity (Amended Counterclaim, ¶ 91).

Moreover, despite the Petitioning Lenders' knowledge of the Fourth Amendment and Yucaipa's purchase of loans pursuant thereto before and at the time the Fourth Amendment was executed, the Petitioning Lenders sat on their hands and did not contest Yucaipa's acquisition of this debt or the Fourth Amendment (Amended Counterclaim, ¶ 92).  In addition, the Petitioning Lenders treated Yucaipa as Requisite Lender under the Fourth Amendment when it suited their own economic interests.  Yucaipa respectfully submits that to enforce retroactively the Third Amendment against Yucaipa would deprive Yucaipa of its legitimate expectations in purchasing the first lien debt it acquired pursuant to the Fourth Amendment and would result in an unjust enrichment of the other Lenders at Yucaipa's expense, a result that should not be permitted under equity and in good conscience.

Additionally, the ability of the Petitioning Lenders, along with other Lenders, to claim

Requisite Lender status would also unjustly enrich such Lenders, and for this reason, they should

now be estopped from asserting and acting upon such asserted status.  The Petitioning Lenders

acquired a minority position in the first lien debt and should not be allowed to dramatically

increase their voting rights, credit bid rights and distributions years after the fact by depriving

Yucaipa of the benefit of its bargain pursuant to the Fourth Amendment –which the Petitioning

Lenders endorsed and acquiesced to – and on which Yucaipa reasonably relied.

### III.  ARGUMENT

**A.      The First Lien Credit Documents Do Not bar Yucaipa's Amended Counterclaim**

Petitioning Lenders argue that Yucaipa's Amended Counterclaim should be dismissed

pursuant to Third Amendment § 2.7(e)'s waiver and covenant not to sue language and,

alternatively, because Section 10.6(b) of the Credit Agreement binds Yucaipa to the Third

Amendment by virtue of the consent of its "predecessors-in-interest" to that amendment.  Neither

section bars Yucaipa's claims and, therefore, the Motion should be denied.

1.    The Third Amendment Does Not Bar Yucaipa's Claims

a.    **The Fourth Amendment still remains in force because there has been no final determination that it is void or unenforceable.  Accordingly, the Third Amendment's covenant not to sue is of no force or effect at this time.**

Petitioning Lenders premise the first half of their Motion on a provision in Third

Amendment § 2.7(e), which  purportedly adds a new Section 10.6(j) to the First Lien Credit

Agreement requiring, among other things, that Yucaipa waive its claims against, and covenant

not to sue, Lenders such as Petitioning Lenders.  But, this addition to the First Lien Credit

Agreement was completely eliminated by the Fourth Amendment, and, therefore, was not part of

the Credit Agreement when Yucaipa first became a Lender.  (4A § 2.4(e).)  Thus, unless and

until the Fourth Amendment is invalidated, it remains in full force and effect, meaning the Third

Amendment's covenant not to sue is of no force or effect at this time.

While Justice Ramos stated at oral argument on Petitioning Lenders' motion for summary

judgment that he intended to grant their motion, without any discovery, Justice Ramos has not

yet issued any written decision or order stating what part or parts of the Fourth Amendment he

finds to be invalid, in whole or in part, or why.  Thus, the Fourth Amendment remains in full

force and effect because there has been no final determination that it is void or unenforceable.

Further, in the New York Action, Petitioning Lenders sought only to invalidate a single

provision of the Fourth Amendment that they contended affects Yucaipa's Requisite Lender

status, and argued from that position that the entire Fourth Amendment should be invalidated.

[Docket No. 576-20 (Petitioning Lenders' memorandum of law in support of their motion for

summary judgment in the New York action), at 17, et seq.; see also Docket No. 576-22

(Yucaipa's response thereto), at 4, 18 et seq.]  However, Petitioning Lenders failed to give

Justice Ramos the whole story; that the Fourth Amendment contains a severability clause and

that the other changes to the Credit Agreement made pursuant to the Fourth Amendment never

required unanimous lender consent . (4A, §6.2.)  Under governing New York law, the

severability clause operates to sever the supposedly offending provision from the Fourth

Amendment, while permitting the remainder of the Fourth Amendment to remain in effect –

including the provision that deleted Third Amendment § 2.7(e).  See Christian v. Christian, 42

N.Y.2d 63, 73 (N.Y. 1977) (where parties included an express severability clause within

separation agreement, the contract was "divisible, and there [was] little room for construction");

Sheridan v. Sheridan, 202 A.D.2d 749, 752 (N.Y. App. Div. 1994) (the unchallenged provisions

of a separation agreement were valid where plaintiff only challenged the financial provisions and

the agreement contained a severability clause).  Following oral argument on the summary

judgment motion, Yucaipa and Petitioning Lenders submitted letter briefs addressing the

severability issue. [*See* Docket No. 701 (Petitioning Lenders filed copies of both letters with this

Court on December 13, 2012).]

Accordingly, at this time – nearly three months after Judge Ramos said he was inclined to

rule in favor of the Petitioning Lenders on their motion for summary judgment – there has still

been no determination by Justice Ramos that the provision in the Fourth Amendment that deleted

Section 10.6(j) from the First Lien Credit Agreement added by Third Amendment § 2.7(e) is

void or unenforceable.  For that reason alone, the Petitioning Lenders' Motion premised upon

operation of Third Amendment § 2.7(e) must be denied.[4]

> **b.  Yucaipa's equitable Amended Counterclaims seek a declaration that Third Amendment provisions are not binding on Yucaipa; hence, even if the covenant not to sue might otherwise apply to the Amended Counterclaims (which it does not), its application would require a determination of the ultimate issue in this proceeding – whether the Third Amendment binds Yucaipa. Thus, the motion to dismiss should be denied as premature.**

Petitioning Lenders' Motion puts the cart before the horse in asking the Court to apply

the Third Amendment's waiver and covenant not to sue provisions before the parties have even

conducted discovery and presented evidence on Yucaipa's claims that it should not be bound by

the Third Amendment or, in the alternative, that it would be inequitable to do so.

