**<u>EXHIBIT E</u>**

Case 12-50947-CSS   Doc 117-5   Filed 02/21/13   Page 2 of 33

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

-------------------------------------------------------------------X

BDCM OPPORTUNITY FUND II, LP,         :

BLACK DIAMOND CLO 2005-1 LTD      :     Hon. Charles E. Ramos

SPECTRUM INVESTMENT PARTNERS,    :

L.P.,                                    :     Motion Seq. No. 3

                                        :

                 Plaintiffs,          :     Index No. 650150/2012

                                        :

            -against-               :

                                        :

YUCAIPA AMERICAN ALLIANCE FUND    :

I, LP, and YUCAIPA AMERICAN           :

ALLIANCE (PARALLEL) FUND I, LP       :

                                        :

                Defendants.         :

-------------------------------------------------------------------X

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP

David E. Ross
David E. Spalten
Adam K. Grant
Marissa E. Teicher
1633 Broadway
New York, New York 10019
(212) 506-1700

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ............................................................................... iii

PRELIMINARY STATEMENT .......................................................................... 1

STATEMENT OF FACTS ................................................................................. 4

I.  The Credit Agreement's Original Terms Did Not Allow A Sponsor To Also Be A Lender ................................................................................................ 5

II.  The Third Amendment Gave Sponsor Yucaipa The Right To Become A Lender ........... 5

III.  Plaintiffs Were Aware Of, And Did Not Protest, Yucaipa's Efforts To Become Requisite Lender ........................................................................................ 6

IV.  The Fourth Amendment Allowed Yucaipa To Become Requisite Lender ..................... 6

V.  The Georgia Action Was Litigated By Plaintiffs' Admitted Agent, CIT ..................... 7

VI.  Plaintiffs Fail To Challenge The Georgia Dismissal, And Instead File This Lawsuit ................................................................................................. 8

ARGUMENT .................................................................................................. 8

I.  With No Discovery Yet Taken, Including On Defendants' Potentially Dispositive Affirmative Defenses, The Motion Is Premature And Must Be Denied ...................... 8

    A.  As This Court Previously Determined, Discovery is Necessary on Defendants' Res Judicata Defense ................................................................ 9

        i.  Discovery is Necessary Concerning the Agency Issue ........................... 11

        ii.  This Court Also Has Determined That There Are Fact Questions Whether The Georgia Settlement Agreement Is Binding On Plaintiffs, And Thus Bars This Action On Res Judicata Grounds ........... 13

    B.  Discovery is Also Necessary on Defendants' Potentially Dispositive Waiver and Estoppel Defenses ........................................................... 16

II.  Plaintiffs' Reading Of The Agreement Violates Fundamental Rules Of Contract Construction; The Motion Must Be Denied Because Plaintiffs Cannot Show The Absence Of Material Issues Of Fact Nor A Right To Judgment As A Matter Of Law ................................................................................................... 17

    A.  Plaintiffs' Construction Is Contrary To The Agreement's Express Terms .......... 18

i.      The Doctrine of "Expressio Unius" Demonstrates Plaintiffs Are
        Not Entitled to Summary Judgment as a Matter of Law ........................18

ii.     Changing the Definition of TLE Did Not Change the Definition of
        Requisite Lender ...................................................................................20

iii.    Plaintiffs Cannot Show the Change to the Definition of TLE In the
        Fourth Amendment Changed the Definition of Requisite Lender ..........21

iv.     The Intent of the Credit Agreement Was Never to Prevent Yucaipa
        From Becoming Requisite Lender .........................................................22

III.    Under Any Reading Of The Agreement, Plaintiffs Cannot Show They Are
        Entitled To The Declaration They Seek .......................................................23

CONCLUSION.................................................................................................................25

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

C<span style="font-variant:small-caps">ASES</span>

1009 Second Ave. Assocs. v. New York City Off-Track Betting Corp.,
    248 A.D.2d 106 (1st Dep't 1998)...........................................................................................19

335 Second St. Hous. Corp. v. Fridal Enters., Inc.,
    36 A.D.3d 608 (2d Dep't 2007) .......................................................................................3, 16

Amico v. Melville Volunteer Fire Co.,
    39 A.D.3d 784 (2d Dep't 2007) ...........................................................................................9

Ayotte v. Gervasio,
    81 N.Y.2d 1062 (1993)........................................................................................................17

Baseball Office of the Comm'r v. Marsh & McLennan, Inc.,
    295 A.D.2d 73 (1st Dep't 2002) ..........................................................................................9

Bisbing v. Sterling Precision Corp.,
    34 A.D.2d 427 (3d Dep't 1970) .....................................................................................16, 17

Brown & Williamson Tobacco Corp. v. Gault,
    280 Ga. 420 (2006)..............................................................................................10, 11, 14

City of Centerville v. City of Warner Robins,
    270 Ga. 183 (1998)..............................................................................................................14

City of Demorest v. Roberts & Dunahoo Props., L.L.C.,
    288 Ga. App. 708 (Ga. Ct. App. 2008)................................................................................14

College Park Land Co. v. Mayor of College Park,
    48 Ga. App. 528 (Ga. Ct. App. 1934) .................................................................................11

Dice v. Inwood Hills Condo.,
    237 A.D.2d 403 (2d Dep't 1997) ........................................................................................17

Eastman v. Volpi Mfg. USA, Co.,
    229 A.D.2d 913 (4th Dep't 1996) .......................................................................................17

Fowler v. Vineyard,
    261 Ga. 454 (1991)..............................................................................................................11

HSBC Bank USA, N.A. v. Wm. V. Schmidt Co.,
    No. 102914/2010, 2011 N.Y. Misc. LEXIS 2721 (N.Y. Cty. May 24, 2011).........................9

James v. Aircraft Serv. Int'l Grp.,
   84 A.D.3d 1026 (2d Dep't 2011) ........................................................................8

Jimenez v. N.Y. Cent. Mut. Fire Ins. Co.,
   71 A.D.3d 637 (2d Dep't 2010) .........................................................................9

Korff v. Corbett,
   18 A.D.3d 248 (1st Dep't 2005) ............................................................. 19, 22, 23

Loder v. Nied,
   89 A.D.3d 1197 (3d Dep't 2011) ........................................................................9

Luna v. Dobson,
   97 N.Y.2d 178 (2001)......................................................................................10

Matter of New York City Asbestos Litig.,
   41 A.D.3d 299 (1st Dep't 2007) ......................................................................19

Roberts v. Hill,
   81 Ga. App. 185 (Ga. Ct. App. 1950) ..............................................................11

Stone v. Cont'l Ins. Co.,
   234 A.D.2d 282 (2d Dep't 1996) .....................................................................17

Suffolk Cnty. Water Auth. v. Vill. of Greenport,
   21 A.D.3d 947 (2d Dep't 2005) .......................................................................20

Terry v. State Farm Fire & Cas. Ins. Co.,
   269 Ga. 777 (1998)..................................................................................... 13, 14

Two Guys from Harrison-N.Y. v. S.F.R. Realty Ass'n,
   63 N.Y.2d 396 (1984)......................................................................................18

Udoh v. Inwood Gardens, Inc.,
   70 A.D.3d 563 (1st Dep't 2010) ......................................................................17

Venables v. Sagona,
   46 A.D.3d 672 (2d Dep't 2007) .................................................................. 12, 17

Weiner v. Anesthesia Assocs. of W. Suffolk, P.C.,
   203 A.D.2d 454 (2d Dep't 1994) ............................................................. 19, 22, 23

Yanuck v. Simon Paston & Sons Agency,
   209 A.D.2d 207 (1st Dep't 1994)....................................................................18

STATUTES

CPLR 3212 and 3001 ...............................................................................................1, 2

CPLR 3212 (b)........................................................................................................................17

CPLR 3212 (f) ........................................................................................................................8

O.C.G.A. § 9-12-40.........................................................................................................10, 11

**OTHER AUTHORITIES**

Rule 19-a(b) ........................................................................................................................1, 4

Defendants ("Yucaipa" or "Defendants"), by their attorneys, Kasowitz, Benson, Torres & Friedman LLP, respectfully submit this brief in opposition to the CPLR 3212 and 3001 Motion of plaintiffs Black Diamond and Spectrum for summary judgment, dated August 27, 2012 (the "Motion" or "Pl. Br."). The facts upon which this memorandum are based are set forth in (i) Defendants' Rule 19-a(b) Response to Plaintiffs' Statement of Purportedly Undisputed Facts ("19-a(b)"); (ii) the Affirmation of Adam K. Grant, Esq., dated September 25, 2012 ("Grant Opp. Aff."); and (iii) the Affidavit of Derex Walker, dated September 25, 2012 (the "Walker Aff."), each of which is submitted herewith.

