**<u>EXHIBIT F</u>**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------x

BDCM OPPORTUNITY FUND II, LP, BLACK
DIAMOND CLO 2005-1 LTD, and
SPECTRUM INVESTMENT PARTNERS,
L.P.,

                      Plaintiffs,

              - against -

YUCAIPA AMERICAN ALLIANCE FUND I,
LP, and YUCAIPA AMERICAN ALLIANCE
(PARALLEL) FUND I, LP,

                      Defendants.

------------------------------------------------------------x

Index No.: 650150/2012

Motion Seq. No. 3

Hon. Charles E. Ramos

 

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York 10022
(212) 756-2000

*Attorneys for Plaintiffs
BDCM Opportunity Fund II, LP,
Black Diamond CLO 2005-1 Ltd., and
Spectrum Investment Partners, L.P.*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT…………………………………………………………………….1

ARGUMENT…………………………………………………………………………………...4

I. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT UNDER THE PLAIN
   TERMS OF THE UNDERLYING AGREEMENTS…………………………………………….4

   A. Summary Judgment Is Appropriate At This Time................................................................ 4

   B. An Amendment Having The Effect of Changing The Definition Of Requisite Lenders
   Requires Unanimous Affected Lender Consent. ...................................................................... 5

   C. The Purported Fourth Amendment Had The Effect of Amending The Definition of
   Requisite Lenders by Changing the Meaning of Term Loan Exposure..................................... 5

      1. Defendants Could Not Have Become Requisite Lenders Under The Third Amendment. . 7

      2. Only As A Result of The Purported Fourth Amendment Could Defendants Claim To Be
      Requisite Lenders.................................................................................................................. 9

   D. All Lenders Were Affected By The Purported Fourth Amendment, Which For The First
   Time Permitted Defendants To Become Requisite Lenders.................................................... 10

II. DEFENDANTS' AFFIRMATIVE DEFENSES FAIL AS A MATTER OF LAW………….11

   A. The Settlement Agreement Forecloses Defendants' *Res Judicata* Defense. ....................... 11

   B. The Credit Agreement's "No Waiver" Provision Precludes Defendants From Asserting
   Waiver or Estoppel. ............................................................................................................. 13

   C. Even If The No-Waiver Provisions Do Not Apply, Plaintiffs' Failure To Object To The
   Third Amendment Has No Relevance. .................................................................................. 15

CONCLUSION…………………………………………………………………………………..15

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                                      **PAGE(S)**

*Antonini v. Petito*,
      96 A.D.3d 446 (1st Dep't 2012) ............................................................................... 14

*Awards.com v. Kinko's, Inc.*,
      42 A.D.3d 178 (1st Dep't 2007) ............................................................................... 14

*Blitman Constr. Corp. v. Ins. Co. of N. Am.*,
      66 N.Y.2d 820 (1985) ............................................................................................... 14

*Brown & Williamson Tobacco Corp. v. Gault*,
      280 Ga. 420 (2006) ................................................................................................... 11

*City of Centerville v. City of Warner Robins*,
      270 Ga. 183 (1998) ................................................................................................... 12

*Crossland Sav., FSB v. Loguidice-Chatwal Real Estate Inv. Co.*,
      171 A.D.2d 457 (1st Dep't 1991) ............................................................................. 15

*Fabiano v. Philip Morris Inc.*,
      54 A.D.3d 146 (1st Dep't 2008) ............................................................................... 12

*Fundamental Port. Advisors, Inc. v. Toqueville Asset Mgmt.*,
      7 N.Y.3d 96 (2006) ................................................................................................... 14

*Gen. Phoenix Corp. v. Cabot*,
      300 N.Y. 87 (1949) ..................................................................................................... 4

*Lee v. Marvel Enters., Inc.*,
      386 F. Supp. 2d 235 (S.D.N.Y. 2005) ........................................................................ 9

*Pearce, Urstadt, Mayer & Greer Realty Corp. v. Atrium Dev. Assocs.*,
      77 N.Y. 2d 490 (1991) ................................................................................................ 5

*Quintel Commc'ns, Inc. v. Fed. Transtel, Inc.*,
      142 F. Supp. 2d 476 (S.D.N.Y. 2001) ........................................................................ 5

*Reiss v. Fin. Performance Grp.*,
      97 N.Y. 2d 195 (2001) ................................................................................................ 4

*RM Realty Holdings Corp. v. Moore*,
      64 A.D.3d 434 (1st Dep't 2009) ................................................................................. 9

*Rotblut v. Conn. Gen. Life Ins. Co.*,
    226 A.D.2d 617 (2d Dep't 1996) ............................................................................. 11

*Shea v. Am. Tobacco Co.*,
    73 A.D.3d 730 (2d Dep't 2010) ............................................................................. 12

*Terry v. State Farm Fire & Cas. Ins. Co.*,
    269 Ga. 777 (1998) ............................................................................................... 12

*Triax Capital Advisors, LLC v. Rutter,*
    83 A.D.3d 490 (1st Dep't 2011) ............................................................................. 11

*Weeks Marine, Inc. v. Am. S.S. Owners Mut. Prot. and Indem. Assoc., Inc.*,
    No. 08 Civ. 9878, 2011 WL 3796331 (S.D.N.Y. Aug. 25, 2011) ............................. 15

## PRELIMINARY STATEMENT

This is a straightforward action which only seeks one remedy: a declaration as to the meaning of certain contract language.  No extrinsic evidence is relevant.  Thus, contrary to Defendants' objection, this motion is not premature; it is being made at exactly the right time.  There are two possible outcomes to the motion: either (1) the Court finds, upon review of the four corners of the contract, that the language is clear on its face, in which case the Court should grant summary judgment, and the parties will not waste significant time and money in unnecessary discovery; or (2) the Court finds that the language is ambiguous, the motion for summary judgment is denied, and the case will move forward with a ruling that will help the parties focus their discovery.  In either instance, the motion is not only timely, it is advisable in order to either end the action now or give the parties guidance as to future proceedings.

