**EXHIBIT G**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------- x

BDCM OPPORTUNITY FUND II, LP,          :
BLACK DIAMOND CLO 2005-1 LTD, and      :
SPECTRUM INVESTMENT PARTNERS,          :
L.P.,                                  :
                                       :
               Plaintiffs,          :
                                       :
       - against -                 :
                                       :
YUCAIPA AMERICAN ALLIANCE FUND         :
I, LP, and YUCAIPA AMERICAN            :
ALLIANCE (PARALLEL) FUND I, LP,        :
                                       :
              Defendants.          :

------------------------------------------------------- x

Index No.: 650150/2012

Motion Seq. No. 3

Hon. Charles E. Ramos


# MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT


SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York 10022
(212) 756-2000

*Attorneys for Plaintiffs*
*BDCM Opportunity Fund II, LP,*
*Black Diamond CLO 2005-1 Ltd., and*
*Spectrum Investment Partners, L.P.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................................ 7

ARGUMENT ............................................................................................................................. 14

I.  THE CREDIT AGREEMENT REQUIRES UNANIMOUS LENDER CONSENT FOR
    AMENDMENTS TO THE DEFINITION OF REQUISITE LENDER.................................. 16

II. THE PURPORTED FOURTH AMENDMENT AMENDS THE DEFINITION OF
    REQUISITE LENDERS BY CHANGING THE MEANING OF "TERM LOAN
    EXPOSURE." ............................................................................................................................ 17

III. IT IS IRRELEVANT THAT THE PURPORTED FOURTH AMENDMENT DID NOT
     CHANGE THE LITERAL WORDING OF THE DEFINITION OF THE REQUISITE
     LENDERS. ............................................................................................................................... 19

IV. ALLIED FAILED TO OBTAIN THE CONSENT OF ALL AFFECTED LENDERS FOR
    THE PURPORTED FOURTH AMENDMENT, AND THUS THE PURPORTED FOURTH
    AMENDMENT NEVER BECAME EFFECTIVE. ................................................................. 23

CONCLUSION ......................................................................................................................... 25

## TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(S)**

*Analisa Salon, Ltd. v. Elide Properties, LLC*,
    30 A.D.3d 448 (2d Dep't 2006) ................................................................21

*Broadwall Am., Inc. v. Bram Will-El LLC*,
    32 A.D.3d 748 (1st Dep't 2006) ..............................................................23

*Deutsche Bank AG v. JPMorgan Chase Bank*,
    No. 04 Civ. 7192, 2007 U.S. Dist. LEXIS 71933 (S.D.N.Y. Sept. 27, 2007) ..........................24

*Eitan Ventures, LLC v. Peeled, Inc.*,
    94 A.D.3d 614 (1st Dep't 2012) ..............................................................21

*Gen. Phoenix Corp. v. Cabot*,
    300 N.Y. 87 (1949) ..........................................................................15

*Giuffrida v. Citibank Corp.*,
    100 N.Y.2d 72 (2003) ........................................................................14

*Hudock v. Vil. of Endicott*,
    28 A.D.3d 923 (3d Dep't 2006) ................................................................16

*Jones Lang Wootten USA v. LeBoeuf, Lamb, Greene & MacRae*,
    243 A.D.2d 168 (1st Dep't 1998) ..............................................................23

*In re Liquidation of Union Indem. Ins. Co. of N.Y.*,
    89 N.Y.2d 94 (1996) ..........................................................................7

*Maysek & Moran, Inc. v. S.G. Warburg & Co.*,
    284 A.D.2d 203 (1st Dep't 2001) ..............................................................15

*Pearce, Urstadt, Mayer & Greer Realty Corp. v. Atrium Dev. Assocs.*,
    77 N.Y.2d 490 (1991) ........................................................................20

*Richard Feiner and Co. v. Paramount Pictures Corp.*,
    95 A.D.3d 232 (1st Dep't 2012) ..............................................................21

*RM Realty Holdings Corp. v. Moore*,
    64 A.D.3d 434 (1st Dep't 2009) ..............................................................23

*Ruttenberg v. Davidge Data Sys. Corp.*,
    215 A.D.2d 191 (1st Dep't 1995) ..............................................................20

*Teitelbaum Holdings, Ltd. v. Gold,*
    48 N.Y.2d 51 (1979) ...................................................................................................15

*Travelers Cas. and Sur. Co. v. Certain Underwriters at Lloyd's of London*,
    96 N.Y.2d 583 (2001) .................................................................................................20

## RULES

N.Y. C.P.L.R. § 3001 (McKinney 2012) ...........................................................................1

N.Y. C.P.L.R. § 3212 (McKinney 2012) ...........................................................1, 14, 25

## MISCELLANEOUS

BLACK'S LAW DICTIONARY 592 (9th ed. 2009) .................................................................20

Plaintiffs BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 LTD, and Spectrum Investment Partners, L.P. (collectively, "Plaintiffs") respectfully submit this memorandum of law in support of their motion, pursuant to CPLR 3212 and 3001, for summary judgment declaring that the purported Fourth Amendment to the Credit Agreement is not, and never was, effective, and that, as a result, Defendants are not, and may not act as, Requisite Lenders under the Credit Agreement (the "Motion").

## PRELIMINARY STATEMENT

There is no dispute that under the terms of the Credit Agreement[1] as initially drafted and executed, Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund, L.P. (collectively, "Yucaipa"), as the "Sponsors" and controlling shareholders of Allied Systems Holdings, Inc. ("Allied" or "Borrower"), were absolutely prohibited from being a Lender to Allied, or an Eligible Assignee of a Lender, and thus could not acquire any Term Loans or other Obligations under the Credit Agreement.

There is also no dispute that under the Third Amendment to the Credit Agreement (which was approved by a majority of the Lenders at the request of Yucaipa and Allied), Yucaipa was permitted to acquire a certain limited amount of Term Loans under the Credit Agreement.  However, the *quid pro quo* for permitting Yucaipa to acquire the Term Loans was that a cap was imposed on the amount of Term Loans that Yucaipa could acquire, and that any such Term Loans acquired by Yucaipa would be subject to substantial restrictions that among other things, would preclude Yucaipa from voting on any matter that could affect in any way the rights and remedies of the Lenders, or the Lenders' ability to obtain payment on their debt.

---

[1] All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Credit Agreement, which was annexed to the Complaint as Exhibit A and is attached hereto as Exhibit 1 to the Affidavit of Richard Ehrlich, sworn to August 27, 2012 ("Ehrlich Aff."), filed in support of this Motion.

What is in dispute is whether Yucaipa was successful in its brazen attempt to circumvent these carefully crafted and important restrictions – and to become not only a Lender but Requisite Lenders – through the subterfuge of the purported Fourth Amendment. Plaintiffs contend that Yucaipa's scheme was in fact not successful because the purported Fourth Amendment violates the Credit Agreement and the Third Amendment, and thus never became effective.