As previously noted, when considering a motion to dismiss under Fed. R. Civ. P.

12(b)(6), the Court "must accept the plaintiff's well-pleaded allegations as true and draw all

reasonable inferences in [its] favor."  <u>Mann v. Brenner</u>, *supra*, 375 F. App'x  at 235. The

presumptively true allegations contained in Yucaipa's Amended Counterclaims are more than

---

[4]    At this point, Petitioning Lenders can only speculate about how Justice Ramos will rule and what the basis will be for his ruling.  Yucaipa reserves the right to supplement this brief assuming Justice Ramos issues a written decision before this Motion is decided.

sufficient to bar Petitioning Lenders from applying the covenant not sue, Section 2.7(e) of the Third Amendment, to dismiss Yucaipa's Amended Counterclaims.

As described in more detail above, as a consequence of a continuing deterioration of the car hauling industry, Allied's first lien Lenders continuously approached Yucaipa about acquiring their positions throughout 2008 and decided to amend the Credit Agreement to facilitate such an acquisition given the paucity of potential buyers for their debt. (Amended Counterclaim ¶¶ 54, 60)  At all times, including during its February 2009 tender offer, Yucaipa made it clear it would not acquire such debt unless the restrictions in the First Lien Credit and those imposed by the Third Amendment preventing Yucaipa from becoming the Requisite Lender were removed. (Amended Counterclaim ¶¶ 60-61) Indeed, Yucaipa expressly conditioned its tender offer for first lien debt on the passage of the Proposed Fourth Amendment which would have eliminated these restrictions.  Neither the Petitioning Lenders nor any other Lender objected to the terms of the Proposed Fourth Amendment or suggested at any time that any such amendment required unanimous Lender consent. (Amended Counterclaim ¶63)

Shortly, after ComVest acquired a majority of Allied's first lien debt and became Requisite Lender, Yucaipa and ComVest entered into negotiations for Yucaipa's purchase of ComVest's position which included, among other things, an amendment to the First Lien Credit Agreement to permit Yucaipa to acquire a majority of the first lien debt and become Requisite Lender. Petitioning Lenders and other Lenders were well aware of Yucaipa's negotiations with ComVest (which took place over a six-month period) and its desire to assume Requisite Lender status.  And, they not only failed to object to the transaction or suggest that unanimous Lender consent was required, they affirmatively encouraged Yucaipa to acquire ComVest's first lien debt and become Requisite Lender.  (Amended Counterclaim ¶¶64-65, 71-72) Moreover, they

were privy to the terms (including the purchase price Yucaipa proposed to pay to ComVest) of

the planned purchase from ComVest (having travelled to Los Angeles days before the purchase

was consummated for the sole purpose of coordinating their actions with Yucaipa with respect to

the Debtors) and promised to work with Yucaipa once the ComVest transaction was

consummated to maximize the value of the Debtors' estate for the benefit of all stakeholders.

Yucaipa relied on the lack of any objection by the Lenders and on the affirmative support

and encouragement of Petitioning Lenders in proceeding to consummate the ComVest

transaction and, accordingly, for its belief in the validity of the Fourth Amendment.  Yucaipa

would not have acquired any portion of Allied's first lien debt, much less ComVest's entire

position. if it understood any portion of the Fourth Amendment was invalid or if the Petitioning

Lenders had expressed any objection or intent to challenge the transaction. (Amended

Counterclaim. ¶¶18,70, 75)

Further, after Yucaipa purchased ComVest's Requisite Lender position following the

Fourth Amendment's enactment on August 21, 2009, Petitioning Lenders continued to discuss

potential business strategies with Yucaipa which were premised on Yucaipa's exercise of its

Requisite Lender powers, and Petitioning Lenders repeatedly expressed support for Yucaipa's

plans as Requisite Lender.  (Amended Counterclaim ¶ 8.)  From March through May, 2011,

Petitioning Lenders attempted to broker a transaction to sell Allied Holdings; a transaction which

was fully dependent on Yucaipa's ability to vote the majority of Allied Holdings' first lien debt

and exercise its Requisite Lender powers.  (Id.)  Indeed, Petitioning Lenders' plan depended on

Yucaipa's Requisite Lender status to fulfill the Petitioning Lenders' own business objectives.

(Id.)  (See also, e.g., Amended Counterclaim ¶¶ 3, 6, 18, 27, 65, 75, 93, 94, Counts I-III.)

As a consequence of Petitioning Lenders' misconduct, which must be accepted as true for the purposes of this Motion, Yucaipa would be entitled to declaratory and other relief determining that Petitioning Lenders cannot enforce certain Third Amendment provisions against Yucaipa.  (Id.)  Indeed, Petitioning Lenders have not challenged these claims in the Motion, implicitly conceding that Yucaipa's Amended Counterclaim validly states claims for the relief Yucaipa seeks.