## PRELIMINARY STATEMENT

No discovery has yet been taken in this case. Plaintiffs' Motion is thus premature at best. The Motion also misstates the issues before this Court, and cannot be granted because there are fundamental, disputed issues of material fact precluding the grant of summary judgment in Plaintiffs' favor. Though the Motion was evidently filed now in an attempt to increase Plaintiffs' negotiating leverage in the bankruptcy proceeding Plaintiffs instigated against the borrower Allied, this Court need not delve deeply in Plaintiffs' tactical motivations. Plaintiffs cannot meet their burden on summary judgment, and the Motion must be denied, because: (i) discovery is necessary on Defendants' potentially dispositive affirmative defenses, (ii) Plaintiffs' interpretation of the Credit Agreement's requirements is contrary to its text, and (iii) under any reading of the Credit Agreement, Plaintiffs are not entitled to the relief they seek.

When this Court denied Defendants' Motion to Dismiss on res judicata grounds, the Court expressly anticipated the need for discovery on that defense, stating, "I'm not saying [Defendants] don't have a defense here," and informing the parties that a preliminary conference to discuss discovery would follow service of the answer. (19-a(b), ¶ 5). Rather than await this Court's scheduling of the preliminary conference and the conduct of discovery pursuant to a "PC

Order," Plaintiffs filed this premature Motion. Discovery is necessary to resolve, among other things, whether this action is barred by res judicata given Plaintiffs' contradictory statements concerning their relationship to CIT and their relationship to the Georgia Action. As the Georgia Action presented an identity of issues to the instant action and was resolved by dismissals with prejudice having the preclusive effect of a final judgment by a Court of competent jurisdiction – and Plaintiffs do not contend otherwise – the only remaining question is whether, and to what extent, Plaintiffs were privy to the resolution of the Georgia Action.

When it suited Plaintiffs' interests to highlight the identical nature of this action to the Georgia Action, Plaintiffs admitted, among other things, that CIT was their agent in the Georgia Action, while "CIT was defending the Georgia action, and thereby complying with its fiduciary duties as Agent to Plaintiffs . . . ." (Id., ¶ 63) (emphasis supplied). But, when it became clear that such statements may bar the instant action under res judicata principles, Plaintiffs shifted gears, "[i]f a representative relationship did exist between Plaintiffs and CIT in connection with the Georgia Action. . . ." (Grant Aff., Exh. C at 19) and now deny the very agency they previously admitted under oath in this case. Accordingly, discovery is necessary to resolve the nature and extent of this agency relationship. Discovery also is necessary on several of Defendants' other potentially dispositive affirmative defenses to determine whether Plaintiffs' acquiescence to the passage of the Third Amendment without their consent bars their contention that the Fourth Amendment required their consent.

Putting aside that Plaintiffs' Motion is fundamentally premature, and could not be considered until resolution of Defendants' dispositive affirmative defenses, the core premise of Plaintiffs' Motion, based on the text of multiple portions of the Credit Agreement, is fundamentally wrong; Plaintiffs' reading simply is not countenanced by the Agreement's

language, meaning and structure. Contrary to Plaintiffs' contention, amending the definition of Term Loan Exposure ("TLE") did not require unanimous Lender consent.

First, the Credit Agreement expressly lists only two defined terms the amendment of which required unanimous Lender consent: "Requisite Lenders" and "Pro Rata Share." Thus, amending the definition of TLE did not require unanimous Lender consent.

Second, contrary to Plaintiffs' contention, the Fourth Amendment's change to the definition of TLE did not have the effect of amending the definition of Requisite Lenders. Reading the Credit Agreement as Plaintiffs' contend: (a) renders a key portion of the Credit Agreement superfluous, which is not permitted under New York law, and (b) makes the Credit Agreement an unusable morass because, contrary to the Credit Agreement's plain language, unanimous Lender consent then would be required for changes to any one of 33 terms, when the Credit Agreement expressly provides that such consent is only required for a change to 2 terms. Additionally, because the change to TLE in the Fourth Amendment concerned the voting rights of a Sponsor who acquired a certain amount of first lien debt, the change to TLE did not "affect" the definition of Requisite Lenders because the definition of Requisite Lenders does not concern Lender voting rights (the definition instead limits itself to a strict mathematical calculation of the amounts of certain types of debt held by each Lender). Thus, while the change to TLE in the Fourth Amendment may have permitted a change in the identity of the Requisite Lender, it did not – contrary to Plaintiffs' argument – change the definition of the term.

Third, contrary to Plaintiffs' contention, nothing in the Credit Agreement evidences that the intent of the Credit Agreement was to bar Yucaipa from ever becoming Requisite Lender. Were that the case, the Credit Agreement would explicitly have stated as much or would require unanimous Lender consent to amend the definition of Eligible Assignee (i.e., the term controlling

what parties are, and are not, permitted to acquire Allied's debt). But it does not do so.

Additionally, if unanimous Lender consent were required for the Fourth Amendment to remove certain language from the definition of TLE then, logically, unanimous Lender consent also must have been required to add that very same language in the Third Amendment. As the Third Amendment was passed with less than unanimous consent, Plaintiffs' argument would necessitate the severance of the "offending" TLE language from the Third Amendment, pursuant to the Third Amendment's severability clause. The effect of such severance would, despite Plaintiffs' effort, permit Yucaipa to be the Requisite Lender. Thus, adopting Plaintiffs' strained reading of the Agreement would require denial of their Motion in any event.

Finally, even assuming, arguendo, Plaintiffs' incorrect reading of the Credit Agreement, they are not entitled to the declaration they request that the "Fourth Amendment [is] null and void, ineffective, and not binding" and "that Yucaipa is not Requisite Lender[]." Given the severability clause in the Fourth Amendment, Plaintiffs would – at most – be entitled to a declaration that the change to the definition of TLE in the Fourth Amendment be severed therefrom (leaving the rest of the Fourth Amendment valid and enforceable).

## STATEMENT OF FACTS[1]

Plaintiffs' Motion centers on the question of whether an amendment to one defined term in the Fourth Amendment to the Credit Agreement (the "Agreement") required Plaintiffs' consent. To understand why the change to the definition of the term "TLE" in the Fourth Amendment did not require unanimous consent, the Court should understand the context in which the Third Amendment and Fourth Amendment were passed, and Plaintiffs' conduct in connection with the Agreement and the Georgia Action.

---

[1]    A full recitation of the facts, including the many disputed issues of material fact, is set forth in Defendants' Rule 19-a(b) Response to Plaintiffs' Statement of Purportedly Undisputed Facts, submitted herewith.

**I.    The Credit Agreement's Original Terms Did Not Allow A Sponsor To Also Be A Lender**

As the Sponsor, Yucaipa was precluded from acquiring any of Allied's first-lien debt because the definition of "Eligible Assignee" – which defined what entities could and could not acquire Allied's first-lien debt – specifically stated that "no . . . Sponsor shall be an Eligible Assignee." (19-a(b), ¶ 14). This is significant because, contrary to the thesis of Plaintiffs' Motion, it is the subsequent amendments to the term "Eligible Assignee" – not TLE – that permitted Yucaipa to become the Requisite Lender.