As this Court is aware, on an application to construe language in a contract, the Court is **not to look to extrinsic evidence to create ambiguity in the contract**; rather, the Court is charged with limiting its review to the four corners of the contract to determine if there is any ambiguity.

Rather than limit themselves to the language of the contracts at issue, Defendants submit the Walker Affidavit, which presents exclusively extrinsic evidence and serves no purpose other than to put before this Court inflammatory accusations that will be strongly contested if necessary.  Defendants, however, are putting the cart before the horse; rather than looking to extrinsic evidence to create ambiguity, the parties, and this Court, are to look to the text of the contract alone to ascertain if there is any ambiguity.[1]

This motion is also timely and dispositive as to the affirmative defenses raised by Defendants and which Defendants argue require significant amounts of discovery.  As to the alleged affirmative defense of

---

[1] Although the Walker Affidavit is irrelevant to this motion, Plaintiffs deny each statement contained therein as well as the similarly irrelevant "Additional Material Facts Asserted By Defendants" attached to Defendants' Opposition.  Indeed, the Court should never get to the Walker Affidavit, regardless of its ruling on this motion.  If the Court determines from the face of the agreements that there is no ambiguity, the Court need not look at any extrinsic evidence.  If, on the other hand, the Court determines there is ambiguity and denies this motion, the parties will move on to plenary discovery as to all relevant extrinsic evidence, not simply the Walker Affidavit.  In either case, the Walker Affidavit is irrelevant to this motion.

*res judicata*, no resort to extrinsic evidence is necessary.  Attached to the Complaint as Exhibit E is the Settlement Agreement resolving the Georgia Action.  Plaintiffs were not parties to the Georgia Action. Defendants argue that CIT settled that litigation as Plaintiffs' agent and as a result Plaintiffs are bound by that settlement through *res judicata*.  Defendants further argue that they need extensive discovery as to whether CIT had the authority to settle on Plaintiffs' behalf.  This issue, however, is simply a red herring, and any such discovery is unnecessary and wasteful.  Even if CIT had the authority to settle the Georgia Action for Plaintiffs, which it did not, the Settlement Agreement makes clear CIT did not do so — CIT only settled its own claims in its individual capacity.  Thus, the issue of CIT's authority is completely irrelevant.  Since the Settlement Agreement is clear on its face, the Court does not need to look beyond its four corners.

As to the Defendants' other affirmative defense, that Plaintiffs waived the right to object to the Purported Fourth Amendment by not objecting to language in the Third Amendment, there is an express "no waiver" clause in the agreements at issue.  As a result, the waiver defense cannot be sustained.

Further, even in the absence of the no waiver clause, this Court would still be able to resolve the issue of waiver from the face of the agreements, without resort to extrinsic evidence.  Defendants' argument is that by virtue of the language in the Credit Agreement, Plaintiffs were required to affirmatively object to the Third Amendment in order to maintain the right to object to the Purported Fourth Amendment.  However, review of the relevant contract language shows that there was no such requirement placed on the Plaintiffs because they were not "affected" by the Third Amendment, and thus the consent of all Lenders was not required.  The same is not true for the Purported Fourth Amendment. Thus, even without resorting to the no waiver clause, there is no ambiguity in the agreements and no need to resort to extrinsic evidence.

The reason Defendants seek to delay this action by taking extensive discovery of unnecessary extrinsic evidence is because, in the Allied bankruptcy, Defendants are attempting to act as Requisite

Lenders and through that role are threatening to prejudice the rights of the Plaintiffs as Lenders. Until this Court rules on the issue of whether the Purported Fourth Amendment is null and void, Defendants will continue to threaten Plaintiffs' rights. Thus, the more delay the Defendants can achieve in this action by arguing for discovery of irrelevant extrinsic evidence, the longer they will be able to threaten the rights of Plaintiffs in the bankruptcy. The need for a speedy resolution of the Requisite Lender issue is another reason this motion is timely.

The only issue to be determined by this Court, after its determination that the agreements are not ambiguous on their face, is the meaning of the contract language at issue. Plaintiffs respectfully submit that the contract language is clear that the Purported Fourth Amendment is null and void because the required consents thereto were never obtained. In that regard, the question posed by Plaintiffs' motion is whether the Purported Fourth Amendment had "the effect" of amending the definition of Requisite Lenders in the Credit Agreement. In our Opening Brief, Plaintiffs established the following, based entirely on the pleadings and Credit Documents:

- Under the Credit Agreement, as amended by the Third Amendment, Yucaipa could not acquire a material amount of Term Loan Exposure and could not act as Requisite Lenders due to such limitations and the strict prohibitions on Yucaipa's ability to exercise *any* voting rights;

- The Purported Fourth Amendment would eliminate these prohibitions by amending the definition of Term Loan Exposure, a key defined term incorporated into the definition of Requisite Lenders and upon which that definition turns; and

- As a result of the amendment to the definition of Term Loan Exposure, which has the effect of amending the definition of Requisite Lenders under the Purported Fourth Amendment, and Yucaipa's acquisition of the majority share of Allied's Obligations, Yucaipa now claims to be Requisite Lenders.