Why is this so important? The answer is straightforward. This is not just about Yucaipa becoming a Lender or owning Term Loans under the Credit Agreement. Rather, this is about Yucaipa trying to claim ownership of a sufficient amount of the Term Loans so as to declare itself "Requisite Lenders," a designation that would allow Yucaipa to make decisions binding on all Lenders, including the ability to direct the Agent for the Lenders to exercise (or forbear from exercising) rights and remedies against Allied and the other Loan Parties upon the occurrence and during the continuance of an Event of Default (which has been the case here since 2008).

In this Motion, Plaintiffs, who are Lenders under the Credit Agreement, seek a declaration that the purported Fourth Amendment to the Credit Agreement – which ostensibly strips out all of the fundamental restrictions incorporated into the Credit Agreement by the Third Amendment on the ability of Defendants as the "Sponsor" and majority shareholders to acquire more than a majority of the Term Loans and become the "Requisite Lender" – is ineffective, because Allied failed to obtain (and did not even seek) the unanimous Lender consent required by the Credit Agreement to remove these restrictions. Because the Credit Agreement unambiguously requires unanimous consent – and because it admittedly was not obtained – no material issue of fact exists, and Plaintiffs' Motion should be granted.

In May 2007, Allied, together with several related entities, emerged from bankruptcy under a plan of reorganization.  As a result of that reorganization, Yucaipa became the majority and controlling shareholder of Allied, controlling both Allied's Board of Directors and its senior management.  In connection with Allied's emergence from bankruptcy, Allied and certain of its affiliates entered into that certain Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit Agreement and Guaranty Agreement, dated May 15, 2007 with Goldman Sachs Credit Partners L.P., as lead arranger and syndication agent, The CIT Group/Business Credit, Inc., as administrative agent and collateral agent ("CIT" or "Agent"), and the Lenders from time party thereto (the "Credit Agreement"), pursuant to which the Lenders agreed to provide Allied with loans and other financial accommodations in an amount up to $265 million.

In light of the inherent conflict of interest between the interests of the Lenders (as creditors), on the one hand, and the Borrower and its controlling equity holder (Yucaipa), on the other hand, the Credit Agreement contained provisions that specifically prohibited Yucaipa, as the "Sponsor," from acquiring any of the Obligations or becoming a Lender.  The reason for this prohibition is that the Lenders did not want the controlling equity holder of the Borrower to have any influence over decisions that could impair the Lenders' recoveries and/or confer value upon the equity, including whether to exercise rights and remedies (or not) upon the occurrence and during the continuance of an Event of Default.

In April 2008, at the request of Yucaipa and Allied, a majority of the Lenders agreed to enter into that certain Amendment No. 3 to Credit Agreement and Consent (the "Third Amendment"), pursuant to which Yucaipa was permitted to acquire a limited amount of the Term Loans.  In order to continue the protections against the obvious conflicts of interest that

would arise by having the Sponsor and controlling shareholder as a Lender, the Lenders insisted (and Yucaipa agreed) on, among other things, the inclusion of numerous and stringent restrictions that, *inter alia*, limited the principal amount of Term Loans that Yucaipa could purchase, expressly prohibited Yucaipa from having any voting rights with respect to any debt it acquired, and, expressly required that the Yucaipa-held debt be wholly disregarded for purposes of calculating "Term Loan Exposure" – a critical input in determining which Lender or group of Lenders might constitute "Requisite Lenders."[2]  The result of these limitations was that Yucaipa *could never be or become the Requisite Lender under the Credit Agreement*,[3] and could never direct the exercise of the Lenders' rights and remedies against Allied.

The current action arises because, in August 2009, after significant Events of Default had occurred and had been continuing for more than a year (including payment defaults), Yucaipa shamelessly undertook to carry out a scheme to circumvent these carefully crafted and extensively negotiated restrictions.  In doing so, Yucaipa choreographed a series of events that purported to allow Yucaipa to acquire a majority of the Obligations outstanding under the Credit Agreement and declare *itself* the Requisite Lender, with all of the powers the Requisite Lender possesses to direct the Agent to exercise, or more importantly to direct the Agent to forbear from exercising, the Lenders' rights and remedies.  Yucaipa had clear motivation for hijacking control over the potential exercise of rights by Allied's Lenders:  by that point Allied had been in continuous default under the Credit Agreement since 2008 (and would continue to be in default

---

[2]  Under the Credit Agreement, "Requisite Lenders" have broad authority to direct the Agent to act (or refrain from acting) on behalf of all Lenders, including the right to direct the Agent to declare Events of Default, accelerate payment obligations and foreclose on the collateral securing the loans, or, perhaps even more importantly, to refuse, on behalf of all the Lenders, to exercise those rights and remedies

[3]  In fact, because of this limitation Yucaipa could not even team up with other Lenders to become "Requisite Lenders."

until its recent bankruptcy filing), and this was the means by which Yucaipa could protect its equity interests against the legitimate exercise of the Lenders' rights and remedies.

In furtherance of this scheme, Allied first entered into an agreement with ComVest Investment Partners III, L.P. ("ComVest") – who then held a majority of the outstanding Obligations under the Credit Agreement – pursuant to which Yucaipa agreed to purchase the Obligations held by ComVest for a combination of cash and future consideration to ComVest (calculated as a percentage of Yucaipa's ultimate recovery on the Obligations purchased). That transaction, however, could not be consummated so long as the restrictions on Yucaipa's acquisition, ownership and voting of Obligations, as set forth in the Third Amendment, remained effective. So, as a condition to the consummation of the transaction, Yucaipa required that an amendment to the Credit Agreement be entered into by Allied and ComVest eliminating the restrictions.

Thus, as further detailed below, on August 21, 2009, Yucaipa, as controlling shareholder of Allied, caused Allied to enter into that certain Amendment No. 4 to Credit Agreement with ComVest (the "Purported Fourth Amendment"), which purported to eliminate any restrictions on Yucaipa's ownership of Allied debt (including those that existed in the Credit Agreement as initially drafted and executed), including the provision disregarding Yucaipa-held debt in calculating "Term Loan Exposure," which would otherwise have prevented Yucaipa from becoming the Requisite Lender. After the Purported Fourth Amendment was signed, Yucaipa consummated its transaction with ComVest and acquired a majority of the Obligations – thereby in one fell swoop ostensibly seizing control of the Lenders' rights and remedies under the Credit Facility.