In sum, in order to grant Petitioning Lenders' Motion and apply Section 2.7(e) of the Third Amendment, the Court would need to determine in the first instance, while assuming Yucaipa's allegations to be true, that Yucaipa's equitable claims lack merit on their face – a proposition that Petitioning Lenders do not and cannot not genuinely assert.[5]

> c.  **The covenant not to sue is unenforceable because Yucaipa was improperly induced to acquire Allied first lien debt by Petitioning Lenders.**

Covenants not to sue, releases of claims and other liability limiting clauses are unenforceable as a matter of law where, as here, they are improperly procured.  As even Petitioning Lenders acknowledge, Yucaipa can only be bound by the covenant not to sue in Section 2.7(e) of the Third Amendment because of its status as a "Restricted Sponsor Affiliate" Lender.  But as alleged in its Amended Counterclaims and as summarized above, Yucaipa only became a Lender as a consequence of the ComVest transaction which the Petitioning Lenders affirmatively endorsed and encouraged Yucaipa to pursue.  The law does not allow Petitioning Lenders to deceive Yucaipa as to their intentions, encourage Yucaipa to acquire ComVest's Requisite Lender position and lead Yucaipa to believe that the Fourth Amendment was valid, only to subsequently challenge the validity of the Fourth Amendment (in secret communications

---

[5]  To the extent a specific reference to Section 2.7(e) of the Third Amendment is required in Yucaipa's declaratory relief claim to determine its unenforceability, Yucaipa hereby seeks leave to amend the declaratory relief claim for that purpose.

with their agent, CIT) and seek to bind Yucaipa to certain restrictions imposed by the Third

Amendment when Petitioning Lenders were fully aware that Yucaipa had refused to acquire

Allied debt subject those restrictions – and then, further still, argue that Yucaipa is barred from

challenging the Petitioning Lenders' misleading conduct by the very terms of the Third

Amendment which Yucaipa had previously refused to accept.  Simply put, Petitioning Lenders

attempt to benefit from their wrongdoing should be rejected.

The case law is legion around the country, that a party cannot rely on a covenant not to

sue, release or other similar liability limiting clauses to bar a lawsuit where the covenant was

procured by misconduct.  See e.g. Turkish v. Kasenetz, 27 F. 3d, 23, 27-28 (2d Cir. 1994) ("[it]

is well settled that parties cannot use contractual limitation of liability clauses to shield

themselves from liability for their own fraudulent conduct."); Koch v. Greenberg, 2011 U.S. Dist

LEXIS 144605 at p. 21 (S.D.N.Y. 2012) (same); Litinov v. Hodson, 905 N.Y.S. 2d 400, 401, 74

A.D. 3d 1884, 1885 (NY App. Div. 2010))(a release can be set aside if procured by illegality,

fraud or mutual mistake); American Life Ins. Co. v. Parra, 25 F. Supp. 2d 467, 478 (D. Del.

1998) ("Delaware law recognizes a release may be voidable if obtained through fraud or

misrepresentation.")

Accordingly, since Yucaipa essentially alleges that its status as a Lender was the direct

consequence of the Petitioning Lenders' improper inducement, Petitioning Lenders cannot rely

on Yucaipa's Lender status and the covenant not to sue added to the First Lien Credit Agreement

by Section 2.7(e) of the Third Amendment to avoid Yucaipa's claims.

> d. **Covenants not to sue are ineffective when relied upon to insulate a party from its own willful or intentional misconduct, such as the wrongful conduct Yucaipa alleges against Petitioning Lenders.**

Putting the inducement issue aside, at the motion to dismiss stage, the Court should

nevertheless deny Petitioning Lenders' insistence on applying the covenant not to sue added by

Third Amendment § 2.7(e) to bar Yucaipa's claims because Petitioning Lenders seek to use it to exculpate themselves from their own intentional, willful and deceptive misconduct.

Exculpatory agreements or covenants not to sue "are ineffective to insulate the releasee from intentional, willful or grossly negligent acts." Great N. Assocs., Inc. v. Cont'l Cas. Co., 192 A.D.2d 976, 977-78 (N.Y. App. Div. 1993) (holding that "[i]nasmuch as all of the 13 causes of action interposed by plaintiff against Rose & Kiernan allege intentional wrongdoing, willful, malicious and fraudulent acts, the release clearly is ineffective to insulate [defendant] from liability."); see also Sommer v. Federal Signal Corp., 79 N.Y.2d 540, 553-554 (N.Y. 1992) (exculpatory clauses are unenforceable to insulate a party from its allegedly grossly negligent conduct). Similarly, the Delaware Supreme Court has recognized that "Courts overwhelmingly reject attempts to limit liability either by contract or by tariff for gross negligence, willful misconduct, and fraud." Brown v. United Water Del., Inc., 3 A.3d 253, 256 (Del. 2010) (citation omitted). Indeed, "covenants not to sue, when considered purely defensively, are narrowly construed because they have the effect of exculpating a party from its own wrongdoing." Collins & Aikman Products Co. v. Sermatech Eng'g Group, Inc., 297 A.D.2d 248, 249-50 (N.Y. App. Div. 2002) (citation omitted).[6] Covenants not to sue "are not looked upon with favor by the courts, are strictly construed against the party relying on them, and clear and explicit language in the agreements is required in order to absolve the promisee from liability." Kaufman v. Am. Youth Hostels, Inc., 6 A.D.2d 223, 229 (N.Y. App. Div. 1958).

Here, Petitioning Lenders seek not only to shield themselves from the consequences of their own intentional misconduct, but also to thereby wrongfully and unjustly enrich themselves.

---

[6]    Petitioning Lenders concede that New York law governs the substance and interpretation of the Credit Agreement based on its choice of law clause. (Motion at 12 (citing to CA § 10.14).)

The primary purpose of a covenant not to sue "is to serve as a shield rather than a sword."

Artvale, Inc. v. Rugby Fabrics Corp., 363 F.2d 1002, 1008 (2d Cir. 1966) (applying New York

law).  Contrary to this purpose, Petitioning Lenders seek to use the covenant as a sword – to

grant themselves a financial windfall by seeking to invalidate the Fourth Amendment after

giving false assurances to Yucaipa that they supported the Fourth Amendment (which deleted the

covenant) and which Yucaipa relied on in acquiring Allied Holdings' debt.