**II.    The Third Amendment Gave Sponsor Yucaipa The Right To Become A Lender**

On April 17, 2008, the Third Amendment passed by the vote of the Requisite Lenders but without Plaintiffs' consent. (Id., ¶¶ 22, 23). In relevant part, the Third Amendment modified the definition of Eligible Assignee to permit Yucaipa to acquire a part of Allied's first-lien debt. (Id., ¶ 24). The Third Amendment also modified the definition of TLE such that Term Loans acquired by Yucaipa would be disregarded with respect to provisions of the Agreement "relating to the voting rights of Lenders." (Id., ¶¶ 26, 27). In sum, the Third Amendment permitted Yucaipa to become a Lender but, because it limited the amount of debt Yucaipa could acquire, the Third Amendment limited Yucaipa's ability to become the Requisite Lender based solely on its own holdings. (Id., ¶ 28). Section 10.5(b) of the Agreement lists eleven circumstances for which unanimous Lender consent is required to amend or modify the Agreement. But Section 10.5(b) references only two terms whose amendment would trigger the Agreement's unanimous Lender requirement: "Requisite Lenders" and "Pro Rata Share." (Id., ¶¶ 17-19). And because the Third Amendment changed neither of those terms, although it did amend the definition of TLE, the Third Amendment was passed pursuant to Section 10.5(a) of the Agreement with Requisite Lender consent (i.e., essentially the majority of the first-lien lenders). (Id., ¶¶ 25, 29).

Importantly, Plaintiffs never have asserted that the Third Amendment's change to the definition of TLE required their consent. (Id., ¶¶ 25, 29).

### III.    Plaintiffs Were Aware Of, And Did Not Protest, Yucaipa's Efforts To Become Requisite Lender

In December 2008, Lenders holding the majority of Allied's first-lien debt sought to exit their positions by selling them to Yucaipa, but Yucaipa made clear it would not buy their positions unless the Third Amendment was modified to allow Yucaipa to become the Requisite Lender on its own. (Id., ¶ 33). To that end, in February 2009, Yucaipa launched a tender offer (the "Tender Offer") that included Allied's proposed fourth amendment (the "Proposed Fourth Amendment") to all Lenders, including Plaintiffs. (Id., ¶¶ 34, 35). That Proposed Fourth Amendment proposed amending the Third Amendment's terms by eliminating any limits on the amount of Term Loans and "LC Deposits" Yucaipa could purchase, permitting Yucaipa to acquire a majority of Allied's first-lien debt, and permitting Yucaipa to become the sole Requisite Lender. (Id.). Plaintiffs never voiced any objection to such an amendment. (Id., ¶ 37). Between February 2009 and August 21, 2009, Plaintiffs knew that Yucaipa was negotiating to acquire first-lien debt over and above the amounts that were permitted by the Third Amendment. Plaintiffs also never voiced any objection to Yucaipa's efforts in that regard. In fact, Plaintiffs actively were involved in discussions that assumed Yucaipa would acquire first-lien debt in excess of the amounts permitted by the Third Amendment. (Id., ¶¶ 38-39).

### IV.    The Fourth Amendment Allowed Yucaipa To Become Requisite Lender

On August 21, 2009, ComVest, as Requisite Lender, and Allied agreed to amend the Agreement by enacting the Fourth Amendment. (Id., ¶ 40). Plaintiffs were aware of the proposed terms of the Fourth Amendment and, again, stated no objection to its terms. (Id., ¶¶ 54-55). In relevant part, the Fourth Amendment removed the Third Amendment's restrictions on

the amount of first-lien debt Yucaipa could acquire – thereby allowing Yucaipa to acquire sufficient first-lien debt to become the Requisite Lender – as well as the language concerning TLE which was added by the Third Amendment.  (Id., ¶¶ 43, 44, 48).  In reliance upon the enactment of the Fourth Amendment, Yucaipa acquired the majority of Allied's first-lien debt and became Requisite Lender.  (Id., ¶¶ 51-52).  Like the Third Amendment, the Fourth Amendment did not require Plaintiffs' consent because the Fourth Amendment's terms did not trigger the unanimous Lender consent provisions of Section 10.5(b), and did not change the definition of either Requisite Lender or Pro Rata Share.  (Id., ¶ 47).

## V.    The Georgia Action Was Litigated By Plaintiffs' Admitted Agent, CIT

Though Plaintiffs were aware of Yucaipa's plan to become Requisite Lender and the basic terms of the Fourth Amendment well in advance of its passage, Plaintiffs did not object to it until a month after it passed.  (Id., ¶ 56).  At that point, Plaintiffs sent a letter to the Administrative Agent, CIT, requesting that CIT not recognize the validity of the Fourth Amendment.  (Id.).  Based in part on Plaintiffs' letter, CIT refused to recognize Yucaipa as the Requisite Lender, forcing Allied and Yucaipa to bring suit in Georgia state court to have the Fourth Amendment declared valid (the "Georgia Action").  (Id., ¶ 57).  CIT counterclaimed both in its capacity as Administrative Agent and as a Lender, and, expressly in its Agent capacity sought a declaration that the Fourth Amendment was invalid.  (Id., ¶ 58).

Following two years of litigation – during which Plaintiffs responded to Yucaipa's discovery requests and Black Diamond's representative was deposed – and following months of settlement negotiations of which Plaintiffs were aware, Yucaipa, Allied and CIT agreed to dismiss the Georgia Action, *with prejudice*, and resolve their claims.  (Id., ¶¶ 59, 60, 64).  They entered into a settlement agreement ("Settlement Agreement") that, among other things, expressly required all parties to dismiss with prejudice all their claims – including all of those

7

contained in the counterclaims CIT brought as Agent. (Id., ¶ 64). Plaintiffs received a copy of

the Settlement Agreement and, two days later, the Georgia Action was dismissed pursuant to

mutual dismissals with prejudice ("Dismissals with Prejudice"), entered into by CIT as

"Defendant and Counterclaim-Plaintiff" and stating that CIT "hereby dismiss[es] with prejudice

the Verified Answer and Counterclaims and all claims it asserted in its Verified Answer and

Counterclaims." (Id., ¶¶ 64, 66, 68).

## VI.    Plaintiffs Fail To Challenge The Georgia Dismissal, And Instead File This Lawsuit

Plaintiffs neither intervened in the Georgia Action nor did they object to the Settlement

Agreement or the Dismissals with Prejudice in any court. Instead, one month following the

filing of the Dismissals with Prejudice, Plaintiffs brought this action seeking precisely the same

relief their agent, CIT, had sought as Administrative Agent, and then dismissed with prejudice in

the Georgia Action.