As demonstrated in Plaintiffs' Opening Brief, Section 10.5(b) of the Credit Agreement requires unanimous affected Lender consent for any amendment that has the effect of changing the definition of Requisite Lenders. (Opening Br. at 16-17.) The Purported Fourth Amendment clearly had such an effect and it is undisputed that no affected Lender, other than Yucaipa's counterparty, gave the required consent.

As a result, under the plain terms of the Credit Agreement, the Purported Fourth Amendment never became effective and is thus null and void.

## ARGUMENT

I. **PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT UNDER THE PLAIN TERMS OF THE UNDERLYING AGREEMENTS.**

A.    **Summary Judgment Is Appropriate At This Time.**

This case presents a pure issue of contract interpretation and no discovery is needed.  Plaintiffs seek a declaration regarding their consent rights under the Credit Agreement with respect to an extensive and integrated set of amendments (*i.e.,* the Purported Fourth Amendment) that had the effect of amending the definition of Requisite Lenders.  The agreement is unambiguous; an amendment that had the effect of changing the definition of Requisite Lenders, which the Purported Fourth Amendment unequivocally did, required the consent of all affected Lenders, including Plaintiffs.

In their opposition papers, Defendants kick up a lot of dirt in an attempt to manufacture a material issue of fact.  However, none of these purported material facts are relevant to this motion since the motion is purely addressed to contract construction.  It is well-settled that extrinsic evidence is "**not admissible to create an ambiguity** in a written agreement which is complete and clear and unambiguous on its face." *Reiss v. Fin. Performance Grp.*, 97 N.Y. 2d 195, 199 (2001) (emphasis added).  Defendants' attempt to argue that there are many material factual issues is a fruitless exercise in the face of the contractual language and the limited relief sought in this suit.

Once the Court determines that the documents are unambiguous on their face, "the intention of the parties may be gathered from the four corners of the instrument, interpretation of the contract is a question of law . . . [and] no trial is necessary to determine the legal effect of the contract." *Gen. Phoenix Corp. v. Cabot*, 300 N.Y. 87, 92 (1949).  In this case, the documents are unambiguous, no factual discovery is required as to the parties' intent or anything else, and the Court is to determine the legal effect of the relevant agreements without resort to extrinsic evidence.

4

**B.    An Amendment Having The Effect of Changing The Definition Of Requisite Lenders Requires Unanimous Affected Lender Consent.**

Defendants make an overly literal argument that ignores the fact that Section 10.5(b) of the Credit Agreement provides that unanimous affected Lender consent is required for any amendment where "the effect thereof" would amend the definition of Requisite Lenders — not only for amendments that would change the literal words of the definition:

> **Without the written consent of each Lender** (other than a Defaulting Lender) that would be **affected thereby, no amendment,** modification, termination or consent shall be effective **if the effect thereof would:**
>
> **(ix) amend the definition of "Requisite Lenders"**. . .[2]

(Ehrlich Aff., Ex. 1, § 10.5(b)(ix) (emphasis added).)  Ignoring the "if the effect thereof" language, as Defendants urge the Court to do, would, contrary to a cardinal canon of construction, render that phrase meaningless.  *See, e.g., Pearce, Urstadt, Mayer & Greer Realty Corp. v. Atrium Dev. Assocs.*, 77 N.Y. 2d 490, 497 (1991).

As set forth below and in the Opening Brief at 19-23, amending the definition of Term Loan Exposure in the Purported Fourth Amendment had the obvious "effect" of amending the definition of Requisite Lenders,[3] and required unanimous affected Lender consent.

**C.    The Purported Fourth Amendment Had The Effect of Amending The Definition of Requisite Lenders by Changing the Meaning of Term Loan Exposure.**

Defendants set up a straw man, arguing that Plaintiffs' reading of the contracts — which gives

---

[2]  Requisite Lenders are defined in the Credit Agreement as:

> one or more Lenders having or holding Term Loan Exposure, LC Exposure and/or Revolving Exposure and representing more than 50% of the sum of (i) the aggregate Term Loan Exposure of all Lenders, (ii) the aggregate LC Exposure of all Lenders and (iii) the aggregate Revolving Exposure of all Lenders.

(Ehrlich Aff., Ex. 1, § 1.1.) "Ehrlich Aff." refers to the Affidavit of Richard Ehrlich, dated August 27, 2012, submitted in support of Plaintiffs' Motion for Summary Judgment.

[3]  In any event, the change to the definition of Term Loan Exposure did in fact change the actual language of the definition of Requisite Lenders because whenever a defined term is utilized, it is as if the full meaning was used in its place.  Indeed, throughout its Opposition, Yucaipa asks the Court to ignore the function of defined terms, which serve as a drafting convenience utilized by the parties to "set forth exactly what they mean[] in the body of the contract itself." *Quintel Commc'ns, Inc. v. Fed. Transtel, Inc.* 142 F. Supp. 2d 476, 482 (S.D.N.Y. 2001).

meaning to the defined terms incorporated in the definition of Requisite Lenders, instead of treating them as hollow terms — renders the Credit Agreement "an unusable morass because . . . unanimous Lender consent would be required for changes to any one of 33 terms." (Opp. Br. at 3.)  This statement is simply untrue, and it ignores the fact that the proper inquiry is whether any such change has "the effect" of amending the definition of Requisite Lenders.  It is not a given that any such change would have that effect.[4]  In this instance, however, the change to Term Loan Exposure indisputably had the "effect" of changing the definition of Requisite Lenders.