Yucaipa's machinations, however, are flatly prohibited under the Credit Agreement absent the consent of all of the Lenders, and thus the Purported Fourth Amendment is invalid and of no force or effect.  Section 10.5 of the Credit Agreement, which governs amendments to the Credit Agreement, unambiguously states in clause (b) that "[w]ithout the written consent of each Lender . . . affected thereby, no amendment, modification, termination or consent shall be effective if the effect thereof would: . . . (ix) amend the definition of '**Requisite Lenders**' . . . "  Here, the Purported Fourth Amendment "affected" every Lender *and* had the "effect" of amending the definition of Requisite Lenders.  A material element of the definition of Requisite Lenders is Term Loan Exposure, which is utilized both to define which Lenders may become the Requisite Lender (or be part of a group comprising Requisite Lenders) and to calculate whose Obligations may be counted in calculating the amount that a Lender or group of Lenders must hold in order to be the Requisite Lender(s).  There can be no question that the Purported Fourth Amendment's changes to the definition of Term Loan Exposure, at a minimum, had "the effect of" changing the definition of Requisite Lenders by allowing the Yucaipa-owned Obligations *to be included in the calculation of Term Loan Exposure* when, under the Third Amendment, they had previously been *expressly excluded.*  Indeed, it is hard to imagine a more dramatic change to the definition of Requisite Lenders than one that hands the fox the keys to the henhouse.[4]

---

[4]  Although not material to the instant motion, which is based exclusively on the underlying documents, what happened after the Purported Fourth Amendment proves out the exact reason why this type of amendment required the consent of each affected Lender.  Yucaipa, as the putative Requisite Lender, refused to direct the Agent to enforce any of the Lenders' rights under the Credit Agreement and other loan documents despite substantial and continuing Events of Default under the Credit Agreement, including the failure to pay tens of millions of dollars in principal and interest.  In fact, rather than directing the Agent to exercise remedies for the benefit of the Lenders, Yucaipa attempted to direct the Agent  to release to the Borrowers cash collateral held in a segregated account for the benefit of the Lenders.  Yucaipa allowed this state of affairs to continue for almost three years, holding the Agent and remaining Lenders at bay while it tried to devise a scheme to achieve a recovery for itself to the detriment of all other Lenders.

As such, by the express terms of the Credit Agreement, the Purported Fourth Amendment could only become effective upon the unanimous consent of the Lenders. It is undisputed that Allied did not obtain – or even seek – consent from any Lender other than ComVest, whom Yucaipa paid off and indemnified to sell out the remaining Lenders. Accordingly, the Purported Fourth Amendment is not, and never was, effective under the plain terms of the Credit Agreement, and Yucaipa is not the Requisite Lender. No material issue of fact exist as to these matters, and Plaintiffs are entitled to summary judgment as a result.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

*Background.* Allied, based in Georgia, is a leading provider of distribution and transportation services to the automotive industry, specializing in the delivery of new vehicles from manufacturing plants to dealerships. (Ehrlich Aff., Ex. 2, Verified Ga. Compl. ¶ 16;[5] Ex. 4, Answer ¶ 21.) In May 2007, Allied and several related entities emerged from bankruptcy under a plan of reorganization that, among other things, resulted in Yucaipa becoming the majority shareholder of Allied with control over both Allied's Board of Directors and its senior management. (Ehrlich Aff., Ex. 2, Verified Ga. Compl. ¶ 17; Ex. 4, Answer ¶ 22.)

To finance its May 2007 emergence from bankruptcy, Allied obtained financing through two credit facilities consisting of (a) a $265 million senior secured first priority credit facility evidenced by the Credit Agreement (the "First Lien Facility"), and (b) a $50 million second lien credit facility ("Second Lien Facility"). (Ehrlich Aff., Ex. 2, Verified Ga. Compl. ¶ 18; Ex. 4, Answer ¶ 24.) The First Lien Facility is governed by the Credit Agreement, and was

---

[5]  As set forth in the Complaint in this case ("New York Action"), Yucaipa was a plaintiff in a prior action in Georgia ("Georgia State Court Action") where Yucaipa's actions in connection with Allied and Allied's debt were at issue. As set forth in Plaintiffs' Opposition to Defendants' Motion to Dismiss in this case, once Plaintiffs' Agent ceased representing Plaintiffs' interests in the Georgia State Court Action, Plaintiffs filed the New York Action. Statements contained in Yucaipa's verified complaint in the Georgia State Court Action ("Verified Ga. Compl.") may be treated as informal judicial admissions in the New York Action. *See, e.g.*, *In re Liquidation of Union Indem. Ins. Co. of N.Y.*, 89 N.Y.2d 94, 103 (1996).

comprised of (i) term loans in the aggregate principal amount of $180 million (the "Term

Loans"); (ii) a $35 million revolving credit facility from CIT (the "Revolving Loan"); and (iii) a

$50 million synthetic letter of credit facility ("LC Facility").  (Ehrlich Aff., Ex. 2, Verified Ga.

Compl. ¶ 18; Ex. 4 Answer ¶ 25.)  Plaintiffs are Lenders under the Credit Agreement who own

or control, with power to vote, between $40 million and $60 million of the Term Loan and L/C

Facility under the First Lien Facility.  (*See* Ehrlich Aff., Ex. 3, Compl. ¶ 26; Ex. 4, Answer ¶ 26.)

*Requisite Lenders under the Credit Agreement.*  Central to the Credit Agreement

is the concept of the Requisite Lender(s).  As defined in the Credit Agreement, which definition

specifically incorporates the definition of Term Loan Exposure, the Requisite Lenders are

> one or more Lenders having or holding Term Loan Exposure, LC
> Exposure and/or Revolving Exposure and representing more than 50% of
> the sum of (i) the aggregate Term Loan Exposure of all Lenders, (ii) the
> aggregate LC Exposure of all Lenders and (iii) the aggregate Revolving
> Exposure of all Lenders.

(Ehrlich Aff., Ex. 1, Credit Agreement § 1.1.)

As majority debt holders, the Requisite Lenders are vested with broad authority to

make key decisions affecting the rights of all Lenders, including Plaintiffs.  Thus, for example,

subject to certain important exceptions (one of which is applicable here), Requisite Lender

consent is all that is required for any "amendment, modification, termination or waiver of any

provision of the [Credit Agreement], or consent to any departure by any [Borrower or Guarantor]

therefrom."[6]  (*Id.* § 10.5(a).)  In addition, the Requisite Lenders are vested with authority to

direct the Agent to exercise certain rights and remedies on behalf of *all Lenders*, such as

declaring Events of Default, demanding immediate payment by Allied of any and all amounts

---

[6]  "Credit Document" is defined as the Credit Agreement, "the Notes if any, the Collateral Documents, the
Intercreditor Agreement . . . an all other documents, instruments or agreements executed and delivered by a Credit
Party for the benefit of any Agent, Issuing Bank or any Lender in connection herewith."  (§ 1.1.)  Credit Party means
each Borrower and each Guarantor."  (*Id.*)

due, or commencing foreclosure on the collateral pledged to secure the Obligations.  (Ehrlich

Aff., Ex. 1, Credit Agreement §§ 8.1, 9.8; Ex. 4, Answer ¶ 33.)   Significantly, in addition to the

right to direct the Agent to exercise remedies on behalf of all Lenders, the Requisite Lender also

has the power *to direct the Agent to refrain from exercising* such remedies.[7]  (Ehrlich Aff., Ex. 1,