Because Petitioning Lenders seek to shield their duplicitous behavior by the covenant not

to sue contained in an agreement (the Third Amendment) which Yucaipa never signed and to

which Yucaipa specially refused to be bound, the covenant not to sue should not be enforced at

this stage and, therefore, the Petitioning Lenders' Motion should be denied.

2. Yucaipa's Claims Are Permitted Under The Express Exception In Third Amendment § 2.7(e) and the Petitioning Lenders Intentionally Seek to Mislead this Court by Failing to Quote the Provision in its Entirety.

The Petitioning Lenders omit from their citations and discussion crucial limiting

language contained in § 2.7(e) which necessarily compels the denial of the Motion.  While

Petitioning Lenders purport to quote the covenant not to sue, they failed to quote critical

language from the Court which undermines the very essence of their argument.

Petitioning Lenders twice quote for the Court the text of § 2.7(e), as follows:

> To the fullest extent permitted by applicable law, no Restricted Sponsor Affiliate [Yucaipa] shall assert, and each Restricted Sponsor Affiliate immediately and automatically upon becoming a Lender, hereby irrevocably (i) waives, any claim or cause of action against any Lender, any Agent and their respective Affiliates, directors, employees, attorneys, agents or subagents (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement or otherwise) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event

> occurring in connection therewith . . . (ii) waives, releases and agrees not to sue upon any such claim or any such cause of action, whether or not accrued and whether or not known or suspected to exist in its favor and (iii) waives any claim or cause of action against any Agent or any Lender and their respective Affiliates, directors, employees, attorneys, agents or sub-agents on any theory of liability for special, indirect, consequential or punitive damages . . .

(Motion at 7-8, 13 (movants' emphasis deleted).)  Yet, nowhere in the Motion will the Court find the following words – words that Petitioning Lenders deleted by inserting an ellipsis at the end of sub-clause (i):

> . . . *except to the extent caused by such Lender's* or Agent's gross negligence or *willful misconduct on or after the date [Yucaipa] becomes a Lender* hereunder as determined by a court of competent jurisdiction by final and non-appealable judgment . . .

(Third Amendment, § 2.7(e) (emphasis supplied).)

As discussed above, Yucaipa alleges in its Amended Counterclaims that Petitioning Lenders misled and induced Yucaipa to rely on the validity of the Fourth Amendment and proceed to acquire ComVest's first lien debt and assume Requisite Lender status.  And, as Yucaipa has alleged, after Yucaipa acquired ComVest's position, the Petitioning Lenders continued to mislead Yucaipa into believing they were fully supportive of Yucaipa's position and its efforts create value for Allied's stakeholders.  Such deception is quintessential "intentional and willful misconduct" which is expressly excepted from the scope of the covenant not to sue.  (E.g., Amended Counterclaim ¶¶ 3, 8, 65, 82, 92, 94, Counts I-III.)

In summary, accepting Yucaipa's well-pleaded allegations as true, as the Court must on this Motion, Petitioning Lenders' intentional and willful misconduct as pled in the Amended Counterclaim compels denial of the Motion because, by its term, the covenant not to sue

contained in Section 2.7(e) of the Third Amendment does not bar Yucaipa's Amended

Counterclaims in this case.[7]

    3.  <u>Credit Agreement § 10.6(b) Does Not Bar Yucaipa's Claims.</u>

Petitioning Lenders next argue that Yucaipa may not sue to invalidate parts of the Third

Amendment based on Section 10(b) of the Credit Agreement which provides that "[a]ny request,

authority or consent of any Person who, at the time of making such request or giving such

authority or consent, is listed in the Register as a Lender shall be conclusive and binding on any

subsequent holder, assignee or transferee  . . . ."  Based on this provision, Petitioning Lenders

claim that the consent to the Third Amendment by Yucaipa's predecessors-in-interest to the

Allied first lien debt acquired from ComVest is binding on Yucaipa.  Petitioning Lenders'

reliance on this provision fails for several reasons.

First, once again, Petitioning Lenders seek to bind Yucaipa, as ComVest's assignee, to

the Third Amendment, through a provision in the Credit Agreement, while ignoring the

allegations, which must be accepted as true, that Yucaipa never would have acquired ComVest's

position in the first place but for the misconduct of the Petitioning Lenders.  For the reasons

discussed above, this they cannot do – at least not on a motion to dismiss.

Second, Yucaipa alleges, in the alternative, that certain Third Amendment sections are

not enforceable because they were not validly enacted pursuant to the terms of Credit Agreement

---

[7]    In the alternative, Section 2.7(e)'s exception is ambiguous, and parol evidence precluding the grant of this motion to dismiss is required to determine the parties' intent.  Indeed, under Petitioning Lenders' view of Section 2.7(e)'s language, the covenant would bar Yucaipa from seeking the very judicial determination <u>required</u> to trigger the covenant's exception: a "final and non-appealable judgment" from "a court of competent jurisdiction" as to whether Petitioning Lenders acted with "gross negligence or willful misconduct."  <u>See Dubovsky & Sons, Inc. v. Honeywell, Inc.,</u> 454 N.Y.S.2d 329, 331 (N.Y. App. Div. 1982) (stating that exculpatory language must be "expressed in sufficiently clear, unequivocal and unmistakable language.)

§ 10.5 specifying the required level of Lender consent.  (E.g., Amended Counterclaim ¶ 108.)

Credit Agreement § 10.5(d) states: "Any amendment, modification, termination, waiver or

consent effected in accordance with this Section 10.5 shall be binding upon each Lender at the

time outstanding, each future Lender and, if signed by a Credit Party, on such Credit Party."