## ARGUMENT

### I.    With No Discovery Yet Taken, Including On Defendants' Potentially Dispositive Affirmative Defenses, The Motion Is Premature And Must Be Denied

Under CPLR 3212 (f), "[a] party opposing summary judgment is entitled to obtain further

discovery when it appears that facts supporting the opposing party's position may exist but

cannot then be stated," especially "where the opposing party has not had a reasonable

opportunity for disclosure prior to the making of the motion." James v. Aircraft Serv. Int'l Grp.,

84 A.D.3d 1026, 1027 (2d Dep't 2011) (affirming denial of summary judgment where appellant

moved for summary judgment prior to any discovery being conducted). As Defendants have not

yet been able to take discovery on their affirmative defenses, Plaintiffs' Motion must be denied

for this reason alone. In accordance with CPLR 3212 (f), the factual discovery that Defendants

require and plan to take is set forth in the accompanying Affidavit of Adam K. Grant at

paragraphs 8 through 10.  New York courts routinely deny motions for summary judgment as premature where – as here – there has been no discovery, and material facts are unavailable to the nonmoving party.  See Loder v. Nied, 89 A.D.3d 1197, 1201 (3d Dep't 2011) (upholding denial of summary judgment where material facts unavailable to plaintiff as there had been no discovery); Amico v. Melville Volunteer Fire Co., 39 A.D.3d 784, 785 (2d Dep't 2007) (reversing grant of summary judgment as premature as plaintiff did not have opportunity to conduct discovery); Baseball Office of the Comm'r v. Marsh & McLennan, Inc., 295 A.D.2d 73, 82 (1st Dep't 2002).  Summary judgment should likewise be denied where defendant has not yet conducted discovery on its affirmative defenses.  See Jimenez v. N.Y. Cent. Mut. Fire Ins. Co., 71 A.D.3d 637, 640 (2d Dep't 2010) (finding summary judgment premature because defendant entitled to raise affirmative defenses and conduct discovery); HSBC Bank USA, N.A. v. Wm. V. Schmidt Co., No. 102914/2010, 2011 N.Y. Misc. LEXIS 2721 at *10-11 (N.Y. Cty. May 24, 2011) (finding summary judgment premature because defendants raised affirmative defenses and are entitled to discovery).

### A.  As This Court Previously Determined, Discovery is Necessary on Defendants' Res Judicata Defense

Defendants are entitled to discovery relating to their affirmative defense that the Motion – indeed, this whole case – is barred by res judicata.  Defendants moved to dismiss this action on res judicata grounds and, at the May 30 Hearing, this Court determined there were fact questions regarding whether CIT acted as Plaintiffs' agent in settling the Georgia Action with prejudice, expressly stated that although it was denying the Defendants' motion, it was "not saying [Defendants] don't have a defense here," and informed the parties it would be scheduling a preliminary conference to discuss discovery following service of the answer to the Complaint. (19-a(b), ¶ 5).  Yet before this Court has even had the opportunity to schedule a preliminary

9

conference, Plaintiffs filed this Motion.

Under Georgia law,[2] which Plaintiffs concede applies, "[a] judgment of a court of competent jurisdiction shall be conclusive between the same parties and their privies as to all matters put in issue . . . in the cause wherein the judgment was rendered until the judgment is reversed or set aside." O.C.G.A. § 9-12-40. The "doctrine of res judicata prevents the re-litigation of all claims that have already been adjudicated . . . between identical parties or their privies in identical causes of action." Brown & Williamson Tobacco Corp. v. Gault, 280 Ga. 420, 421 (2006). Briefing on Defendants' Motion to Dismiss established that all but one of the necessary elements for a res judicata defense already have been established here. (See 19-a(b), ¶ 3). Plaintiffs' opposition to the Motion to Dismiss neither contested that the Dismissals with Prejudice in the Georgia Action constituted a judgment by a court of competent jurisdiction,[3] nor contested that the Complaint seeks to re-litigate the very same claims that were "put in issue" in the Georgia Action.[4]

Plaintiffs dispute only that they were privies of CIT and thus bound by CIT's dismissal with prejudice of its claims in the Georgia Action. However, Plaintiffs repeatedly have admitted in this action that CIT acted as their agent in litigating the Georgia Action. (See id., ¶ 63). Given Plaintiffs' admissions here, and their conduct in the Georgia Action, and given this Court's ruling on the Motion to Dismiss that discovery is necessary to resolve the agency issue, there exist genuine issues of material fact concerning the extent of Plaintiffs' agency relationship with CIT requiring denial of this Motion, discovery on that issue, and determination of the

---

[2]    The Full Faith and Credit Clause of the U.S. Constitution compels this Court to analyze Defendants' res judicata defense under Georgia law, as the courts of this state are "required to give the same preclusive effect to the [out-of-state] judgment that [the out-of-state court] would under its law." Luna v. Dobson, 97 N.Y.2d 178, 183 (2001) (analyzing Connecticut law in determining the enforceability of Connecticut judgment in New York court).

[3]    (19-a(b), ¶ 3).

[4]    (19-a(b), ¶ 3).

potentially dispositive affirmative defense.

Now, in a transparent effort to "put the cart before the horse," and litigate an issue the Court <u>may never need reach</u>, Plaintiffs ask this Court to ignore the fact discovery it previously ordered and which may demonstrate that this action is barred by <u>res judicata</u>.  Because Plaintiffs have not moved for, and cannot yet move for, summary judgment on Defendants' <u>res judicata</u> defense, Plaintiffs cannot carry their burden of showing an entitlement to summary judgment as a matter of law on the <u>res judicata</u> defense.  The Motion must be denied on this basis alone.

### i.    Discovery is Necessary Concerning the Agency Issue

Under Georgia law, a party and its privies are subject to the doctrine of <u>res judicata</u> where they had a full and fair opportunity to argue their claims in the prior litigation.  <u>Brown & Williamson Tobacco Corp.</u>, 280 Ga. at 421; <u>Fowler v. Vineyard</u>, 261 Ga. 454, 456 (1991); O.C.G.A. § 9-12-40.  Georgia law provides that "privies are all persons represented by the parties."  <u>Roberts v. Hill</u>, 81 Ga. App. 185, 186 (Ga. Ct. App. 1950); <u>see also</u> <u>College Park Land Co. v. Mayor of College Park</u>, 48 Ga. App. 528, 528 (Ga. Ct. App. 1934) ("[A] party . . . [is] in privity with a party to the former litigation when he bears the relationship of  . . . a principal to an agent or agent to a principal . . . .").  Given the factual record to date, Plaintiffs' relationship to the Georgia Action – and their relationship to CIT prior to and throughout the Georgia action – must be the subject of discovery.

The pleadings in the Georgia Action establish that CIT was being sued, and brought suit, in both its representative and individual capacities.  Yucaipa and Allied expressly asserted certain claims against CIT in its capacity as Administrative Agent in the Georgia Complaint.  (19-a(b), ¶ 57; <u>see also</u> Ehrlich Aff., Exh. 2, ¶ 1 ("This action arises from CIT's inexcusable breaches of several of its clear and unambiguous contractual obligations as Administrative Agent . . .")).  In addition, CIT's Counterclaim in the Georgia Action states that it was brought by CIT in <u>both</u>

its individual capacity as a Lender <u>and its representative capacity as Administrative Agent</u>.  (19-a(b), ¶ 58; <u>see, e.g.</u>, Grant Aff., Exh. K, ¶ 42 ("CIT has not breached its obligations <u>as Administrative Agent and Collateral Agent</u> under the Credit Agreement.").  Furthermore, Black Diamond's Principal – Richard Ehrlich – submitted an affidavit in this case *admitting CIT's role as Plaintiffs' agent throughout the Georgia Action.*[5]  Plaintiffs' counsel further confirmed the agency in open court.[6]  Finally, Defendants understood and believed that CIT was litigating as agent for all Lenders, and on its own behalf, throughout the Georgia Action.  (19-a(b), ¶ 62).

In response to this evidence, first marshaled by Defendants on their Motion to Dismiss, Plaintiffs argued that any agency relationship with CIT was vitiated when CIT filed the Dismissals with Prejudice.  (<u>See</u> Grant Aff., Exh. C at 19 ("If a representative relationship did exist between Plaintiffs and CIT in connection with the Georgia Action, it certainly did not survive the negotiation and execution of the Settlement Agreement.")); (19-a(b), ¶ 63) ("CIT. . . . <u>was the agent which was handling the defense of this case, in effect, for us</u> settled [the Georgia Action] on their own stead.") (emphasis supplied).  Given the contradictions and discrepancies between Plaintiffs' admissions and their subsequently changed position that CIT was not their agent, this Court determined that discovery is necessary.  Such discovery will necessarily cover the extent of the agency relationship between Plaintiffs and CIT during the Georgia Action, whether that agency ever terminated, and if so, when.  <u>See</u> <u>Venables v. Sagona</u>, 46 A.D.3d 672, 673 (2d Dep't 2007).