Contrary to Defendants' position that the meanings of the embedded terms are irrelevant, the various defined terms incorporated in the definition of "Requisite Lenders" are necessary to give the definition its meaning.  Thus, a modification of a term embedded in the definition of Requisite Lenders that has the effect of amending how Requisite Lenders are defined requires the written consent of all Lenders who are affected thereby.

There is no dispute that the Purported Fourth Amendment changed the definition of Term Loan Exposure.  (Ehrlich Aff., Ex. 5, § 2.1(e).)  This change to the definition of Term Loan Exposure had the effect of amending the definition of Requisite Lenders by permitting the amount of Term Loans purchased by Defendants to be counted for the purposes of determining the Requisite Lenders — whereas under the Third Amendment they would have been disregarded.  Only after the Purported Fourth Amendment stripped away all restrictions on Defendants' ability to both acquire Obligations and to count its Term

---

[4]  Defendants make an overly strained argument based on the fact that there are two terms which are specifically mentioned in Section 10.5(b) as requiring unanimous Lender consent to be amended: Requisite Lenders and Pro Rata Share.  From this, Defendants argue that, "[i]f Plaintiffs' 'embedding' argument were correct, however, Pro Rata Share would not need to be listed in Section 10.5(b) as one of the terms requiring unanimous Lender consent to modify, because any amendment to that term would automatically have the 'effect' of amending the definition of Requisite Lender." (Opp. Br. at 20.)  Defendants again forget that a change to the definition of Pro Rata Share may not have any "effect" on the definition of Requisite Lenders and also may not "affect" any of the Lenders.  That is, "Pro Rata Share" is a term whose application is broader than simply with reference to the definition of Requisite Lender, and its amendment could, in many circumstances, have *no effect* on the definition of Requisite Lenders.  Because amending the definition of Pro Rata Share does not necessarily have the effect of amending the definition of Requisite Lenders, the inclusion of Pro Rata Share in Section 10.5(b)(ix) is not superfluous and does nothing to undermine the argument that changes to defined terms embedded within the definition of Requisite Lenders, such as Term Loan Exposure, have the effect of amending the definition of Requisite Lenders and affect Lenders.

Loan Exposure and LC Exposure toward the definition of Requisite Lender, could Defendants claim to

have become Requisite Lenders and to control Allied's debt.[5]

### 1.    Defendants Could Not Have Become Requisite Lenders Under The Third Amendment.

Under the Third Amendment, Defendants were permitted to become a "Lender" in name-only.  In

addition to limiting the amount and types of Obligations that Defendants were allowed to acquire,[6]  the

Third Amendment modified the definition of Term Loan Exposure by adding the prohibition, specific to

Defendants alone, that:

> with respect to any provisions of this Agreement relating to the voting rights of
> Lenders (including the right of Lenders to consent or take any other action with
> respect to any amendment, modification, termination or waiver of any provision
> of this Agreement or the other Credit Documents, or consent to any departure by
> any Credit Party therefrom), the aggregate outstanding principal amount of the
> Term Loans of [Defendants] shall be disregarded for purposes of this definition of
> 'Term Loan Exposure.'

(Ehrlich Aff., Ex. 5, § 2.1(e) (emphasis added).)  Simply translated, under the Third Amendment,

Defendants could buy a limited amount of Term Loans but could never vote them, including vote them in

connection with taking **any action** to enforce, modify or waive terms of the Credit Agreement.  In effect,

any Term Loans purchased by Defendants were neutered.  The Purported Fourth Amendment would

reverse the neutering and would give Defendants full rights to acquire Term Loans and vote.[7]

---

[5] Defendants argue for the application of the Latin maxim translated as the expression of one is the exclusion of the
other in making the literal argument that only amendments to the terms Requisite Lenders and Pro Rata Share literally
require unanimous Lender consent; however, that maxim is not applicable here since it only applies in a vacuum, where
expression is given as to one term but the contract is otherwise silent as to other terms.  Here, the Credit Agreement is
not silent; it expressly says that unanimous consent of all affected Lenders is required to an amendment that has the
"effect of" amending the definition of Requisite Lender.

[6]  Under the Third Amendment, Defendants were prohibited from purchasing Revolving Loans or LC Deposits and
were restricted to 25% or $50 million of Term Loan Exposure.  (*See* Ehrlich Aff., Ex. 5, § 2.7(c).)

[7]  The voting rights Defendants agreed to forgo pursuant to the Third Amendment included any right "to consent or take
any other action with respect to any amendment, modification, termination or waiver of any provision of this Agreement
or other Credit Documents, or consent to any departure by any Credit Party therefrom; **it being understood and agreed
that [Defendants] shall have no voting rights for all purposes under this Agreement (whether before, during or
after an Insolvency or Liquidation Proceeding) and the other Credit Documents with respect to their Term
Loans."**  (Ehrlich Aff., Ex. 5 § 2.7(a), amending Section 10.5 of the Credit Agreement (emphasis added).)  In other
words, Defendants was prohibited from having **any influence** as a Lender.