Credit Agreement §§ 8.1, 9.8; Ex. 4, Answer ¶ 33.)  In light of the critical role the Requisite

Lender plays in directing the exercise (or non-exercise) of the rights of the Lenders, the Credit

Agreement expressly prohibited, absent the consent of *all* affected Lenders, any amendment or

modification of the Credit Agreement "if the effect thereof would . . . amend the definition of

**Requisite Lenders**."  (Ehrlich Aff., Ex. 1, Credit Agreement § 10.5(b)(ix).)

       Given the manifest conflict of interest that would arise if Yucaipa – as controlling

and majority shareholder of Allied – were able to control the exercise of the Lenders' rights and

remedies under the Credit Agreement, and thereby protect and benefit itself as equity owner, the

Credit Agreement as initially drafted and executed foreclosed any possibility that Yucaipa could

become a Requisite Lender.  Under the Credit Agreement, the only parties eligible to be a

Requisite Lender are "Lenders" under the Credit Agreement, which consist solely of the original

Lender signatories to the Credit Agreement, and Eligible Assignees who subsequently become

Lenders pursuant to an Assignment Agreement.  (*Id.* § 1.1.)  Yucaipa was not a Lender

signatory under the Credit Agreement.  (*Id.*)  Nor could Yucaipa become a Lender through an

Assignment Agreement because, pursuant to Section 10.6(c) of the Credit Agreement, Lenders

were only permitted to sell, transfer or assign their rights under the Credit Agreement (*i.e.*, enter

into an Assignment Agreement) to Eligible Assignees.  (*Id.* § 10.6(c))  The definition of Eligible

---

[7]  Pursuant to Section 9.8(b) of the Credit Agreement, no individual Lender is permitted to take any action to enforce
any rights as against the collateral.

Assignee expressly provides that "no . . . Sponsor shall be an Eligible Assignee." (*Id.* § 1.1.) Yucaipa is the Sponsor. (*Id.*)

>*Limited Modification of the Credit Agreement.* In or around April 2008,

Yucaipa sought to acquire a portion of the Obligations under the Credit Agreement (and thus become a Lender under the Credit Agreement). (Ehrlich Aff., Ex. 4, Answer ¶ 28; Ex. 5, Third Amendment, Recitals.) However, due to the restrictions prohibiting Yucaipa from being an Eligible Assignee, Yucaipa could only purchase the Obligations if an amendment to the Credit Agreement were executed permitting such acquisition. (Ehrlich Aff., Ex. 1, Credit Agreement §§ 1.1, 10.6(c).) As a result, Yucaipa and Allied requested and received consent from a majority of the Lenders to amend the Credit Agreement – the Third Amendment – to permit Yucaipa to become a "Lender" under extremely limited circumstances and conditions and with severe restrictions. (Ehrlich Aff., Ex. 5, Third Amendment § 2.1.)

>Specifically, under the Third Amendment, Yucaipa was expressly designated a

Restricted Sponsor Affiliate and was:

- *Prohibited from* accumulating over (i) 25% of the aggregate principal amount of the Term Loan Exposure held by all Lenders or (ii) $50 million of the principal amount of Term Loans (Ehrlich Aff., Ex. 5, Third Amendment §§ 2.7(c), 2.7(e)) – **thus preventing the acquisition of the majority ownership stake required to become a Requisite Lender**;[8]

- *Prohibited from* exercising any and all voting rights it would otherwise have as a Lender, including the right to consent to an amendment of the Credit Agreement or the right to vote its debt in any Allied bankruptcy – **thereby precluding Yucaipa from exercising any voting rights needed to act as a Requisite Lender** (*Id.* §§ 2.1(e), 2.7(a), 2.7(b), 2.7(e));

- *Prohibited from* including its Term Loans in any calculation of Term Loan Exposure when such calculation was required under the Credit Agreement – **thus**

---

[8] Yucaipa was also prohibited from acquiring *any* Revolving Loans or LC Deposit Loans. (Ehrlich Aff., Ex. 5, Third Amendment § 2.1(c).)

> **again precluding Yucaipa from amassing a sufficient stake to become a Requisite Lender** (*Id.* § 2.1(e)); and

- *Required to* contribute to Allied as capital no less than 50% of the aggregate principal amount of any Term Loans that Yucaipa obtained within ten days after the date of such acquisition **– thus further minimizing the impact Yucaipa could assert through its ownership of the Term Loans.** (*Id.* § 2.7(e).)

To ensure Yucaipa's compliance with these fundamental restrictions, the Third Amendment further required Allied to deliver to the Administrative Agent monthly reports of the amount of Term Loans acquired and held by Yucaipa, and the price paid for such loans.[9] (Ehrlich Aff., Ex. 5, Third Amendment § 2.3(a).)

These conditions and restrictions make clear the Lenders' continuing intent under the Credit Agreement to preclude Yucaipa from ever becoming, or even being eligible to become, the Requisite Lender. Because of these conditions and restrictions, the Third Amendment did not "affect" the Lenders in the manner that would require the consent of each Lender under section 10.5(b) of the Credit Agreement.[10]

***Yucaipa Usurps Requisite Lender Status.*** By early 2009, Allied had been in continuous default under its Credit Agreement Obligations for more than a year.[11] (Ehrlich Aff.,

---

[9]  Despite this requirement, and in contravention of the Third Amendment, Yucaipa utilized its control over Allied to cause Allied to fail to deliver these monthly reports of Yucaipa's holdings, which constituted another Event of Default under the Credit Agreement. In fact, since August 2008, Allied, at Yucaipa's direction and control, has been in continuous default under the Credit Agreement. (*See* Ehrlich Aff., Ex. 2, Verified Ga. Compl. ¶¶ 27, 29; Ex. 4, Answer ¶ 37.) Allied and Yucaipa acknowledged the defaults and recognized that the defaults entitled the Lenders to accelerate the debt. (Ehrlich Aff. Ex. 7, Forbearance Agreement.)

[10]  Section 10.5(a) of the Credit Agreement generally provides that amendments or modifications to the Credit Agreement will be effective if consented to by Requisite Lenders (i.e., holders of a majority of the outstanding Obligations). If, however, the proposed amendment or modification is of the type identified in subclauses (i)-(xi) of section 10.5(b), the amendment or modification must be consented to by each Lender "that would be affected thereby." The reason for the distinction is that amendments or modifications of the types set forth in subclauses (i)-(xi) are clearly ones that could fundamentally change a Lenders' decision to extend (or withhold the extension of) credit, and thus the Credit Agreement requires that any affected Lender be consulted and its consent obtained. These changes have the most significant impact on Lender economics and can fundamentally change the initial contract between each Lender and the Borrower.