(Emphasis added.)  Both this Section 10.5(d) and Section 10.6(b), relied on by Petitioning

Lenders, relate to when predecessor Lenders' consent can bind subsequent Lenders, but Section

10.5(d) more specifically governs Lenders' consent to amendments to the Credit Agreement

under Section 10.5 – exactly the type of consent at issue in Petitioning Lenders' Motion.  (See

Motion at 15.)  Under New York law, the more specific language of Section 10.5(d) controls

over the more general language of Section 10.6(b).  Muzak Corp. v. Hotel Taft Corp., 1 N.Y.2d

42, 46 (N.Y. 1956) ("Even if there was an inconsistency between a specific provision and a

general provision of a contract (we find none), the specific provision controls."); DeWitt v.

DeWitt, 62 A.D.3d 744, 745 (N.Y. App. Div. 2009) (specific provision controls over general

provision).  Because Yucaipa contends that the relevant portions of the Third Amendment were

not "effected in accordance with this Section 10.5," for purposes of the Motion, Section 10.5(d)'s

express exclusion applies and Yucaipa is not bound by any predecessor Lender's consent to the

Third Amendment.

Finally, Petitioning Lenders completely misconstrue Yucaipa's argument in their attempt

to apply Section 10.6(b).  Petitioning Lenders argue based on Section 10.6(b) that "Yucaipa

cannot undo the consents and authorizations to the Third Amendment given by Lenders that held

Commitments, LC Deposits or Loans now held by Yucaipa."  (Motion at 15.)[8]  But Yucaipa's

---

[8]    Petitioning Lenders' argument under Section 10.6(b) requires an interpretation of the terms
"consent" and "binding" that Yucaipa contends is unsupported.  To the extent Petitioning
Lenders' argument may be credited, it evidences the ambiguous nature of those terms under

Amended Counterclaim does not attempt to "undo" any predecessor Lender's consent to the

Third Amendment.  Rather, Yucaipa challenges the enforceability of portions of the Third

Amendment itself based on the equitable and other grounds set forth in the Amended

Counterclaim.  Thus, Section 10.6(b) is simply inapplicable to Yucaipa's claims.

**B.    Yucaipa's Declaratory Judgment Claim Was Timely Filed[9]**

Yucaipa's declaratory judgment claim is timely under either Delaware's three-year

limitations period or New York's six-year limitations period for the simple reason that any

claims by Yucaipa concerning the validity and application of the Third Amendment could not

have accrued until November 19, 2012, at the earliest, when Justice Ramos orally advised that he

intended to grant Petitioning Lenders' some unspecified relief on their summary judgment

motion.[10]  Until then, the Fourth Amendment, which had eliminated the provisions of the Third

Amendment which the Petitioning Lenders now seek to enforce, indisputably was still in effect

(as it is now).  Indeed, it would have made no sense for Yucaipa to bring an action seeking to

estop anyone Lender from imposing the Third Amendment restrictions on Yucaipa's first lien

debt or bring an action to declare portions of the Third Amendment inapplicable to Yucaipa

when the Fourth Amendment still controlled the parties' relationship.  Accordingly, Yucaipa's

---

Section 10.6(b), and thus parol evidence precluding the grant of this Motion is required to determine the parties' intent.

[9]    Petitioning Lenders assert only that Yucaipa's declaratory judgment claim is barred by Delaware's three-year statute of limitations.  (See Motion at 15-16 Thus, even if Petitioning Lenders were correct (they are not), Yucaipa could proceed on its remaining claims for unjust enrichment, estoppel and injunctive relief.

[10]    Although Justice Ramos has yet to issue a formal written ruling with the force of law, Justice Ramos' statements at the November 19, 2012 hearing indicate that he intends to find at least some portion of the Fourth Amendment unenforceable, such that there is a dispute ripe for determination by this Court.  See Moore Corp. v. Wallace Comp. Servs., Inc., 898 F. Supp. 1089, 1095 (D. Del. 1995) (finding issuance of a declaratory judgment warranted where the probability of future event occurring is of sufficient immediacy and reality).

claims – brought two weeks after Justice Ramos's statement – are within any applicable limitations period.[11]

In any event, New York's six-year limitations period applies to Yucaipa's claims. Yucaipa did not forum shop to secure a longer limitations period for its claims, so Delaware's borrowing statute does not require the application of Delaware's shorter limitations period. New York's statute of limitations also applies because Yucaipa's claims arose in New York and concern a contract with a New York choice of law provision, and the only connection this action has to Delaware is that it is the location in which the Petitioning Lenders chose to file this involuntary proceeding.

1.  Yucaipa's Declaratory Judgment Action Did Not Accrue in April 2008.

Petitioning Lenders first assert that Yucaipa's declaratory judgment claim accrued when the Third Amendment was enacted in April 2008 and then argue that the Delaware three year limitations period for breach of contract bars Yucaipa's claim. (Motion at 18-19)  This argument is simply without merit.  Yucaipa was not a Lender at the time of the Third Amendment's enactment, did not sign the Third Amendment and did not acquire any first lien debt under the Third Amendment.  Accordingly, Yucaipa would not have had standing to bring any claim in

---

[11]    Under any hypothesis, these claims will be litigated because they are a set off or recoupment in response to Petitioning Lenders' recent equitable subordination complaint. Yucaipa can assert such claims as defenses whether or not they would be timely as direct claims. N.Y. C.P.L.R. 203(d) ("if the defense or counterclaim arose from the transactions, occurrences, or series of transactions or occurrences, upon which a claim asserted in the complaint depends, it is not barred to the extent of the demand in the complaint notwithstanding that it was barred at the time the claims asserted in the complaint were interposed."); PNC Bank v. Turner, 659 A.2d 222, 225 (Del. Super. Ct. 1995) ("the underlying policy of the statute of limitations is not promoted by suppressing a valid defense arising out of a transaction.  The purpose of statutes of limitation is to bar actions and not to deny matters of defense.  As a general rule, such statutes are not applicable to defenses, but only where affirmative relief is sought." (citations omitted)).