---

[5]     Ehrlich's affidavit concedes: "While CIT was defending the Georgia action, and thereby complying with its fiduciary <u>duties as Agent</u> to Plaintiffs here . . . Plaintiffs were not compelled to challenge the Purported Fourth Amendment" (19-a(b), ¶ 63; Grant Aff., Exh. L, ¶ 12 (emphasis supplied)) and "Plaintiffs commenced the New York Action because of CIT's failure to continue to protect the interests of Plaintiffs and the other Allied Lenders, <u>and its concession in the settlement agreement of the Georgia Action that the Purported Fourth Amendment is valid.</u>"  (<u>Id</u>.) (emphasis supplied).

[6]     CIT "was the agent which was handling the defense of [the Georgia Action] . . ." (<u>id</u>.); and "CIT . . . <u>was the agent which was handling the defense of this case, in effect, for us</u> . . ." (<u>id</u>.) (emphasis supplied).

In addition, if Plaintiffs genuinely believed that CIT settled the Georgia Action in violation of its agency relationship with Plaintiffs, Georgia law required that Plaintiffs either "appear[] in the [Georgia Action] before rendition of the judgment or . . . attack[] the judgment by subsequent proceedings."  Restat. 2d of Judgments, § 41, Comment a.  Plaintiffs did neither, failing to intervene in the Georgia Action, or attack the judgment directly in a subsequent proceeding in Georgia.  Discovery also is therefore appropriate on what Plaintiffs knew, and when they knew it, as regards the litigation, the settlement negotiations, the settlement, and the Dismissals with Prejudice.

> **ii.    This Court Also Has Determined That There Are Fact Questions Whether The Georgia Settlement Agreement Is Binding On Plaintiffs, And Thus Bars This Action On Res Judicata Grounds**

In denying Defendants' Motion to Dismiss, this Court already ruled there are fact questions on the agency issue requiring discovery before the Court can decide if the case is barred by res judicata.  Ignoring that ruling, we expect Plaintiffs to argue in reply – as they did in opposing the Motion to Dismiss – that the Settlement Agreement establishes that the Georgia Action was resolved by CIT solely in its individual capacity.  (Grant Aff., Exh. C at 18-20; id., Exh. D at 25:21-28:8).  Yet, this Court has already found there to be a fact issue regarding whether the Settlement Agreement was binding on Plaintiffs, which, if so, would bar this action on res judicata grounds.

First, Plaintiffs previously have argued – and likely will continue to argue – that paragraph 1(d) of the Settlement Agreement establishes that CIT only resolved the Georgia Action in its Lender capacity.  Contrary to Plaintiffs' claims, Georgia law holds that Plaintiffs are not entitled to look past the unambiguous Dismissals with Prejudice to the Settlement Agreement.  It is the dismissals themselves that serve as a preclusive judgment where the scope of the dismissed claims is unambiguous. Terry v. State Farm Fire & Cas. Ins. Co., 269 Ga. 777,

778-79 (1998) (holding that since the language of the consent dismissal was clear and unambiguous, the terms of the dismissal are controlling for claim preclusion purposes, and the court should look no further to determine the intention of the parties).[7]  Second, CIT's Counterclaim expressly was brought in both its individual and representative capacities (19-a(b), ¶ 58).  Plaintiffs repeatedly have admitted – and Defendants understood – that CIT was litigating the Georgia Action at least in part in its representative capacity as Plaintiffs' agent, and Defendants intended that CIT was executing the Settlement Agreement and entering into the Dismissals with Prejudice as both a Lender and as the Administrative Agent.  (Id., ¶¶ 62, 63, 67).

Third, paragraph 2 of the Settlement Agreement required each of CIT, Yucaipa and Allied to dismiss their respective claims in the [Georgia] Action with prejudice . . . ."  (Id., ¶ 68) (emphasis supplied).  Thereafter, in the Dismissals with Prejudice, CIT as the "Defendant and Counterclaim Plaintiff. . . dismiss[ed] with prejudice the Verified Answer and Counterclaims and all claims it asserted in its Verified Answer and Counterclaims."  (Id., ¶ 66) (emphasis supplied). Accordingly, the Settlement Agreement, on its face, called for CIT's dismissal, with prejudice, of all its claims including the entire declaratory judgment claim CIT brought in its representative capacity.  (Id., ¶¶ 64, 68).

Furthermore, the Settlement Agreement on its face demonstrates that CIT settled the case at least in part in its representative capacity as Defendants' agent.  While it is true that Section 1(d) states, among other things, that the parties to the Settlement Agreement do not release any

---

[7]       Plaintiffs contended in their opposition to the motion to dismiss, and likely will restate in their reply, that Brown & Williamson Tobacco Corp. v. Gault, 280 Ga. 420 (2006), City of Centerville v. City of Warner Robins, 270 Ga. 183 (1998) and City of Demorest v. Roberts & Dunahoo Props., L.L.C., 288 Ga. App. 708 (Ga. Ct. App. 2008) state that a court should always look past the document filed with the Court – in this case the Dismissals with Prejudice – to the settlement agreement to determine the parties' intent. (Grant Aff., Exh. C at 14-15).  As before, Plaintiffs' reliance on these cases is simply wrong, as they are clearly distinguishable from the facts in this case.  At best, those cases stand for the proposition that a Georgia court analyzing ambiguous consent judgments will look to the terms of a settlement agreement to divine the parties' intent.  There is no such ambiguity in the Dismissals with Prejudice here, nor can Plaintiffs allege any such ambiguity.  (Grant Aff., Exh. B at 3-4).

claims "belonging to any person or entity other than the Parties to this Agreement," this language does not mean that CIT was resolving the Georgia Action solely as a Lender. Defendants understood and intended that the sole and exclusive purposes of this language were to (a) preserve claims third parties might have unrelated to the validity of the Fourth Amendment or Yucaipa's Requisite Lender status, (b) ensure Allied was not inadvertently released from its obligations under the Credit Documents, and (c) preserve claims that Lenders may have had against CIT for liability resulting from its actions or inactions as Agent. (Id., ¶ 69). But Defendants never intended, and the Settlement Agreement does not state or otherwise evidence, that Section 1(d) limited the scope of the Dismissals with Prejudice or otherwise limited CIT's capacity to enter the Settlement Agreement and the Dismissals with Prejudice in its representative capacity. (Id.). In point of fact, the Settlement Agreement includes a number of settlement obligations CIT could only have undertaken in its representative capacity, because they expressly involved the exercise of its agency powers as defined in the credit documents, such as the recordation of loans, procedures for its potential resignation as agent, and similar types of duties.[8]

Accordingly, as the Court previously ruled in denying the Motion to Dismiss, discovery is needed on these issues. Plaintiffs certainly cannot now demonstrate the absence of material

---

[8]    Several provisions of the Settlement Agreement specifically were intended to apply to CIT in its representative capacity. For example, paragraph 10 of the Settlement Agreement clearly contemplated CIT acting in its representative capacity, as it states "CIT acknowledges that it recorded [Defendants'] first lien loans … on the Register (as defined in the Credit Agreement) and expressly recognizes the validity and enforceability of the Fourth Amendment." (19-a(b), ¶ 65). The Agreement requires the Administrative Agent to record each loan on the Register. (Id., ¶ 21). Defendants intended that many other Settlement Agreement provisions would apply to CIT in its representative capacity. (See id., ¶ 65; see, e.g., Grant Aff., Exh. I, ¶ 13 (concerning circumstances under which CIT may resign as Administrative Agent and Collateral Agent and CIT's agreement not to exercise any remedies as Administrative and Collateral Agent before it resigns without Defendants' written consent as Requisite Lender); Grant Aff., Exh. 1, ¶ 7 ("CIT in its capacity as agent or otherwise agrees to support any Restructuring [of Allied] to which [Defendants] consent[]" under certain enumerated conditions); id., ¶ 11 (concerning CIT's resolution of administrative issues in its representative capacity as Administrative and Collateral Agent); id., ¶ 14 (concerning CIT's "consent rights over the appointment of a replacement Administrative Agent and Collateral Agent")).

issues of fact on the agency issues nor the right to prevail as a matter of law on Defendants' <u>res judicata</u> defense.