The aforesaid prohibitions in the Third Amendment prevented Defendants from becoming Requisite Lenders[8] because the amount of Defendants' Term Loans could not be counted in the definition of Term Loan Exposure.  Since the term "Requisite Lenders" is defined to be the holder of more than 50% of aggregate Term Loan Exposure and certain other loan exposure, and Defendants' Term Loans were expressly disregarded for purposes of the definition of "Term Loan Exposure" under the Third Amendment, Defendants could never become Requisite Lenders.  Defendants' neutered Term Loans simply did not count.  In fact, Defendants admit that "[c]hanging the definition of TLE [Term Loan Exposure] . . . at most . . . affected the identity of who could be the Requisite Lender." (Opp. Br. at 22) (emphasis in original).

Despite holding a limited amount of neutered Term Loans, with no ability to vote, consent to any action, or amend the Credit Agreement, Defendants claim that they could have become Requisite Lenders under the Third Amendment.  (Opp. Br. at 21-22.)  In continuing with this argument, Defendants assert that the Third Amendment's definition of Term Loan Exposure "only requires that Defendants' Terms Loans be disregarded 'with respect to any provision of [the Agreement] relating to the voting rights of Lenders.'" (*Id.* at 21.)  "Requisite Lender," according to Defendants, is merely an "arithmetic calculation."[9]  (*Id.*)  This is simply not the case.

As noted, the prohibitions in the Third Amendment make clear that the Term Loans held by Defendants are to be disregarded "with respect to any provisions of this Agreement relating to the voting rights of Lenders."  (Ehrlich Aff., Ex. 5, § 2.1(e).)  The rights from which Defendants were expressly

---

[8]  In addition, the Third Amendment gave the Administrative Agent the discretion to exclude Defendants from receiving documents or participating in meeting with "the Lenders (including with respect to the exercise of rights and remedies under the Credit Agreement.") (Ehrlich Aff., Ex. 5, § 2.6(a).)  Defendants cannot seriously claim that they could have become Requisite Lenders when the Administrative Agent could have precluded them from participating in meetings with respect to the exercise of the Lenders' rights under the Credit Agreement.

[9]  If being the "Requisite Lender" was just a matter of arithmetic as Defendants contend, no party would care to dispute the identity of the Requisite Lender.  Rather, as acknowledged by all parties, Requisite Lenders enjoy considerable control over the Lenders' actions, including the right to enforce or not to enforce the Lenders' remedies against Allied, rights explicitly withheld from Defendants under the Third Amendment.

denied under the Third Amendment — *i.e.*, to be disregarded from "any provision of this Agreement relating to the voting rights of Lenders" — are **precisely** the types of rights vested in the Requisite Lenders under the Credit Agreement (*i.e.*, the ability to consent to certain amendments, waivers, etc. under Section 10.5(b)).[10]  Without this authority and the voting power to back it up, the Requisite Lenders would have no ability to perform the functions contemplated by the Credit Agreement.  Defendants' argument that they could be Requisite Lenders but not vote is thus disingenuous and overly technical.  The entire purpose of being Requisite Lenders is so you can exercise voting rights associated with more than 50% of the debt in respect of waivers, consent rights and the like.  To be Requisite Lenders in name only, with no ability to act, improperly elevates form over substance.  *See, e.g., RM Realty Holdings Corp. v. Moore*, 64 A.D.3d 434, 438 (1st Dep't 2009) (discarding alternative interpretation as "an exercise in elevating form over substance" that was "in contravention of well-settled canons of contract interpretation").  Also, to have a Requisite Lenders who could not actually deliver the requisite votes needed to cause amendments, waivers and consents to become effective would be an absurd result, and thus is not a permissible interpretation of the Credit Agreement.  *See, e.g., Lee v. Marvel Enters., Inc.*, 386 F. Supp. 2d 235, 244 (S.D.N.Y. 2005) (noting that a court should avoid interpretations that result in an absurdity, an injustice, or an inequitable or unusual result).

> **2.     Only As A Result of The Purported Fourth Amendment Could Defendants Claim To Be Requisite Lenders.**

If any doubt remains about Defendants' inability to become Requisite Lenders under the Third Amendment, the Court need only look to the Purported Fourth Amendment.  If Defendants were truly permitted to become Requisite Lenders under the Third Amendment, there would be no need for the Purported Fourth Amendment to rollback the prohibitions on Defendants' ability to exercise voting rights.

---

[10]  *See, e.g.,* § 6.13 Amendments or Waivers of Organizational Documents and Certain Agreements ("No Credit Party shall . . . agree to any amendment . . . to any of its Organizational Documents . . . without in each case obtaining the prior written consent of Requisite Lenders . . ."); § 8.1 Defaults ("upon any other Event of Default, at the request of (or with the consent of) Requisite Lenders . . ."); § 10.5 Amendments ("no amendment shall be effective . . . without the written consent of the Requisite Lenders).

The Purported Fourth Amendment eliminates these restrictions from the Third Amendment by amending the definition of Term Loan Exposure specifically to strike the provision disregarding Defendants' Term Loans from the calculation of the definition. (Ehrlich Aff., Ex. 6, § 2.1(b).) The Purported Fourth Amendment also removes the fundamental restriction on Defendants' ability to acquire over 25% of the outstanding Term Loans and no longer requires Defendants to contribute capital of at least 50% of the aggregate principal amount of any Term Loans so acquired. (Ehrlich Aff., Ex. 6, §§ 2.7(c), 2.7(e).) Obviously, the only reason this was all done was because the Third Amendment prevented Defendants from controlling Allied's debt by acting as Requisite Lenders. The Purported Fourth Amendment itself puts the lie to Defendants' position. (*See* Opening Br. at 12-13, 17-18.)