[11]  Allied has since formally disclosed that, among other things, it has failed to make principal and interest payments for multiple consecutive quarters, failed to comply with the financial covenants in the Credit Agreement, failed to

Ex. 2, Verified Ga. Compl. ¶¶ 27, 29; Ex. 4, Answer ¶ 37.)  In a transparent effort to frustrate the Lenders' rights under the Credit Agreement – in particular to prevent the Lenders from declaring the Obligations to be immediately due and payable – Yucaipa engineered a two-step hijacking of Allied's Credit Facility.  First, Yucaipa and ComVest entered into an Assignment and Assumption Agreement whereby Yucaipa agreed to acquire the Obligations owned by ComVest for a combination of cash and future consideration.  (Ehrlich Aff., Ex. 2, Verified Ga. Compl. ¶ 33; Ex. 4, Answer ¶ 45.)  That transaction, however, could not be consummated so long as the restrictions on Yucaipa's acquisition, ownership and voting Obligations, as set forth in the Third Amendment, remained effective.  So as a condition to consummation of the transaction Yucaipa required that an amendment to the Credit Agreement be entered into by Allied and ComVest eliminating the restrictions.

Thus, on August 21, 2009, Yucaipa caused Allied to enter into the Purported Fourth Amendment with ComVest, the then-Requisite Lender.  (Ehrlich Aff., Ex. 6, Purported Fourth Amendment.)  No Lenders other than ComVest consented to, nor were even informed of, the Purported Fourth Amendment prior to its execution (Ehrlich Aff., Ex. 6, Purported Fourth Amendment at 11-13) even though stripping out the conditions and restrictions that prevented Yucaipa from becoming Requisite Lender clearly affected all the Lenders.

The sole purpose and effect of the Purported Fourth Amendment was to remove *all* of the restrictions imposed on Yucaipa's acquisition, ownership and voting of Obligations under the initial Credit Agreement and the Third Amendment, thereby *for the first time* making Yucaipa eligible to be a Requisite Lender.  (*See, e.g.*, Ehrlich Aff., Ex. 6, Purported Fourth Amendment §§ 2.1(b), 2.4.)  Thus, the Fourth Amendment purports to:

---

deliver requisite financial information and failed to disclose the extent of Yucaipa's holdings.  (*See* Ehrlich Aff., Ex. 7, Forbearance Agreement.)

- Modify the definition of Term Loan Exposure (a term expressly used in the definition of Requisite Lenders in the Credit Agreement) to delete the language from "Term Loan Exposure" added by the Third Amendment that excludes the amount of Term Loans held by Yucaipa from any calculation of the aggregate amount of Term Loans outstanding (Ehrlich Aff., Ex. 6, Purported Fourth Amendment § 2.1(b); Ex. 5, Third Amendment § 2.1(c); Ex. 1, Credit Agreement § 1.1);

- Eliminate the provision of the Credit Agreement added by the Third Amendment that prohibited Yucaipa from acquiring more than the lesser amount of 25% of the aggregate Term Loan Exposure, or $50 million of the principal amount of Term Loans (Ehrlich Aff., Ex. 6, Purported Fourth Amendment § 2.4(c); Ex. 5, Third Amendment § 2.7(c); Ex. 1, Credit Agreement § 10.6(c));

- Eliminate the restrictions placed on Yucaipa's right to vote as if it was a Lender, including the right to consent to any modification of the Credit Agreement and to vote its debt in bankruptcy, that were added by the Third Amendment (Ehrlich Aff., Ex. 6, Purported Fourth Amendment § 2.4(a); Ex. 5, Third Amendment § 2.7(a); Ex. 1, Credit Agreement § 10.5);

- Eliminate the requirement added by the Third Amendment that Yucaipa was required to make a capital contribution to Allied of 50% of the aggregate principal amount of Term Loans it acquired. (Ehrlich Aff., Ex. 6, Purported Fourth Amendment § 2.4(e); Ex. 5, Third Amendment § 2.7(e).); and

- Eliminate the restriction in the definition of Eligible Assignee in the Credit Agreement as initially drafted that prohibited the Sponsor from becoming an Eligible Assignee. (Ehrlich Aff., Ex. 6, Purported Fourth Amendment § 2.1(b); Ex. 5, Third Amendment § 2.1(c); Ex. 1, Credit Agreement § 1.1.)[12]

The Fourth Amendment therefore accomplished what no rational Lender would have permitted at the time the Credit Agreement was executed – it afforded the opportunity for Yucaipa to control both sides of the financing, to control simultaneously the Borrower, through its majority equity position, and the Lenders, through its Requisite Lender position.

Upon the execution and purported effectiveness of the Purported Fourth Amendment, Yucaipa and ComVest consummated the transactions contemplated by the Assignment and Assumption Agreement.  (Ehrlich Aff., Ex. 2, Verified Ga. Compl. ¶ 33; Ex. 4,

---

[12]  It is important to note that the Purported Fourth Amendment did not just eliminate the restrictions added by the Third Amendment; rather, it purported to eliminate restrictions that existed in the original Credit Agreement, and on which the Lenders relied in agreeing to extend credit in the first instance.

Answer ¶ 45.)  Through that acquisition, and in conjunction with the purported removal of the

restrictions on Yucaipa in the Purported Fourth Amendment, Yucaipa now contends that *it* is the

Requisite Lender, with all of the attendant powers to enforce or refuse to enforce the Lenders'

rights and remedies.  (Ehrlich Aff., Ex. 2, Verified Ga. Compl. at ¶¶ 4-6; Ex. 4, Answer ¶¶ 8,

33.)  Not surprisingly, since purporting to become Requisite Lender, Yucaipa has refused to

allow the Agent to enforce any of those rights.  It has prevented the Agent from taking any

actions on behalf of the Lenders to accelerate the Obligations or exercise remedies,

notwithstanding Allied admitted its continuing Events of Default for more than three years,

including the failure to pay millions of dollars of principal and interest on the Obligations to the

detriment of all of Allied's legitimate Lenders.

## ARGUMENT

Summary judgment is warranted where there are no material issues of fact, and

judgment may be entered as a matter of law.  *See* CPLR 3212(b); *see also Giuffrida v. Citibank

Corp.*, 100 N.Y.2d 72, 81 (2003).  Here, the material facts are undisputed:

- Under the Credit Agreement, as amended by the Third Amendment, Yucaipa could not be a Requisite Lender because of the restrictions on Yucaipa's eligibility to attain Requisite Lender status;

- Allied and ComVest entered into the Purported Fourth Amendment eliminating those restrictions;

- As a result of the Purported Fourth Amendment and Yucaipa's concurrent acquisition of ComVest's majority share of Allied's Obligations, Yucaipa now purports to be the Requisite Lender;

- Section 10.5(b) of the Credit Agreement unambiguously requires the consent of all "affected" Lenders to any amendment that has "the effect" of amending the definition of Requisite Lender;

- All of Allied's other Lenders are undeniably affected by an amendment that would permit Yucaipa to ascend to Requisite Lender status; and

- Neither the Plaintiffs nor any Lender, other than ComVest, consented to the Purported Fourth Amendment.