2008 challenging the applicability or validity of Third Amendment provisions to a first lien debt position which Yucaipa had yet to acquire.

Anticipating this argument, Petitioning Lenders assert that "once Yucaipa was assigned debt under the First Lien Facility, it stood in the shoes of its predecessors-in-interest with respect to any challenges that could have been interposed" and, therefore, since Yucaipa's predecessors had standing to challenge the Third Amendment Yucaipa's declaratory relief claim accrued at that time. (Motion at 19-20) This argument erroneously assumes, however, that Yucaipa's predecessors-in-interest themselves had standing to challenge the provisions of the Third Amendment which Petitioning Lenders seek to apply to Yucaipa. But, of course, they did not.

The provisions which Petitioning Lenders now seek to apply to Yucaipa (limitations on the amount of first lien debt Yucaipa could acquire, the requirement that Yucaipa contribute 50% of acquired first lien debt to equity and restrictions on Yucaipa's voting rights), were designed to apply <u>only to Yucaipa</u>; they did not apply to any other Lender including Yucaipa's so-called predecessors-in-interest. [12]

---

[12] Even if Delaware's three-year statute of limitations applies (which, for reasons stated below, it should not), and even if Yucaipa's claim accrued when the Third Amendment was executed (which, as explained above, it did not), Yucaipa's Amended Counterclaim is nevertheless timely because the statute of limitations was tolled during the time that the Third Amendment's relevant terms were inoperative and unenforceable.

"The Supreme Court has long recognized that bankruptcy courts are equitable tribunals that apply equitable principles in the administration of bankruptcy proceedings." <u>Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery</u>, 330 F.3d 548, 567 (3d Cir. 2003). As such, bankruptcy courts can equitably toll statutes of limitation, on a case-by-case basis, to prevent inequity. <u>Smith v. Equicredit Corp.</u>, 2002 U.S. Dist. LEXIS 19395, at *11 (E.D. Pa. Oct. 3, 2002).

The Third Amendment was enacted on April 17, 2008. The Fourth Amendment was enacted 16 months later, on August 21, 2009. Thus, when the Fourth Amendment was passed, only 16 months of the applicable limitations period, at most, had run on claims concerning the validity or applicability of the Third Amendment to Yucaipa's first lien debt position. While the Fourth Amendment was in place, no claim could have been brought

In short, Petitioning Lenders' argument that Yucaipa's declaratory relief claim accrued in April 2008, 16 months before it event became a first lien debt holder, is devoid of merit. [13]

2. Yucaipa's Declaratory Judgment Action Did Not Accrue Until The New York Court's Colloquy At The Conclusion Of The New York Motion for Summary Judgment Hearing.

Under both New York and Delaware law,[14] Yucaipa's declaratory action did not accrue prior to the existence of a "justiciable controversy" (i.e. an actual controversy between genuine disputants with a stake in the outcome). Long Island Lighting Co. v. Allianz Underwriters Ins. Co., 35 A.D.3d 253, 253 (N.Y. App. Div. 2006); Moore Corp. v. Wallace Comp. Servs., Inc., 898 F. Supp. 1089, 1094 (D. Del. 1995). In addition, the controversy must involve some present prejudice to the plaintiff. See Town of Islip v. Zalak, 165 A.D.2d 83, 95 (N.Y. App. Div. 1991)

---

because the provisions of the Third Amendment at issue were eliminated. Thus, it was only at the point when Justice Ramos made his oral statement regarding his intention to grant Petitioning Lenders' summary judgment motion, that any claim regarding the enforceability or applicability of those Third Amendment provisions again became ripe – assuming arguendo it had been ripe before the Fourth Amendment was passed. At that point, there remained at least an additional 20 months for Yucaipa to assert claims concerning the Third Amendment's validity (even assuming Delaware 3-year statutory period applies). See Smith, 2002 U.S. Dist. LEXIS 19395, at *15-18; see also Shockley v. Minner, 2008 U.S. Dist. LEXIS 52596, at *10-11 (D. Del. July 10, 2008) (finding allegations sufficient to invoke doctrine of equitable tolling where defendants "misled [plaintiff] into thinking that the allegedly illegal employment action was taken for valid, non-actionable reasons").

Accordingly, regardless of the statute of limitations applied, Yucaipa's claim is timely because the statute of limitations should be deemed tolled during the time that the Third Amendment's relevant terms were inoperative and unenforceable.

[13]  Petitioning Lenders argue that Yucaipa's claim accrued when the Third Amendment went into effect because "Yucaipa alleges that the provisions of the Third Amendment restricting its ability to buy debt and vote debt were void ab initio." (Motion at 18.) However, regardless of whether the Third Amendment was validly approved, Yucaipa's claim seeking a declaration as to the validity and applicability of certain provisions of the Third Amendment did not accrue until Justice Ramos made his oral statement regarding his intention to invalidate the Fourth Amendment. Until then, the validity and applicability of these Third Amendment provisions was not relevant to Yucaipa.

[14]  Delaware federal courts apply the Declaratory Judgment Act, which requires that there be a "case of actual controversy" before a court to declare the rights and other legal relations of interested parties seeking a declaration. 28 USC § 2201.