**B. Discovery is Also Necessary on Defendants' Potentially Dispositive Waiver and Estoppel Defenses**

In addition, before Plaintiffs' summary judgment Motion can be considered, Defendants are entitled to conduct discovery on their other, potentially dispositive, affirmative defenses based on waiver and estoppel. Defendants' fourth and fifth Affirmative Defenses in their Answer assert that Plaintiffs' claims are barred by waiver and/or estoppel. (Ehrlich SJ Aff., Exh. 4). Both the Third Amendment and the Fourth Amendment were passed without unanimous affected Lender consent and, among other things, both modified the definition of TLE. In fact, the Fourth Amendment simply removed the language concerning TLE which the Third Amendment added. But Plaintiffs never objected to the Third Amendment's passage or to the terms of the Fourth Amendment prior to the Fourth Amendment's passage, and have conceded that the Third Amendment was validly enacted. (19-a(b), ¶¶ 23, 25, 29, 39). Following the Fourth Amendment's passage – in reliance upon the validity of the Third and Fourth Amendments – on August 21, 2009, Yucaipa acquired all of its majority holdings of Allied's first-lien debt from ComVest, pursuant to the Assignment and Assumption Agreement. (See id., ¶ 51).

Plaintiffs' failure to object to the Third Amendment may: (i) estop them from arguing that the Fourth Amendment's modification to the definition of TLE required any greater consent than the Third Amendment's did;[9] and (ii) act as a waiver of the contention that the Fourth

---

[9] Under New York law, the doctrine of equitable estoppel provides that "[w]hen a party with full knowledge, or with sufficient notice of his rights and of all the material facts, freely does what amounts to a recognition or adoption of a contract or transaction as existing, or acts in a manner inconsistent with its repudiation, and so as to affect or interfere with the relations and situation of the parties, he acquiesces in and assents to it and is equitably estopped from impeaching it, although it was originally void or voidable." <u>Bisbing v. Sterling Precision Corp.</u>, 34 A.D.2d 427, 430-31 (3d Dep't 1970) (reversing the lower court and holding that defendant's motion for summary judgment should not have been granted as there are issues of fact as to plaintiff's equitable estoppel defense); <u>335 Second St. Hous. Corp. v. Fridal Enters., Inc.</u>, 36 A.D.3d 608, 609 (2d Dep't 2007) (finding defendant equitably

Amendment's modification to the definition of TLE required any greater consent than the Third

Amendment's did.[10]  Given that CIT – the Administrative Agent and a Lender under the

Agreement – expressly advised the First Lien Lenders that the Third Amendment required only

Requisite Lender approval, and not unanimous Lender consent (see id., ¶ 23), Defendants are

entitled to discovery to determine whether Plaintiffs understood and acquiesced in that advice

and the passage of the Amendment as well.  See Venables, 46 A.D.3d at 673.

II.    **Plaintiffs' Reading Of The Agreement Violates Fundamental Rules Of Contract Construction; The Motion Must Be Denied Because Plaintiffs Cannot Show The Absence Of Material Issues Of Fact Nor A Right To Judgment As A Matter Of Law**

"CPLR 3212 (b) requires the proponent of a motion for summary judgment to

demonstrate the absence of genuine issues of material fact on every relevant issue raised by the

pleadings, including any affirmative defenses."  Stone v. Cont'l Ins. Co., 234 A.D.2d 282, 284

(2d Dep't 1996).  "The failure to make such prima facie showing requires a denial of the

motion…."  Ayotte v. Gervasio, 81 N.Y.2d 1062, 1063 (1993) (citation omitted).  Here, even

before any discovery has been taken on the issues, Plaintiffs' Motion must be denied because

Plaintiffs cannot establish that there are no genuine issues of material fact as to the construction

and meaning of the provisions of the Credit Agreement relevant to the instant Motion.  See

Udoh v. Inwood Gardens, Inc., 70 A.D.3d 563, 565 (1st Dep't 2010).

---

estopped from imposing higher interest rate where defendant acquiesced to plaintiff's payments at lower rate without complaint or objection).  Accordingly, discovery is necessary to determine whether, among other things, Plaintiffs acquiesced in or ratified the passage of the Third Amendment.  See Bisbing, 34 A.D.2d at 430-31.

[10]    In New York, the defense of waiver is available where there is a "voluntary abandonment or relinquishment of a known right, which, except for such waiver, the party would have enjoyed."  Dice v. Inwood Hills Condo., 237 A.D.2d 403, 404 (2d Dep't 1997).  "Waiver may be accomplished by express agreement or by such conduct or failure to act as to evince an intent not to claim the purported advantage . . . ."  Id. (quotation omitted).  To establish that Plaintiffs have waived their right to challenge the validity of the change to the definition of TLE in the Fourth Amendment, Defendants need discovery regarding whether, among other things, Plaintiffs acquiesced in the passage of the Third Amendment.  Such a question of fact on an affirmative defense precludes summary judgment.  See Eastman v. Volpi Mfg. USA, Co., 229 A.D.2d 913, 914 (4th Dep't 1996).

### A.  Plaintiffs' Construction Is Contrary To The Agreement's Express Terms

Plaintiffs contend that the entire Fourth Amendment "required unanimous consent of all Lenders affected thereby." (Pl. Br. at 18).  However, as set forth in the following sections, that is clearly not the case, as under any reading of the Agreement, the Fourth Amendment contains other changes that could not conceivably require unanimous consent.  Accordingly, Plaintiffs' argument must be that the <u>amendment to the term TLE</u> in the Fourth Amendment required unanimous consent.  Plaintiffs' contention in that regard is also contrary to the express terms of the Agreement, and accordingly Plaintiff's position creates triable issue of fact precluding a grant of summary judgment.[11]

### i.    The Doctrine of "Expressio Unius" Demonstrates Plaintiffs Are Not Entitled to Summary Judgment as a Matter of Law

Plaintiffs contend that an amendment to the term TLE constitutes an amendment requiring unanimous Lender consent under Section 10.5(b).  However, Section 10.5(b) of the Agreement lists eleven separate enumerated circumstances in which "written consent of each Lender . . . that would be affected thereby" is required.  <u>An amendment to the definition of TLE is **not** one of those enumerated circumstances.</u>  (19-a(b), ¶¶ 17-19) (emphasis supplied).  Under New York law,[12] when a contract lists specific items that are covered by a provision, other items that are not listed are deemed to have intentionally been excluded.  <u>See, e.g.</u>, <u>Two Guys from Harrison-N.Y. v. S.F.R. Realty Ass'n.</u>, 63 N.Y.2d 396, 403-04 (1984) (holding that the

---

[11]    Although the Fourth Amendment's change to the definition of TLE clearly did not require unanimous affected Lender consent, if the Court were willing to credit Plaintiffs' assertion that it does, the Court would logically be required to find that Section 10.5(b)(ix) is "subject to competing, reasonable interpretations" and is therefore ambiguous and "raise[s] triable issues of fact precluding summary judgment." <u>Yanuck v. Simon Paston & Sons Agency</u>, 209 A.D.2d 207, 208 (1st Dep't 1994) ("[W]here . . . interpretation of contract terms or provisions are susceptible to at least two reasonable interpretations, and intent must be gleaned from disputed evidence or from inferences outside the written words, it becomes an issue of fact that must be resolved by trial."). Thus, under any hypothesis, Plaintiffs cannot show entitlement to summary judgment as a matter of law on this issue, and the Motion must be denied.