### D.   All Lenders Were Affected By The Purported Fourth Amendment, Which For The First Time Permitted Defendants To Become Requisite Lenders.

Defendants argue that the Credit Agreement and Third Amendment did not preclude Defendants from being Requisite Lenders. (Opp. Br. at 22-23.) As set forth in pages 9-11 of Plaintiffs' Opening Brief, a review of the plain terms of the Credit Agreement and Third Amendment shows that nothing could be further from the truth. The restrictions set forth in these agreements precluded Defendants from ever becoming the Requisite Lenders.[11]

It cannot reasonably be disputed that all Lenders, including Plaintiffs, were affected by the Purported Fourth Amendment, which for the first time permitted Defendants, Allied's controlling shareholder, to become Allied's Requisite Lender. Therefore, under Section 10.5(b)(ix), all Lenders

---

[11] Defendants contend that the change to the definition of Eligible Assignee is what allowed Defendants to become the Requisite Lenders and that this change took place in the Third Amendment where Plaintiffs say unanimous Lender consent was not needed. It is not correct that the change to "Eligible Assignee" allowed Defendants to become Requisite Lenders; all this change allowed Defendants to do was to buy loans, but because the Third Amendment placed strict restrictions on Defendants' ability to both purchase Term Loans and to count those loans as part of the Term Loan Exposure, and prohibited Defendants from voting these loans, there was no danger that Defendants could ever become the Requisite Lender. Thus, the Lenders were not affected by the Third Amendment. It was only in the Purported Fourth Amendment, where these strict restrictions were removed, principally by the amendment to the definition of Term Loan Exposure, that Defendants were able to become Requisite Lenders and the Lenders were first affected, thus requiring unanimous Lender consent. The propriety of this amendment was immediately challenged by Plaintiffs, who requested the Administrative Agent not act on the direction of Defendants. (*See* Grant Aff. Ex. J.) "Grant Aff." refers to the Affidavit of Adam K. Grant, dated September 25, 2012, submitted in support of Defendants' Opposition.

needed to give their written consent for the Purported Fourth Amendment to become valid.  There is no

dispute that such consent was neither sought nor obtained.[12]  The Purported Fourth Amendment should

thus be declared null and void.[13]

## II.    DEFENDANTS' AFFIRMATIVE DEFENSES FAIL AS A MATTER OF LAW.

### A.    The Settlement Agreement Forecloses Defendants' *Res Judicata* Defense.

Defendants argue that summary judgment should not be granted because fact discovery is

necessary for its *res judicata* defense, which is based upon the settlement of the Georgia Action, a case in

which Plaintiffs were not parties.  (Opp. Br. at 9-17.)  Once again, Defendants improperly seek recourse to

extrinsic evidence in an effort to create an ambiguity where none exists.  The Settlement Agreement —

which was negotiated and executed by Defendants — unequivocally demonstrates that any claims by

Plaintiffs were not dismissed in the Georgia Action.

Under both Georgia and New York law,[14] the Court is to look to the settlement agreement in order

to determine the impact of a consensual dismissal.  *See, e.g., Brown & Williamson Tobacco Corp. v.

Gault*, 280 Ga. 420, 423-24 (2006) (looking to settlement agreement to determine scope of previous

adjudication for *res judicata* purposes); *City of Centerville v. City of Warner Robins*, 270 Ga. 183, 186-87

---

[12] Defendants assert that Plaintiffs were aware of the discussions leading up to the Purported Fourth Amendment and did not object.  Plaintiffs disagree with these assertions; however, they are irrelevant.  The Credit Documents require the affirmative written consent of the affected Lenders; there can be no doubt that, even if Plaintiffs knew of the discussions leading up to the Purported Fourth Amendment, they never consented to such amendment, nor were they even asked to do so.  Further, these alleged actions by Defendants could not create a waiver of Plaintiffs' rights.  (*See* Sections II.B, II.C, *infra*.)

[13]  Defendants argue in the alternative that if the amended meaning of Term Loan Exposure did, as Plaintiffs' assert, have the effect of amending the definition of Requisite Lenders, then only the section that amends the definition of Term Loan Exposure should be severed from the Purported Fourth Amendment.  (Opp. Br. at 23-25.)  That result is not defensible.  The clear purpose of the **entire** Purported Fourth Amendment was to remove all of the restrictions put in place to prevent Defendants from acquiring any material portion of the Obligations, exercising any rights associated with those Obligations, or becoming Requisite Lenders.  The change to Term Loan Exposure is a key component of this highly integrated agreement that had a single intent — to allow Defendants to control the debt — and thus cannot be severed.  *See e.g., Rotblut v. Conn. Gen. Life Ins. Co.*, 226 A.D.2d 617, 617 (2d Dep't 1996); ("As a general rule, a contract is entire when by its terms, nature, and purpose, it contemplates and intends that each and all of its parts and the consideration therefore shall be common each to the other and interdependent.")