14

The only issue before the Court therefore is whether, under the plain terms of the Credit Agreement, the Purported Fourth Amendment had "the effect" of amending the Requisite Lender definition within the meaning of section 10.5(b), thereby requiring consent of all affected Lenders, which was not obtained.  All of the Lenders were affected by this amendment because, prior to the Purported Fourth Amendment, Yucaipa could not become the Requisite Lender, and thereby frustrate the rights of the Lenders in order to protect its ownership interests in Allied, whereas after the Purported Fourth Amendment it could and did.

This motion thus presents a pure issue of contract construction, which can and should be decided on summary judgment.  As the Court of Appeals has made clear, "[w]here the intention of the parties may be gathered from the four corners of the instrument, interpretation of the contract is a question of law, and no trial is necessary to determine the legal effect of the contract."  *Gen. Phoenix Corp. v. Cabot*, 300 N.Y. 87, 92 (1949); *see Teitelbaum Holdings, Ltd. v. Gold*, 48 N.Y.2d 51, 56 (1979) ("Interpretation of an unambiguous contract provision is a function of the court, and matters extrinsic to the agreement may not be considered when the intent of the parties can be gleaned from the face of the instrument."); *see also Maysek & Moran, Inc. v. S.G. Warburg & Co.*, 284 A.D.2d 203, 204 (1st Dep't 2001) ("[T]he construction of an unambiguous contract is a question of law for the court to pass on, and . . . circumstances extrinsic to the agreement or varying interpretations of the contract provisions will not be considered, where . . . the intention of the parties can be gathered from the instrument itself." (internal quotation omitted)).

As set forth below, the intent of the parties to the Credit Agreement to preclude Yucaipa from becoming a Requisite Lender is patently clear from the four corners of the agreement, and no amendment inconsistent with that intent was permitted without the consent of

15

all Lenders affected thereby, which would be all Lenders.  That consent was never given, and the

Fourth Amendment is thus a nullity, requiring a declaratory judgment in favor of Plaintiffs.  *See*

*Hudock v. Vill. of Endicott*, 28 A.D.3d 923, 924 (3d Dep't 2006) (where a contract is

unambiguous, and summary judgment is warranted, a declaratory judgment in favor of the

movant must be entered).

**I.      THE CREDIT AGREEMENT REQUIRES UNANIMOUS LENDER CONSENT FOR AMENDMENTS TO THE DEFINITION OF REQUISITE LENDER.**

Amendments to the Credit Agreement are governed by Section 10.5, which

generally requires (except in specific defined circumstances, including ones applicable here) only

Requisite Lender consent for any amendment or modification to the Credit Agreement.  (*See*

Ehrlich Aff., Ex. 1, Credit Agreement § 10.5(a).)  For certain amendments or modifications,

however, consent of the Requisite Lender alone is not sufficient. Sections 10.5(b) and (c) set

forth certain amendments or modifications that are deemed to be so fundamental to the rights of

each Lender that they cannot be changed by the vote of a simple majority.  Rather, they must be

consented to by each Lender "affected thereby."

Included among those amendments which require the consent of each Lender

affected thereby are any amendments that have the effect of amending the definition of Requisite

Lender.  Specifically, Section 10.5(b)(ix) provides that:

> Without the written consent of each Lender (other than a Defaulting Lender) that would be affected thereby, no amendment, modification, termination or consent shall be effective **if the effect thereof would:**
>
> **(ix) amend the definition of "Requisite Lenders"** . . .

(emphasis added).

As noted above, Requisite Lenders are defined in the Credit Agreement as:

> one or more Lenders having or holding Term Loan Exposure, LC
> Exposure and/or Revolving Exposure and representing more than 50% of
> the sum of the (i) aggregate Term Loan Exposure of all Lenders, (ii) the
> aggregate LC Exposure of all Lenders and (iii) the aggregate Revolving
> Exposure of all Lenders.

(Ehrlich Aff., Ex. 1, Credit Agreement § 1.1.)  Integral and material to the definition of Requisite

Lenders are the numerous defined terms incorporated in the definition of Requisite Lenders, the

meanings of which are necessary to give the Requisite Lenders definition its substance.

## II.    THE PURPORTED FOURTH AMENDMENT AMENDS THE DEFINITION OF REQUISITE LENDERS BY CHANGING THE MEANING OF "TERM LOAN EXPOSURE."

The Purported Fourth Amendment dramatically changes a key definition

incorporated and integrated into the definition of Requisite Lenders; namely, the definition of

Term Loan Exposure.  Term Loan Exposure is used both to determine who is eligible to be a

Requisite Lender and to calculate the amount of the Obligations held by a Lender (or group of

Lenders) in determining the Requisite Lenders.  (*Id.* § 1.1.)

Prior to the Purported Fourth Amendment, Term Loan Exposure was defined in

the Third Amendment to include the outstanding principal amount of Term Loans held by a

Lender, but explicitly provided that, "with respect to any provisions of this Agreement relating to

voting rights of Lenders (including the right of Lenders to consent to or take any other action

with respect to any amendment . . . of any provision of this Agreement . . .), the aggregate

outstanding principal amount of the Term Loans of all Restricted Sponsor Affiliates [*i.e.*,

Yucaipa] *shall be disregarded for purposes of this definition of 'Term Loan Exposure*.'"

(Ehrlich Aff., Ex. 5, Third Amendment § 2.1(e) (emphasis added).)  In other words,

notwithstanding the fact that Yucaipa was permitted to acquire a limited amount of Term Loan

Obligations, Yucaipa had no voting rights or any rights to become Requisite Lenders.  (*See id.*)

Indeed, by the express terms of the Third Amendment, upon acquiring any interest in the Term

17

Loans, Yucaipa "knowingly and irrevocably waive[d] any and all right to exercise any voting rights it would otherwise have as a Lender *for all purposes* under [the Credit Agreement]." (*Id.* § 2.7(e)(iv) (emphasis added).)

The Purported Fourth Amendment strikes all of these restrictions on Yucaipa's ability to own and vote Allied's Term Loans (and removes the restriction on Yucaipa acquiring other Classes of Loans, *i.e.* Revolving Loans or LC Deposits), thereby allowing Yucaipa – Allied's controlling shareholder – to purchase ComVest's interest in the Loans and then control all of the material decisions on behalf of Allied's Lenders (and bind them in that regard). (*See, e.g.*, Ehrlich Aff., Ex. 6, Purported Fourth Amendment §§ 2.1(b), 2.4(a), 2.4(c)-(e).) To the point here, the Purported Fourth Amendment expressly amends the definition of Term Loan Exposure to eliminate the provision requiring Yucaipa's Term Loan share be excluded from the calculation of Term Loan Exposure, thereby permitting Yucaipa's Term Loan Exposure to be counted for purposes of determining the Requisite Lenders. (*Id.* § 2.1(b).)