(no lack of justiciable controversy where plaintiff sought a declaration that a land use law was invalid until plaintiff's permit application was formally denied).  Here, no justiciable controversy concerning the effect of the Third Amendment's limitations on Yucaipa's ability to hold first lien debt existed prior to Justice Ramos's statements; until then, no issue existed regarding the potential applicability of these provisions of the Third Amendment to Yucaipa's first lien debt position.  Accordingly, Yucaipa's cause of action did not accrue until, at the earliest, November 19, 2012 – only weeks before the Amended Counterclaim was interposed – and thus timely – under both New York and  Delaware law.[15]

Nor did Yucaipa's acquisition of Allied Holdings' first lien debt in August 2009 give rise to a justiciable controversy.  Yucaipa did not become a first lien Lender under the Credit Agreement until it acquired ComVest's position following the passage of the Fourth Amendment, <u>which stripped away the very portions of the Third Amendment Yucaipa now seeks to have declared invalid or unenforceable</u>.  Further, CIT even recorded Yucaipa's purchase of the ComVest position on the claim register it maintained as agent under the First Lien Credit Agreement.  Those Third Amendment provisions did not even arguably affect Yucaipa until Justice Ramos' colloquy on November 19, 2012.   Thus, when Yucaipa became a party to the Credit Agreement, there existed no case or controversy concerning the enforceability of those provisions of the Third Amendment.  <u>Moore Corp.</u>, 898 F. Supp. at 1094 (the difference between a hypothetical question and an actual controversy is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal

---

[15]   Yucaipa's action for declaratory judgment expressly states that it is based on the assumption, "*arguendo*, [Justice Ramos rules] that the Fourth Amendment's provisions are invalid," and that it is only under that circumstance that Yucaipa would be seeking a declaration concerning the enforceability and applicability of certain Third Amendment provisions.  (Amended Counterclaim, ¶ 108.)

interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment). Any declaratory action brought by Yucaipa before November 19, 2012 concerning the Third Amendment would have been premature for the reasons discussed above.[16]

One might argue that the statute of limitations may have accrued and begun to run for a few months in the late fall of 2009 when CIT, as Administrative Agent for the Lenders, refused to recognize the validity of the Fourth Amendment and refused to recognize Yucaipa as Requisite Lender. Even if that were the case, the limitations period would have been tolled during the two year period the Georgia Action was pending – particularly since, during that same period, the Petitioning Lenders worked with Yucaipa to develop various strategies for Allied which relied on Yucaipa's status as Requisite Lender. Once, the Georgia Action was settled, there was no dispute concerning the validity of the Fourth Amendment (and indirectly, the potential applicability of the Third Amendment) until the Petitioning Lenders filed the Complaint in the New York Action in January 2012. And, the Amended Counterclaims in this case were initially filed in December 2012 – only eleven (11) months later.

Thus, giving Petitioning Lenders every benefit of the doubt, the declaratory relief claim may have accrued in the fall of 2009, been tolled for the two plus year pendency of the Georgia action, and began to run again in January 2012. But, that means the claim may have been ripe to pursue for only slightly more than one (1) year – which means Yucaipa filed its Amended

---

[16]     Even had Yucaipa known or considered that the Fourth Amendment might later be challenged as being invalid, mere knowledge that one's rights may be in dispute at some indeterminate point in the future is insufficient to begin the running of the statute of limitations for a declaratory judgment. See Charney v. North Jersey Trading Corp., 172 A.D.2d 390, 390 (N.Y. App. Div. 1991) (rejecting the contention that a cause of action for a declaratory judgment accrues at the moment the party learns their rights might be in dispute).

Counterclaim with nearly two (2) years to spare assuming, for the sake of argument only, that the three (3) year Delaware statute of limitations applies.

Accordingly, it is clear that Yucaipa timely commenced its Amended Counterclaims within any applicable statutory period, be it six years or three years.

3.  New York's Six-Year Statute of Limitations Applies to Yucaipa's Amended Counterclaim.

Petitioning Lenders contend that Delaware's choice-of-law rules provide that the law of the forum, in this case Delaware, generally determines whether an action is barred by the statute of limitations and, therefore, that Delaware's shorter limitations period applies. (Motion 16-17) Petitioning Lenders' analysis fundamentally misunderstands the policies underlying the borrowing statute, and thereby reaches an erroneous result.

The Delaware borrowing statute (10 Del. C.§ 8121) does not apply to Yucaipa's claims because the purpose of Delaware's borrowing statute – to preclude parties from forum shopping in Delaware for a longer limitations period – has no applicability here.  As the Supreme Court of Delaware recognized in Saudi Basic Indus. Corp. v. Mobil Yanbu Petrochemical Co. Inc., 866 A.2d 1, 16 (Del. 2005), the borrowing statute does not operate to impose the shorter limitations period (as between Delaware and where the cause of action arose) unless the plaintiff brought the claim in Delaware in an attempt to obtain a longer limitations period.  That is the converse of the facts here; Petitioning Lenders are the parties that shopped for this forum and now seek to impose the a shorter limitations period.  Accordingly, once the borrowing statute argument has been dispensed with, the Court properly should apply New York's limitations period  under the "most significant relationship" test because the only connection Delaware has to Yucaipa's compulsory Counterclaim and Cross-Claim is that Petitioning Lenders chose to file and maintain this involuntary bankruptcy in this forum over the Debtor's objection.

a.    **The purpose of the borrowing statute is to prevent forum shopping**.