[12]    The Agreement is governed by New York law, pursuant to its choice of law provision. (<u>See</u> CA § 10.14).

specification of certain permitted activities should be read as implicitly prohibiting other alterations); see also 1009 Second Ave. Assocs. v. New York City Off-Track Betting Corp., 248 A.D.2d 106, 108 (1st Dep't 1998); Matter of New York City Asbestos Litig., 41 A.D.3d 299, 302 (1st Dep't 2007) (applying "standard canon of contract construction expressio unius est exclusio alterius, . . . that the expression of one thing implies the exclusion of the other").

Here, Section 10.5(b) states that an amendment to the terms "Requisite Lenders" or "Pro Rata Share" are the only definitional amendments requiring unanimous Lender consent.  The Agreement does not state that an amendment to TLE requires unanimous affected Lender consent.  (19-a(b), ¶¶ 18-19).  Accordingly, under the doctrine of expressio unius est exclusio alterius, changes to the definition of TLE do not require unanimous affected Lender consent.

If the Court were nevertheless willing to accept Plaintiffs' contention that their construction is reasonable, then, at best, ambiguity exists and discovery is necessary to divine the parties' intent.  Korff v. Corbett, 18 A.D.3d 248, 251 (1st Dep't 2005) ("To the extent that any of [an] agreement's terms may be ambiguous, indefinite or uncertain, it is well settled that extrinsic or parol evidence is admissible to determine their meaning."); see also Weiner v. Anesthesia Assocs. of W. Suffolk, P.C., 203 A.D.2d 454, 454-55 (2d Dep't 1994) ("[W]here . . . a court determines that the terms of the agreement are ambiguous and the intent of the parties becomes a matter of inquiry, parol evidence is permitted to determine that intent.").[13]

---

[13]    Because this Motion was filed prematurely, this Court does not have before it evidence necessary to determine the parties' intent.  Accordingly, Defendants need discovery from Plaintiffs, as well as the parties to the Agreement, CIT and Allied.  As noted, supra, if the Agreement is ambiguous, parol evidence is necessary to determine the drafters' intent and, since discovery has not taken place yet, Plaintiffs' Motion should be denied.  (See Grant Aff. at ¶¶ 8-10 (describing categories of necessary discovery)).

### ii.    Changing the Definition of TLE Did Not Change the Definition of Requisite Lender

Plaintiffs contend that a change to the definition of TLE – a defined term referenced in the definition of Requisite Lender – effects a change to the definition of Requisite Lender requiring unanimous Lender consent under Section 10.5(b).  (Pl. Br. at 17-18).  But the text of Section 10.5(b)(ix) does not support this argument.  The term "Requisite Lenders" contains four defined embedded terms, including TLE.  In turn, the definitions of those four embedded terms refer to twelve additional defined embedded terms.  (See 19-a(b), ¶ 19).  And the definitions of those twelve additional terms, themselves, include thirteen additional defined embedded terms. (Id.).  One of the terms embedded within the definition of Requisite Lenders – through the defined term LC Exposure – is the term "Pro Rata Share."  (See id., ¶ 18).  Significantly, Pro Rata Share is the only other such definition listed in Section 10.5(b) the amendment of which requires unanimous consent.  If Plaintiffs' "embedding" argument were correct, however, Pro Rata Share would not need to be listed in Section 10.5(b) as one of the terms requiring unanimous Lender consent to modify, because any amendment to that term would automatically have the "effect" of amending the definition of Requisite Lenders.

Plaintiffs' argument would therefore render the inclusion of Pro Rata Share in 10.5(b)(ix) superfluous.  However, under New York law, such a contract provision is presumed to have been inserted intentionally and with purpose; that term cannot properly be ignored or read out of existence.  Suffolk Cnty. Water Auth. v. Vill. of Greenport, 21 A.D.3d 947, 948 (2d Dep't 2005) (an interpretation which renders language in the contract superfluous is unsupportable).[14] (an interpretation which renders language in the contract superfluous is unsupportable). Accordingly, Plaintiffs' embedding argument must be rejected as a matter of law.

---

[14]    Additionally, Plaintiffs' argument fails as a matter of contract interpretation, because to interpret changes to embedded terms as changes to the definition in which they are embedded would effectively render the agreement a circular maze with a change to any one of 33 separate terms having the "effect" of amending the definition of Requisite Lender – an absurd conclusion.

### iii.    Plaintiffs Cannot Show the Change to the Definition of TLE In the Fourth Amendment Changed the Definition of Requisite Lender

Plaintiffs argue that the Fourth Amendment's change to the definition of TLE "had 'the effect of' changing the definition of Requisite Lender by allowing the Yucaipa-owned Obligations *to be included in the calculation of Term Loan Exposure* when, under the Third Amendment, they had previously been *expressly excluded*." (Pl. Br. at 6) (emphasis in original). This is incorrect. The Third Amendment's definition of TLE only requires that Defendants' aggregate outstanding principal amount of Term Loans be disregarded "with respect to any provisions of [the Agreement] relating to the voting rights of Lenders." (19-a(b), ¶¶ 26-27) (emphasis supplied). The definition of Requisite Lenders is only an arithmetic calculation, referring to the Lender or Lenders holding more than 50% of the sum of the aggregate TLE, LC Exposure and Revolving Exposure of all Lenders. (Id., ¶ 13). The definition of Requisite Lenders refers to a quantity of ownership, but nowhere refers to issues of voting rights, and hence the change in the definition of TLE does not affect the definition of Requisite Lenders. (Id., ¶ 28). Indeed, the Third Amendment expressly permits Defendants to own a limited amount of Allied's first-lien debt. (Id., ¶ 24). Thus, even though other provisions of the Third Amendment limited the amount of Allied debt Defendants could hold, Defendants would be able to pair with another Lender to be joint Requisite Lenders. (Id., ¶ 28). Accordingly, under the Third Amendment, the Allied debt held by Defendants would absolutely count toward the determination of Requisite Lender status, and, despite Plaintiffs' contentions, Defendants are not precluded from becoming Requisite Lenders. (Id., ¶¶ 26-28).

Furthermore, the Fourth Amendment did not change or "affect" the definition of "Requisite Lenders." Section 1.1 of the Agreement provides: **"Requisite Lenders"** means one or more Lenders having or holding Term Loan Exposure, LC Exposure and/or Revolving

Exposure and representing more than 50% of the sum of (i) the aggregate Term Loan Exposure of all Lenders, (ii) the aggregate LC Exposure of all Lenders and (iii) the aggregate Revolving Exposure of all Lenders." (<u>Id</u>., ¶ 13).  Changing the definition of TLE did not change or affect the <u>definition</u> of the term Requisite Lender.  At most, it affected the <u>identity</u> of who could be Requisite Lender.  Thus, there was no change to the definition of the term, but rather a change to the universe of those who could become Requisite Lender.  Once again, Plaintiffs have twisted the text of the Agreement to contradict its express terms.  To the extent the Court nevertheless credits their alternate reading, at best there is ambiguity requiring discovery as to the relevant parties' intent.  <u>Korff</u>, 18 A.D.3d at 251; <u>see also</u> <u>Weiner</u>, 203 A.D.2d at 454-55.

> **iv.   The Intent of the Credit Agreement Was Never to Prevent Yucaipa From Becoming Requisite Lender**

Plaintiffs also argue that the intent of the Agreement was to preclude Defendants "from exercising *any* Lender voting rights, let alone act[ing] as the Requisite Lender." (Pl. Br. at 22) (emphasis in original).  Given that Plaintiffs were not involved, and had no input whatsoever in drafting the Agreement, their characterization of the Agreement's intent has no weight.  (19-a(b), ¶ 10).  In any event, the Agreement says nothing of the sort.