[14]  The Settlement Agreement expressly provides that New York law governs the Settlement Agreement.  (Grant Aff., Ex. I, ¶ 18.)  Under New York law, the intent of the parties is to be determined, if possible, solely by reference to the four corners of the agreement.  *See Triax Capital Advisors, LLC v. Rutter*, 83 A.D.3d 490, 493 (1st Dep't 2011).

(1998) (interpreting the parties' previous consent order to determine its preclusive effect); *Shea v. Am. Tobacco Co.*, 73 A.D.3d 730, 732 (2d Dep't 2010) (analyzing parties' settlement agreement as well as consent decree to determine the preclusive effect of prior suit); *Fabiano v. Philip Morris Inc.*, 54 A.D.3d 146, 151-52 (1st Dep't 2008) (determining preclusive effect based on settlement agreement).[15]  Here, the Settlement Agreement, which required the parties to "dismiss their respective claims in the Action with prejudice upon the execution of this [Settlement] Agreement" provided the basis of the dismissal of the Georgia Action.  (Grant Aff., Ex. I, ¶ 2.)[16]

No reading of the Settlement Agreement could lead to the conclusion that CIT was settling any claims other than its own in the Georgia Action.  First, CIT expressly limited the release it gave under the Settlement Agreement to itself:

> This ***limited release is made solely by CIT*** and its personal representatives, successors and assigns ***on its own behalf and not in a representative capacity on behalf of any other person and does not constitute a release by any other person***.

(Grant Aff., Ex. I, ¶ 1(b).)  Next, the parties to the Settlement Agreement, including Defendants here, made clear that nothing in the Settlement Agreement released any claims belonging to anyone other than the parties to the Settlement Agreement:

> ***For the avoidance of doubt and notwithstanding anything herein to the contrary, nothing in this Agreement shall release any claims***, actions, causes of action . . . ***whatsoever belonging to any person or entity other than the Parties to this Agreement*** (and each of their respective personal representatives, successors and assigns)

---

[15]  Defendants cite to *Terry v. State Farm Fire & Cas. Ins. Co.*, 269 Ga. 777 (1998), for the proposition that the Court should look only to a form stipulation of dismissal filed with the court in Georgia to determine the scope of preclusion and completely disregard the Settlement Agreement.  (Opp. Br. at 13-14.)  In *Terry*, unlike here, there was no written settlement agreement for the court even to consider.  As the authority cited by Plaintiffs indicates, had there been a settlement agreement, the Georgia courts would have looked to it to determine the preclusive effect of the settlement.

[16]  Even accepting Defendants' strained assertion that this Court is limited to the form stipulation of dismissal to determine the preclusive effect of CIT's settlement, this form stipulation is only between the parties to the Georgia Action (Plaintiffs were not a party thereto), and CIT signs the dismissal in its ***individual capacity***.  (Grant Aff., Ex. F, at 3.)  There is no indication on the face of the form stipulation of dismissal that CIT was acting on behalf of anyone other than itself in settling the Georgia Action (as opposed to the Settlement Agreement which expressly makes clear that CIT is only settling its own claims).

(Grant Aff., Ex. I, ¶ 1(d).)  Further, as the signature blocks in the Settlement Agreement show, CIT signs, through its attorneys, only in its individual capacity.  (Grant Aff., Ex. I, at 19.)[17]

Defendants also argue that Georgia law required that Plaintiffs to appear in the Georgia Action to attack the judgment either prior to its entry or by subsequent proceedings.  (Opp. Br. at 13.)[18]  However, this argument is baseless because Plaintiffs had no reason to attack the judgment since, as demonstrated above, CIT was only dismissing its own claims and not any claims belonging to Plaintiffs.

Finally, Defendants several times misstate the record of the argument before the Court on their prior motion to dismiss on *res judicata* grounds, but the transcript is clear.  The Court never said Defendants had a valid *res judicata* defense nor that they had the right to discovery on that defense.  Once the Court reviewed the Settlement Agreement, the Defendants' motion to dismiss was summarily denied.  (Grant Aff., Ex. M, Tr. at 29:15-30:03.)[19]  The unambiguous terms of the Settlement Agreement demonstrate that Plaintiffs' claims have not been released or dismissed.  (*See* Grant Aff., Ex. I, ¶ 1(d).)  No amount of discovery will alter these express terms or change the fact that the *res judicata* affirmative defense fails as a matter of law.

### B.    The Credit Agreement's "No Waiver" Provision Precludes Defendants From Asserting Waiver or Estoppel.

Similarly, Plaintiffs are entitled to summary judgment on Defendants' affirmative defenses of

---

[17] Footnote 8 of Defendants' Opposition proves Plaintiffs' case on this point.  (*See* Opp. Br. at 15 n.8.)  Where the parties to the Settlement Agreement wanted to make it clear that CIT was agreeing to take action in its agency capacity, they said so specifically.  Conversely, as the release provision indicates, where CIT was acting in its individual capacity, they said so specifically.  The parties obviously knew how and when that distinction was to be made and drafted accordingly.

[18] Defendants cannot cite to any Georgia authority to support this proposition, but only to a comment to the Restatement (2d) of Judgments which, since Defendants cannot cite to a case for this proposition, apparently has never been cited by any Georgia court.