It is indisputable that prior to the Purported Fourth Amendment, Yucaipa could not be the Requisite Lender, irrespective of whether it held any of Allied's Obligations. It is only because of the Purported Fourth Amendment that Yucaipa can claim to be the purported Requisite Lender. It is hard to imagine a more fundamental change to the definition of Requisite Lenders than one that allows for the first time a subordinate stakeholder with widely divergent interests to be eligible to be the Requisite Lender, and, in particular, the Sponsor, who initially was specifically excluded from ever becoming a Lender, let alone the Requisite Lender. Given that fundamental change, the Purported Fourth Amendment required unanimous consent of all Lenders affected thereby, which was never obtained. As a matter of law, the Purported Fourth Amendment therefore never became effective.

18

### III.   IT IS IRRELEVANT THAT THE PURPORTED FOURTH AMENDMENT DID NOT CHANGE THE LITERAL WORDING OF THE DEFINITION OF THE REQUISITE LENDERS.

In order to avoid the consequences of its failure to obtain Lender consent to the Purported Fourth Amendment, Yucaipa contended in the Georgia State Court Action that unanimous Lender consent was not required because the Purported Fourth Amendment did not change the specific words contained in the definition of Requisite Lenders.  According to Yucaipa, as long as the words in the definition of Requisite Lenders remain the same, the other Lenders are powerless to prevent any change to the meaning of those defined terms regardless of the effect the changes may have on their rights.  That position is entirely baseless.

First, it is obvious that Yucaipa directly amended the Requisite Lender definition by changing the meaning of one of the key definitions integrated into the definition of Requisite Lender (*i.e.*, the definition of Term Loan Exposure); however, Lender consent would have been required in any event.  By its express terms, Section 10.5(b) does not merely require Lender consent for literal amendments to the definition of Requisite Lenders, but rather for any amendment where "*the effect thereof*" would amend the definition of Requisite Lenders.  (*See* Ehrlich Aff., Ex. 1, Credit Agreement § 10.5(b) (emphasis added).)

This provision necessarily is broader than one that only applies to literal amendments.  Put simply, if Section 10.5(b) were meant to cover only literal amendments, the phrase "the effect thereof" would be surplusage – the provision could merely state that "no amendment . . . shall be effective if it . . . (ix) amends the definition of 'Requisite Lenders.'"  In fact, that is precisely the language used in Section 10.5(c) which, for example, provides that "[n]o amendment, modification, termination or waiver of any provision of the Credit Documents . . . shall:  . . . (ii) amend . . . any provision hereof relating to the Swing Line Sublimit or the Swing Line Loans without the consent of Swing Line Lender."  (*Id.* § 10.5(c).)  The difference in

19

wording between Section 10.5(b) ("if the effect thereof would . . . amend the definition of

**Requisite Lenders**.") and 10.5(c) (no "if the effect thereof" language) is important.  It is well

settled that, in interpreting a contract, the court "cannot and should not accept an interpretation

that ignores the interplay of the terms, renders certain terms 'inoperable,' and creates a conflict

where one need not exist."  *Pearce, Urstadt, Mayer & Greer Realty Corp. v. Atrium Dev.*

*Assocs.*, 77 N.Y.2d 490, 497 (1991); *see Travelers Cas. and Sur. Co. v. Certain Underwriters at*

*Lloyd's of London*, 96 N.Y.2d 583, 594 (2001) (courts should strive to give effect to every

sentence, clause, and word in a contract); *Ruttenberg v. Davidge Data Sys. Corp.*, 215 A.D.2d

191, 196 (1st Dep't 1995) (an interpretation that gives effect to all of the terms of an agreement is

"preferable to one that ignores terms or accords them an unreasonable interpretation").  The only

interpretation that both gives meaning to the phrase "the effect thereof," and takes into account

the material difference in the wording of Sections 10.5(b) and 10.5(c), is one that reads Section

10.5(b) to apply to indirect (as well as literal) amendments, and that interpretation should

therefore control.

There can be no dispute that the Purported Fourth Amendment – at a minimum –

"in effect" amended the definition of Requisite Lenders.  Any amendment to a material term

integrated into the definition of Requisite Lender necessarily has an effect on how Requisite

Lenders are defined.[13]  By changing the definition of Term Loan Exposure to permit Yucaipa's

Term Loans to count toward a determination of the Requisite Lender, the Purported Fourth

Amendment materially changed who could be the Requisite Lender under the Credit Agreement.

Whether that is considered a literal change to the definition of Requisite Lenders, or an indirect

---

[13]  Although its meaning is self-evident, it is worth noting that "Effect" is defined by Black's Law Dictionary as:  "1. Something produced by an agent or cause; a result, outcome, or consequence."  BLACK'S LAW DICTIONARY 592 (9th ed. 2009).  There can be no serious question that the "result, outcome, or consequence" of the Purported Fourth Amendment was to change the definition of Requisite Lenders.

one,[14] is of no moment; it is a material change that required the consent of all Lenders affected thereby (which was all Lenders).

Second, Yucaipa's interpretation is wholly inconsistent with the parties' intent with respect to the Requisite Lender provision.  To ascertain the parties' intent, a court should "examine the contract as a whole and interpret its parts with reference to the whole."  *Eitan Ventures, LLC v. Peeled, Inc.*, 94 A.D.3d 614, 616 (1st Dep't 2012); *see also Richard Feiner and Co., Inc v. Paramount Pictures Corp.*, 95 A.D.3d 232, 237-8 (1st Dep't 2012) ("[T]he intention of the parties to a contract must be ascertained not from one provision but from the entire instrument."); *Analisa Salon, Ltd. v. Elide Properties, LLC*, 30 A.D.3d 448, 448-49 (2d Dep't 2006) (reasoning that a "contract must be read as a whole in order to determine its purpose and intent" and "single clauses cannot be construed by taking them out of their context and giving them an interpretation apart from the contract of which they are a part") (internal quotations omitted).

The Credit Agreement and its Third Amendment leave no doubt that the intent of the parties was to preclude Yucaipa from having any influence over the actions and conduct of the Lenders, acting in their capacities as such, let alone ever permitting the Sponsor (Yucaipa) to become the Requisite Lender.  Under the original Credit Agreement, Yucaipa, the Sponsor, was proscribed from owning or acquiring *any* of the Obligations under the Credit Agreement because it was specifically excluded from the definition of Eligible Assignee.  (*See* Ehrlich Aff., Ex. 1, Credit Agreement § 10.6(c) (permitting the sale, transfer or assignment rights under the Credit Agreement only to Eligible Assignees); § 1.1. ("no Sponsor shall be an Eligible Assignee").)

---

[14]  In any case, as set forth below, a party to a contract may not do indirectly what it is precluded from doing directly.

The initial Credit Agreement therefore intentionally maintained a very strict wall between the Lenders on one side, and Yucaipa/Allied on the other.