The Delaware Supreme Court has stated the purpose of Delaware's borrowing statute is to prevent a party from shopping for a forum with a longer statute of limitations period – "to prevent the plaintiff from circumventing the shorter limitations period mandated by the jurisdiction where the cause of action arose." Saudi Basic Indus. Corp., 866 A.2d 1 at 16-17 (applying Saudi Arabia's longer statute of limitations where applying the borrowing statute "would subvert the statute's fundamental purpose, by enabling [appellant] to prevail on a limitations defense that would never have been available to it had the overcharge claims been brought in the jurisdiction where the cause of action arose").  The Delaware Bankruptcy court has recognized that "[s]imilar rationales apply when debtors file for bankruptcy in Delaware." Youkelsone v. Washington Mutual, Inc. (In re Washington Mutual, Inc.), Adv. No. 09-50039 (MFW), 2010 Bankr. LEXIS 2453, at *12-14 (Bankr. D. Del. Aug. 13, 2010) (the borrowing statute "will not be applied to permit a party to take advantage of Delaware's shorter limitations period, as this 'would basically turn the borrowing statute on its head for the purpose for which it was enacted'").  As the Court in In re Washington Mutual, recognized  the debtor "chose Delaware as the forum in which creditors must bring all of their claims" and that to allow the debtor "to use the benefit of Delaware's shorter limitations period would subvert the anti-forum-shopping purpose of the borrowing statute." Id.  The rationales of Saudi Basic and In re Washington Mutual are apposite to our facts and mandate that New York's six-year statute governs Yucaipa's claims.

Simply put, the Delaware borrowing statute warrants no application here.  Yucaipa did not choose Delaware as the forum where its claims would be heard.  Rather, it was Petitioning Lenders who filed the involuntary Chapter 11 petition against Allied Holdings in this Court.

Allied Holdings attempted to move the bankruptcy to Georgia, which Petitioning Lenders opposed.  [Docket Nos. 29 (Allied's motion to change venue); 50 (Petitioning Lenders' objection).]  It was Allied Holdings that brought this adversary proceeding which sought "to determine the validity and legal effect of the Third and Fourth Amendments to the First Lien Loan Agreement and related agreements."  (Allied Compl. at 2).  As part of its compulsory counterclaims and cross-claims concerning the validity of the Third Amendment, Yucaipa was compelled to bring its claim for declaratory relief in this Court.  Mott v. State, 49 A.3d 1186, 1189 (Del. 2012) (finding that, because plaintiff failed to file a compulsory counterclaim in a prior action, the claim was barred).

Petitioning Lenders, like the plaintiffs in Saudi Basic, should not get the benefit of using their chosen forum to shorten the time in which Yucaipa could bring its claims.  Thus, Delaware's borrowing statute does not apply to Yucaipa's claim.[17]  In re Washington Mutual, Inc., 2010 Bankr. LEXIS 2453, at *12-14.

> b.  **Under Delaware's choice of law provision, New York's six-year statute of limitations applies to Yucaipa's claim.**

Because Delaware's borrowing statute does not apply, and because Yucaipa's cause of action arose outside Delaware, this Court should apply the "most significant relationship test" to determine which limitations period to apply.  In re Washington Mutual, Inc., 2010 Bankr. LEXIS 2453, at *14-15.  Under that analysis, New York clearly has a more significant relationship to the Amended Counterclaim than does Delaware.  Significantly, the parties chose the law of New York, not Delaware, to govern the First Lien Credit Agreement and the Third Amendment.  The parties' claims here arose as a direct result of a ruling by the New York Supreme Court – the

---

[17]  Accordingly, Winstar Commc'ns v. Blackstone Grp., L.P., (In re Winstar Commc'ns, Inc.), 435 B.R. 33, (Bankr. D. Del. 2010), where the claims at issue "'arose in' the [prior] bankruptcy case" in Delaware, is inapposite.  There is no such connection to Delaware here.

Court in which the Petitioning Lenders chose to challenge Yucaipa's Requisite Lender status. Further, none of the parties to this action has its principal place of business in Delaware.  Allied Holdings' principal place of business is in Atlanta, Georgia, Yucaipa's is in California, Black Diamond's is in Connecticut, and Spectrum's is in New York.  (Allied's Complaint [Docket No. 535], at 1 n.1; Amended Counterclaim, ¶¶ 33-34; Petitioning Lenders' Complaint [Docket No. 817], ¶¶ 15-17.)  The only connections between this action and Delaware are that certain of the parties to this action are Delaware partnerships or corporations, and that the Petitioning Lenders chose to file the involuntary Chapter 11 petition and, over the Debtors' objection, in Delaware. In re Washington Mutual, Inc., 2010 Bankr. LEXIS 2453, at *16 (applying New York law where the only relevant contact with Delaware was the bankruptcy case).  Accordingly, New York's six-year statute of limitations applies to Yucaipa's claim.

## IV.  CONCLUSION

For the reasons set forth above, the Yucaipa Counterclaim and Cross-Claim Plaintiffs respectfully request that the Petitioning Lenders' Motion to Dismiss be denied.

Dated: February 13, 2013      Respectfully submitted,
      Wilmington, Delaware

YOUNG, CONAWAY, STARGATT &
   TAYLOR, LLP

/s/  Donald J. Bowman, Jr.
John T. Dorsey, Esquire (No. 2988)
Michael R. Nestor (No. 3526)
Donald J. Bowman, Jr. (No. 4383)
Rodney Square
1000 North King Street
Wilmington, DE  19801
Telephone: (302) 571-6600
mnestor@ycst.com

- and -

01:13294116.1

39

KASOWITZ, BENSON, TORRES &
    FRIEDMAN LLP

David E. Ross
David E. Spalten
Adam K. Grant
1633 Broadway
New York, New York 10019 Phone:
(212) 506-1700
DRoss@kasowitz.com

   - and -

LATHAM & WATKINS, LLP

Russell F. Sauer, Jr.
Robert A. Klyman
Ted. A. Dillman
355 S. Grand Ave.
Los Angeles, CA 90071
Phone: (213) 485-1234
russ.sauer@lw.com
Robert.klyman@lw.com

*Attorneys for Yucaipa*