Under the Agreement, the operative term that initially precluded Defendants from becoming a Lender – or accumulating sufficient first-lien debt to become Requisite Lender – is the definition of Eligible Assignee. (<u>Id</u>., ¶ 14).  The definition of Eligible Assignee designated what entities would be permitted to acquire Allied's first-lien debt and provided, in relevant part, "no . . . Sponsor shall be an Eligible Assignee."  (<u>Id</u>.).  Had the intent of the parties been as Plaintiffs contend – irrevocably to prevent the Sponsor from becoming the Requisite Lender – logically Section 10.5(b)(ix) would have been drafted to expressly include the term "Eligible

Assignee" as a term that required unanimous Lender consent.[15]  Alternatively, had that been the intent, the Agreement would have unequivocally stated that the Sponsor could <u>never</u>, under any circumstances, become an Eligible Assignee.  But the Agreement does not say that.

Indeed, the Third Amendment – validly passed without unanimous Lender consent – changed the definition of Eligible Assignee to allow Defendants to acquire Allied's first-lien debt.  (<u>Id</u>., ¶ 24).  The Fourth Amendment – also passed without unanimous Lender consent – further modified the definition of Eligible Assignee to allow Plaintiffs to acquire the majority of Allied's debt from ComVest.  (<u>Id</u>., ¶ 43).  Plaintiffs never have asserted that these changes to the definition of Eligible Assignee required their consent, nor could they validly do so.

Thus, at the very least, Plaintiffs' arguments demonstrate that discovery is necessary to determine the intent of the parties to the Agreement concerning the circumstances under which Defendants could become an Eligible Assignee and acquire sufficient first-lien debt to become Requisite Lender.  <u>See</u> <u>Korff</u>, 18 A.D.3d at 251; <u>see also</u> <u>Weiner</u>, 203 A.D.2d at 454-55.

## III.    Under Any Reading Of The Agreement, Plaintiffs Cannot Show They Are Entitled To The Declaration They Seek

Plaintiffs seek a declaration that the Fourth Amendment "is null and void, ineffective, and not binding" and "that Yucaipa is not Requisite Lenders under the Agreement."  (19-a(b), ¶ 1).  But Plaintiffs are absolutely not entitled to this relief under any reading of the Agreement. Even assuming, <u>arguendo</u>, that the change to the definition of TLE in the Fourth Amendment required unanimous Lender consent, Plaintiffs are not entitled to a declaration that the <u>entire</u> Fourth Amendment is invalid.  Section 6.2 of the Fourth Amendment contains a severability clause stating: "[i]n case any provision in or obligation hereunder shall be invalid, illegal or

---

[15]    Even Plaintiffs' strained embedding theory would fail in this instance as neither the definition of Requisite Lenders nor any of the terms embedded in it reference the term "Eligible Assignee."

unenforceable . . . the validity, legality and enforceability of the remaining provisions or obligations . . . shall not . . . be affected or impaired thereby." (Id., ¶ 50). As Plaintiffs do not claim, nor can they, that any other terms in the Fourth Amendment required unanimous affected Lender consent, Plaintiffs are not entitled to invalidate the entire Fourth Amendment. Were the Court to rule that Plaintiffs are entitled to a declaration invalidating the Fourth Amendment's change to the definition of TLE, at most, Plaintiffs could only obtain a declaration that that portion of the Fourth Amendment should be severed, and all other provisions of the amendment remain valid and enforceable.

Furthermore, even if, arguendo, Plaintiffs were correct that unanimous Lender consent was required to amend the definition of TLE in the Fourth Amendment, then logically unanimous Lender consent must also have been required to add the TLE language in the Third Amendment in the first place. Yet, unanimous Lender consent was not required to pass the Third Amendment, and Plaintiffs do not contend that such consent was necessary. (Pl. Br. at 24 n.15).[16] Plaintiffs' contention that unanimous Lender consent was not necessary for the amendment to the definition of TLE in the Third Amendment is therefore a transparently selective application of their argument.[17]

---

[16]    If the Court finds ambiguity as to whether Plaintiffs acquiesced to the Third Amendment, Defendants are entitled to discovery on this issue. (See supra, Argument Section I. B., at p. 17).

[17]    Plaintiffs contend that unanimous Lender consent was not required for the change to TLE in the Third Amendment because they were not "affected" by such changes (Pl. Br. at 24 n.15). But they do contend that unanimous Lender consent was required to change the definition of TLE in the Fourth Amendment because they were "affected" by that change. Plaintiffs attempt to bridge this inconsistency by contending that the change to the definition of TLE in the Fourth Amendment "materially changed who could be the Requisite Lender under the Credit Agreement." (Pl. Br. at 20). Plaintiffs' argument fails because – even assuming, arguendo, their own flawed logic – they were "affected" by the Third Amendment. Prior to passage of the Third Amendment, nothing in the Agreement's definitions of Requisite Lenders or TLE specifically limited Defendants' ability to become a Requisite Lender. (19-a(b), ¶ 14). Instead, Defendants were unable to become a Requisite Lender solely because the definition of Eligible Assignee, stated that "no . . . Sponsor shall be an Eligible Assignee" (Id.). The Third Amendment modified the definition of Eligible Assignee, such that other Lenders were no longer prohibited from selling, assigning or transferring all or a portion of their Term Loans to Defendants. (Id., ¶ 24). Thus, the change to TLE added by the Third Amendment would have affected Plaintiffs under their own mistaken theory, because it "materially change[d] who could be the Requisite Lender under the Credit Agreement" by precluding Yucaipa from

24

Furthermore, if unanimous consent was required for the Third and Fourth Amendments' changes to the definition of TLE, then the amended TLE language in <u>both</u> the Third and Fourth Amendments would need to be severed from the Third Amendment, pursuant to Section 7.2 of the Third Amendment, Section 6.2 of the Fourth Amendment and Section 10.11 of the Agreement.  (19-a(b), ¶¶ 30, 50; Ehrlich Aff., Exh. 1, §10.11).  Doing so would make the original definition of TLE in the Agreement the effective definition of TLE.  Because that definition of TLE does not in any way preclude Defendants from becoming Requisite Lenders, and because the definition of Eligible Assignee from the Fourth Amendment would still apply – Defendants would have been permitted to acquire as much TLE as they desired and become the Requisite Lender.

Accordingly, the implication of Plaintiffs' incorrect reading of the Agreement would be to invalidate both the Third and Fourth Amendments in relation to the changes to TLE – such that Yucaipa's Requisite Lender status is valid.  Thus, at bottom, Plaintiffs cannot prevail on summary judgment even if their twisted construction of the Agreement were accepted.

## CONCLUSION

For all of the foregoing reasons, this Court should deny Plaintiffs' Motion for Summary Judgment in its entirety, and should schedule a conference and set a discovery schedule to address all of the claims and defenses in this case.

---

becoming Requisite Lender on its own.  Assuming they were "affected" by the Fourth Amendment's change to TLE's definition, then Plaintiffs were affected in two additional ways: (i) by amending the definition of TLE to exclude any voting rights Yucaipa might have acquired by purchasing Term Loans under the Third Amendment, the Third Amendment's change to the TLE language would increase each Lender's voting rights on a pro rata basis (Ehrlich Aff., Exh. 1 at § 2.7(a)), and (ii) by making Defendants less likely to purchase those interests from the Lenders thereby affecting the value of the Lenders' holdings.  Accordingly, under Plaintiffs' own fallacious logic, Plaintiffs were affected by the change to TLE in the Third Amendment and thus their effort to differentiate the effect of the modification to TLE in the Fourth Amendment fails.

Dated:  New York, New York
       September 26, 2012

Respectfully submitted,

KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP

By:    /s/ David E. Ross
        David E. Ross
        David E. Spalten
        Adam K. Grant
        Marissa E. Teicher

1633 Broadway
New York, New York 10019
Tel:  (212) 506-1700

*Attorneys for Defendants*