[19]  Defendants similarly misstate language in the affidavit of Richard Ehrlich, by claiming that Mr. Ehrlich "admitted CIT's role as Plaintiffs' agent throughout the Georgia Action."  (Opp. Br. at 12.)  Defendants omitted Mr. Ehrlich's next sentence that made clear that any notion that CIT was acting as agent was invalidated by CIT's negotiation and signing of the Settlement Agreement.  ("The aforesaid settlement agreement changed that.")  (Grant Aff., Ex. L, ¶ 12.)  Even though this extrinsic evidence is irrelevant, it is noteworthy to show how far Defendants stretch to try to save their *res judicata* argument.

waiver and equitable estoppel because Defendants cannot establish the essential elements of the defense.

*See, e.g., Blitman Constr. Corp. v. Ins. Co. of N. Am.*, 66 N.Y.2d 820, 823 (1985) (reversing denial of

summary judgment where non-moving party could raise no triable issue concerning waiver or estoppel).

These defenses fail in the face of the unambiguous language of Section 10.9 of the Credit Agreement, the

"no waiver" provision, which provides that:

> No failure or delay on the part of any Agent or any Lender in the exercise
> of any power, right or privilege hereunder or under any other Credit
> Document shall impair such power, right or privilege or be construed to be
> a waiver of any default or acquiescence therein, nor shall any single or
> partial exercise of any such power, right or privilege preclude other or
> further exercise thereof or of any other power, right or privilege. . . . Any
> forbearance or failure to exercise, and any delay in exercising, any right,
> power or remedy hereunder shall not impair any such right, power or
> remedy or be construed to be a waiver thereof, nor shall it preclude the
> further exercise of any such right, power or remedy.

(Ehrlich Aff., Ex. 1, § 10.9.)  "No waiver" provisions, such as Section 10.9, are "uniformly enforced" in

New York.  *Awards.com v. Kinko's, Inc.*, 42 A.D.3d 178, 188 (1st Dep't 2007).  As a result of this

provision, even if Plaintiffs' consent was necessary to approve the Third Amendment (which it was not),

Plaintiffs' alleged acquiescence therein in no way impairs their right to insist that the Purported Fourth

Amendment be approved by unanimous consent of all affected Lenders.  This affirmative defense of

waiver therefore fails as a matter of law.

The "no waiver" provision is equally fatal to Defendants' estoppel defense.  Equitable estoppel is

imposed by law to "prevent the enforcement of rights which would work fraud or injustice" upon the party

against whom the rights are enforced where that party has, "in *justifiable reliance* upon the opposing

party's words or conduct, . . . been misled into acting upon the belief that such enforcement would not be

sought." *Fundamental Port. Advisors, Inc. v. Toqueville Asset Mgmt.*, 7 N.Y.3d 96, 106 (2006) (emphasis

added).  As a matter of law, a "no waiver" provision, such as Section 10.9, makes any claimed reliance not

justifiable.  *See Antonini v. Petito*, 96 A.D.3d 446, 447 (1st Dep't 2012) (finding no merit to waiver and

estoppel defenses and granting summary judgment in light of the agreement's "no waiver" provision);

14

*Crossland Sav., FSB v. Loguidice-Chatwal Real Estate Inv. Co.*, 171 A.D.2d 457, 457 (1st Dep't 1991) (affirming grant of summary judgment where the contract at issue contained a "no waiver" provision because estoppel defense was thereby "negated by the express terms of the parties' unambiguous written agreements"); *see also Weeks Marine, Inc. v. Am. S.S. Owners Mut. Prot. and Indem. Assoc., Inc.*, No. 08 Civ. 9878, 2011 WL 3796331, at *13 (S.D.N.Y. Aug. 25, 2011) (finding "no waiver" provision "bars the assertion of an estoppel claim").

**C.    Even If The No-Waiver Provisions Do Not Apply, Plaintiffs' Failure To Object To The Third Amendment Has No Relevance.**

Even in the absence of Section 10.9, Defendants' waiver and estoppel defenses would still fail because there existed no contractual basis for Plaintiffs to object to the Third Amendment.  (*See* Opening Br. at 16, 24 n.15.)  That is, the unanimous consent provision only applies to the extent language in an amendment *affects* the Lenders.  (Ehrlich Aff., Ex. 1, § 10.5(b).)   Unlike the Purported Fourth Amendment, which permitted Defendants to become Requisite Lenders, the Third Amendment did not *affect* Plaintiffs because, just like the Credit Agreement, it continued to preclude Defendants from doing anything other than acquiring a limited amount of neutered Term Loans.  Defendants could not vote their Term Loans and certainly could not become Requisite Lenders.  Therefore, Plaintiffs' failure to object to the Third Amendment could not possibly act as a waiver of Plaintiffs' right to object to the Purported Fourth Amendment, which changed the definition of Requisite Lenders in a way that materially and adversely affected Plaintiffs by allowing Defendants to become Requisite Lenders.

**CONCLUSION**

For all the foregoing reasons, Plaintiffs respectfully request that this Court grant the Motion; award Plaintiffs, pursuant to CPLR 3212, summary judgment; declare the Purported Fourth Amendment null and void; declare that Defendants are not the Requisite Lenders under the Credit Agreement; and grant Plaintiffs such other and further relief as is just and proper.

15

Dated:  New York, New York
        October 9, 2012

Respectfully submitted,

SCHULTE ROTH & ZABEL LLP

By: /s/ *Robert J. Ward*
    Robert J. Ward
    Adam Harris

919 Third Avenue
New York, New York  10022
(212) 756-2000

*Attorneys for Plaintiffs*