Although the Third Amendment permitted Yucaipa to acquire a *limited* quantity of Allied debt, it further demonstrated the intent of the Lenders to keep Yucaipa on its side of the wall by the addition of express and severe restrictions that were included in the Third Amendment to prevent Yucaipa from having any influence of the Lenders' decisions, let alone from becoming the Requisite Lender.  Thus, Yucaipa was absolutely barred from exercising any voting rights (Ehrlich Aff., Ex. 5, Third Amendment §§ 2.1(e), 2.7(a), 2.7(b), 2.7(e)); was prohibited from consenting to any action in connection with any amendment, modification, termination or waiver of any provision of the Credit Agreement (*id.* § 2.7(e)); and was forced to make a capital contribution to Allied of at least 50% of the aggregate principal amount of any Term Loans it acquired (*id.* § 2.7(e), (k).)  Most significantly, the Third Amended provided that any Term Loans acquired by Yucaipa were to be entirely disregarded from any calculation of the Term Loan Exposure (*i.e.*, the aggregate amount of Term Loans outstanding), which thereby precluded Yucaipa from ever becoming a Requisite Lender (*id.* § 2.1(e).).

In the face of this clear evidence of intent – found within the four corners of the Credit Agreement and the Third Amendment – that Yucaipa was specifically precluded from exercising *any* Lender voting rights, let alone acting as the Requisite Lender, an interpretation of Section 10.5(b) that would permit Yucaipa to become a Requisite Lender without the consent of all Lenders affected thereby is flatly inconsistent with the manifest intent of the parties.  The inescapable consequence of any other interpretation would allow those aligned with the Borrower to seize and control the rights of the Lenders, which defeats the purpose of the Credit Agreement from the perspective of the Lenders.  That is not a reasonable interpretation and

should be rejected.  *See RM Realty Holdings Corp. v. Moore*, 64 A.D.3d 434, 438 (1st Dep't 2009) (a court should "choose that construction which will carry out the plain purpose and object of the agreement.")

Finally, Yucaipa's position completely ignores the purpose of defined terms. Defined terms are a commonly used short-hand for the broader meaning of a utilized term in order to avoid the need to state repetitiously the full meaning of the term every time it appears throughout a document.  Whenever the defined term is utilized, however, it is as if the full meaning was used in each place that defined term is mentioned.  Thus, if the meaning of a defined term is changed, it necessarily changes every substantive provision in which the defined term is used.  Ignoring that reality is merely "elevating form over substance," which is impermissible.  *See, e.g.*, *RM Realty Holdings Corp.*, 64 A.D.3d at 437.  Yucaipa cannot be permitted to seize upon a drafting convenience to permit it to do (arguably) indirectly that which it indisputably could not do directly.  *See Broadwall Am., Inc. v. Bram Will-El LLC*, 32 A.D.3d 748, 751 (1st Dep't 2006); *Jones Lang Wootten USA v. LeBoeuf, Lamb, Greene & MacRae*, 243 A.D.2d 168, 170 (1st Dep't 1998) ("It is said that a party may not accomplish by indirection that which it is forbidden to do directly.").

## IV.    ALLIED FAILED TO OBTAIN THE CONSENT OF ALL AFFECTED LENDERS FOR THE PURPORTED FOURTH AMENDMENT, AND THUS THE PURPORTED FOURTH AMENDMENT NEVER BECAME EFFECTIVE.

Because the Purported Fourth Amendment had the effect of amending the Requisite Lender definition, Section 10.5(b) required the consent of all affected Lenders in order for the purported amendment to become effective.  In this case, there can be little question that *every Lender* would be profoundly affected by an amendment that would allow Yucaipa to achieve Requisite Lender status.

The Requisite Lender is given sole authority to direct the Agent for the Lenders to exercise – or not to exercise – the rights and remedies granted to the Lenders under the Credit Agreement and other loan documents, including the right to call Events of Default, demand immediate payment by Allied of any and all amounts due, or commence foreclosure on the collateral pledged to secure the Obligations.  (Ehrlich Aff., Ex. 1, Credit Agreement §§ 8.1, 9.8.) Indeed, at the time of the Purported Fourth Amendment, those powers were particularly significant because Allied already had been in default (including payment default) under the Credit Agreement for nearly a year (and remained so until its recent bankruptcy filing).  (*See* Ehrlich Aff., Ex. 2, Verified Ga. Compl. ¶¶ 27, 29; Ex. 4, Answer ¶ 37; Ex. 7, Forbearance Agreement.)   It thus greatly affected all of Allied's legitimate Lenders when Allied's controlling shareholder – whose interests were diametrically opposed to the Lenders' interests – seized control of the Lenders' ability to enforce rights under the Credit Agreement.[15]

Notwithstanding the plain language of Section 10.5(b), requiring unanimous consent of the affected Lenders in order to effect an amendment of the Requisite Lender definition, it is undisputed that Allied did not receive – or even seek – the consent of any Lender other than ComVest.  Yucaipa and Allied's failure to obtain unanimous written consent from all affected Lenders for the Purported Fourth Amendment renders the amendment invalid.  *See Deutsche Bank AG v. JPMorgan Chase Bank*, No. 04 Civ. 7192, 2007 U.S. Dist. LEXIS 71933, at *71 (S.D.N.Y. Sept. 27, 2007) (holding, on motion for summary judgment, that an amendment

---

[15]   As discussed above, there can be no doubt that each of the Lenders was "affected" by the change in the definition of Requisite Lenders proposed by the Purported Fourth Amendment, which for the first time would have permitted Yucaipa, as Sponsor, to become the Requisite Lender and take control of the Obligations under the Credit Agreement.  This stands in stark contrast to the amendments contained in the Third Amendment, which was approved and became effective upon the consent of the holders of a majority of the outstanding Obligations.  While the amendments in the Third Amendment allowed Yucaipa for the first time to acquire a limited amount of Term Loans – such amendments also imposed severe restrictions that effectively neutralized Yucaipa to insure that such ownership could not be used to "affect" any other Lender.

to a Credit Agreement was invalid and ineffective under New York law where Required Lender

consent was insufficient to ratify the amendment when the plain terms of the Credit Agreement

required the consent of each affected lender).  As such, Plaintiffs are entitled to a declaration that

the Purported Fourth Amendment is null and void, and that Yucaipa is not the Requisite Lender.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully requests that this Court grant

the Motion; award Plaintiffs, pursuant to CPLR 3212, summary judgment; declare the Purported

Fourth Amendment null and void; declare that Yucaipa is not the Requisite Lender under the

Credit Agreement; and grant Plaintiffs such other and further relief as is just and proper.


Dated:  New York, New York
       August 27, 2012

Respectfully submitted,

SCHULTE ROTH & ZABEL LLP

By:  /s/ *Robert J. Ward*
     Robert J. Ward
     Adam Harris

919 Third Avenue
New York, New York  10022
(212) 756-2000
*Attorneys for Plaintiffs*