**<u>EXHIBIT H</u>**

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

ORIGINAL

FILED IN OFFICE

FEB 1 8 2011

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

ALLIED SYSTEMS HOLDINGS, INC.,           )
YUCAIPA AMERICAN ALLIANCE FUND I,        )
LP, and YUCAIPA AMERICAN ALLIANCE        )
(PARALLEL) FUND I, LP,                   )
                                         )
                    Plaintiffs,          )        Civil Action No. 2009CV177574
                                         )
v.                                       )
                                         )
THE CIT GROUP/BUSINESS CREDIT, INC.,     )
                                         )
                    Defendant.           )

## PLAINTIFFS' JOINT BRIEF IN OPPOSITION TO DEFENDANT THE CIT GROUP/ BUSINESS CREDIT, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

COME NOW Plaintiffs Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP (hereinafter "Yucaipa") and Allied Systems Holdings, Inc. ("Allied") (collectively, "Plaintiffs") and jointly respond to Defendant The CIT Group/Business Credit, Inc.'s ("CIT's") Motion for Partial Summary Judgment (the "Motion") as follows:

### INTRODUCTION

This case arises out of Defendant CIT's breaches of its obligations as the agent for Allied's first-lien lenders. These breaches include but are not limited to CIT's failure to recognize Yucaipa's authority to direct CIT's actions and follow its instructions. CIT's breaches have interfered with Allied's access to lines of credit and its cash, diminished Allied's value and hence diminished the value of Yucaipa's debt and equity investments in Allied, which have a face value in excess of one hundred forty-million dollars ($140,000,000).

CIT's argument is self-contradictory and contrary to the governing rules of contract construction. Under CIT's own course of conduct in the transactions complained of, its

discovery responses, its pleadings, its officers' admissions *in judicio*, the relevant provisions of the Third and Fourth Amendments and governing law, CIT abjectly fails to meet its Rule 56 burdens and is not entitled to summary judgment.

## SUMMARY OF ARGUMENT

Yucaipa's authority to direct CIT's actions arises from Yucaipa's status as Requisite Lender (*i.e.,* the holder of the majority of Allied's first lien debt) under a credit agreement between Allied and various lenders, including CIT (as subsequently amended, the "Credit Agreement" or "CA").[1] Yucaipa became Requisite Lender upon its purchase of the majority of Allied's first lien debt in August 2009. Allied originally issued this debt when it emerged from bankruptcy in 2007 pursuant to a Chapter 11 restructuring plan and the Credit Agreement. CIT serves not only as the first lien lenders' administrative and collateral agent under the CA, but also as the sole revolving lender under the CA. As explained in further detail in Yucaipa's Amended Complaint, CIT has wrongfully placed its interests as revolving lender above its duties as agent. CIT has admitted that it has single-mindedly pursued its own self-interests as the revolving lender in exercising its agency powers, even when doing so has conflicted with the interests of the other lenders it serves as agent – including Yucaipa. Plaintiffs' claims seek to redress and remedy CIT's transparent self-dealing.

The CA was amended four times. While the CA originally restricted Yucaipa's ability to purchase Allied's first lien debt, the Third and Fourth Amendment, taken together, removed all such restrictions and permitted Yucaipa to purchase its existing Requisite Lender stake. CIT's Motion seeks a declaration that Yucaipa is not Requisite Lender because the Fourth Amendment

---

[1] The Credit Agreement's full title is the May 15, 2007 Amended And Restated First Lien Secured Super-Priority Debtor In Possession And Exit Credit And Guaranty Agreement. Copies of the Credit Agreement are attached to the original Verified Complaint at Tab A and to the Affidavit of Janice I. Goldberg in Support of CIT's Motion, dated January 5, 2011 ("Goldberg Aff."), at Ex. "2."

2

contained changes to the term, "Term Loan Exposure" (or "TLE"). CIT asserts that the Fourth Amendment's changes to TLE are invalid because the Fourth Amendment was not passed by unanimous consent of Allied's first lien lenders. CIT contends unanimous consent was required because the Fourth Amendment's provision deleted language the Third Amendment previously added to TLE and thereby allowed Yucaipa to become Requisite Lender, which in turn affected the first lien lenders' interests. This argument fails for a number of reasons.

Initially, CIT conveniently fails to address the fact that the Fourth Amendment provision at issue here simply reverses the additions to the language of TLE made in the Third Amendment – which itself was not passed with unanimous Lender consent. Thus, CIT effectively argues that two different voting standards apply to the Third Amendment's addition of language and the Fourth Amendment's removal of the exact same language. This argument is nonsensical, and CIT's Motion fails as a matter of law. Indeed, even if CIT were correct (and it is not) that unanimous consent is required to modify the language of TLE, its Motion must still be denied, because in such an instance that portion of the Third Amendment that added the disputed language to the definition of TLE would itself be rendered ineffective. If the Third Amendment's insertion were ineffective, then the Credit Agreement's original definition of TLE would continue to control – and the Credit Agreement's definition of the term (which is identical to that under the Fourth Amendment) does not prohibit Yucaipa from becoming Requisite Lender. As a result, even if CIT were correct – which it is not – and unanimous Lender consent were required to amend TLE, the Fourth Amendment would not require unanimous consent because it would not change the language of TLE from its form in the original Credit Agreement. Thus, even if CIT's contractual argument were meritorious, CIT's Motion would *still* fail as a matter of law (or, in the alternative, be denied as moot).

3

In point of fact, CIT has never challenged the validity of the Third Amendment or argued that unanimous consent is required to amend the definition of TLE until now. To the contrary, after consulting with its counsel, Hunton & Williams, CIT admits it repeatedly advised voting lenders that the Third Amendment required merely Requisite Lender consent and not unanimous consent as CIT now effectively alleges in its Motion. CIT's attempt to take a position in the Motion directly contrary to the one it took previously must be rejected, as the doctrine of estoppel precludes CIT's argument that the Fourth Amendment's provision required unanimous consent.

CIT's conduct fully meets the requirements of the estoppel doctrine. In its Motion, CIT did not disclose the undisputed facts that (1) the Third Amendment was passed with only Requisite Lender approval; (2) CIT determined, upon advice of its counsel, that Requisite Lender approval was all that was necessary to enact the Third Amendment, including the change to the TLE language; (3) CIT in that knowledge then informed other Lenders that Requisite Lender approval was all that was necessary to pass the Third Amendment; (4) CIT understood and intended when the Third Amendment passed that Lenders would rely on CIT's assurances that the Third Amendment required no more than Requisite Lender approval; (5) CIT understood when the Third Amendment passed that Yucaipa would buy debt in reliance on the Third Amendment's provisions permitting it to do so; (6) CIT has never maintained the Third Amendment required any more than Requisite Lender consent; and (7) the Fourth Amendment's modification of the TLE language did nothing more than undo the changes the Third Amendment made to that very same language. Further, Plaintiffs' discovery efforts to date, including Plaintiffs' challenges to CIT's unfounded assertion of privilege, have revealed that, despite CIT's repeated attempts to redact critical passages of controlling documents, *CIT has*

4

*acknowledged that Yucaipa is the Requisite Lender in CIT's own non-privileged internal documents which CIT authored during the relevant time frame.* These admissions of record estop CIT from arguing that the Fourth Amendment required unanimous Lender consent and that Yucaipa is not Requisite Lender. The Court should deny CIT's Motion for this reason alone.

CIT is also wrong in arguing that unanimous consent is required to amend the language of TLE. Unanimous consent by affected Lenders is required for any amendment of the definition of the term "Requisite Lenders." But the Fourth Amendment did not change a single word in the definition of "Requisite Lenders," and instead modified the language of TLE. The CA expressly lists the defined terms the amendment of which requires unanimous Lender approval, and "Term Loan Exposure" is not among them. The CA contains a vast number of other defined terms that incorporate multiple levels of other, embedded defined terms. To hold that any amendment of an embedded defined term must constitute an amendment of all concepts that include that term would effectively eviscerate the CA's provision that makes the CA amendable.

## STATEMENT OF FACTS

**1.    The Parties' Claims**

1.      Plaintiffs filed their original Verified Complaint On November 13, 2009. (*See* Plaintiffs' Joint Response to Defendant The CIT Group/Business Credit, Inc.'s Statement of Its Theory of Recovery and Undisputed Material Facts Submitted In Support of Its Motion for Partial Summary Judgment and Plaintiffs' Statement of Additional Undisputed Material Facts That Preclude Summary Judgment In Favor of CIT – Statement of Additional Undisputed Material Facts section (hereinafter "Plaintiffs' SOF") ¶ 1.)

2.      CIT filed its Verified Answer and Counterclaims on December 21, 2009, asserting counterclaims against Plaintiffs for (1) Declaratory Judgment; (2) Breach of the

Implied Covenant of Fair Dealing; (3) Injunctive Relief; (4) Breach of Fiduciary Duties (CIT has moved to dismiss its claims against the Directors named in this count); (5) Aiding and Abetting Breach of Fiduciary Duty; (6) Specific Performance; and (7) Attorneys' Fees. (*See* Plaintiffs' SOF ¶ 2.)

3.       Plaintiffs filed their First Amended Complaint On December 28, 2010, asserting claims against CIT for (1) Declaratory Judgment; (2) Conversion; (3) Breach of Contract; (4) Breach of Agency Duties; (5) Declaratory Judgment; (6) Breach of Credit Agreement; (7) Breach of Security Agreement; (8) Breach of Implied Covenant of Good Faith and Fair Dealing; (9) Wrongful Foreclosure; (10) Tortious Diminution of Value of Allied's Business; (11) Specific Performance; (12) Punitive Damages; and (13) Attorneys' Fees. (*See* Plaintiffs' SOF ¶ 3.)

4.       On January 6, 2011, CIT filed its Motion for Partial Summary Judgment against Plaintiffs seeking judgment on the First Cause of Action of the First Amended Complaint and the First Counterclaim of Defendant's Counterclaims and an Order declaring that Yucaipa is not the Requisite Lender under the Credit Agreement. (*See* Defendant The CIT Group/Business Credit, Inc.'s Motion for Partial Summary Judgment (CIT's "Motion"), filed January 6, 2011.)

**II.       The Credit Agreement**

5.       Allied is a leading provider of distribution, logistics, and transportation services to the automotive industry, specializing in the delivery of new vehicles from the manufacturing plant to the dealership. (*See* CIT's Statement of Undisputed Facts ("CIT's SMF") ¶ 2; *see also* Plaintiffs' SOF ¶ 5.)

6.       Allied filed for bankruptcy under Chapter 11 of the Bankruptcy Code in July 2005 and emerged from bankruptcy on May 30, 2007. (*See* CIT's SMF ¶ 4; *see also* Plaintiffs' SOF ¶ 6.) Under Allied's restructuring plan, Yucaipa became Allied's largest shareholder. *See id.*

6

7.      Allied obtained financing through a $315 million credit facility to facilitate its exit from bankruptcy in 2007, comprised of a $265 million senior secured first priority credit facility (the "Senior Credit Facility") and a $50 million junior credit facility. (*See* CIT SMF ¶ 5; *see also* Plaintiffs' SOF ¶ 7.). The Senior Credit Facility is governed by the Credit Agreement. (*See* Plaintiffs' SOF ¶ 7.) The parties to the Credit Agreement are Allied, as Borrowers; certain of Allied's subsidiaries, as Guarantors; various unnamed Lenders; Goldman Sachs Credit Partners L.P., as Lead Arranger and Syndication Agent; and CIT, as Administrative Agent and Collateral Agent. (*See* Plaintiffs' SOF ¶ 7.)

8.      The Senior Credit Facility is comprised of a $35 million revolving credit facility from CIT (the "Revolving Loan"), a $50 million synthetic letter of credit facility (the "Letters of Credit" or "LC"), and term loans in the original aggregate principal amount of $180 million (the "Term Loans"). (*See* Plaintiffs' SOF ¶ 8.)

9.      The Credit Agreement grants significant and explicit rights to the "Requisite Lenders," The Credit Agreement defines Requisite Lenders as:

> "Requisite Lenders" means one or more Lenders having or holding Term Loan Exposure, LC Exposure and/or Revolving Exposure and representing more than 50% of the sum of (i) the aggregate Term Loan Exposure of all Lenders, (ii) the aggregate LC Exposure of all Lenders and (iii) the aggregate Revolving Exposure of all Lenders.

(CA § 1.1.) The term "Requisite Lenders" is also sometimes called "Required Lenders" and CIT uses the terms interchangeably. (*See* Plaintiffs' SOF ¶ 9.)

10.     The original form of the Credit Agreement defines "Term Loan Exposure" ("TLE") as:

> "Term Loan Exposure" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Term Loans of such Lender plus during the Term Loan Commitment Period, the unfunded Term Loan Commitment of such Lender; *provided*, at any time prior to the making of the

7

initial Term Loans, the Term Loan Exposure of any Lender shall be equal to such Lender's Term Loan Commitment.

(CA § 1.1) (emphasis in original.)

11.    Pursuant to CA § 10.5(a), the Requisite Lenders may amend or modify the Credit Agreement, subject only to certain specifically delineated exceptions contained within CA § 10.5(b) and (c). (*See* CA § 10.5.) CIT's Motion asserts exclusively one such exception found at CA § 10.5(b)(ix), which states:

> (b)    Affected Lenders' Consent. Without the written consent of each Lender (other than a Defaulting Lender) that would be affected thereby, no amendment, modification, termination, or consent shall be effective if the effect thereof would:
> . . .
> (ix)    amend the definition of "**Requisite Lenders**" or "**Pro Rata Share**"; provided, with the consent of Requisite Lenders, additional extensions of credit pursuant hereto may be included in the determination of "**Requisite Lenders**" or "**Pro Rata Share**" on substantially the same basis as the Term Loan Commitments, the Term Loans, the LC Commitments, the LC Deposits, the Revolving Commitments and the Revolving Loans are included on the Closing Date; . . . .

(CA § 1.1 (emphasis in original); *see also* CIT's Brief, p. 4, fn. 2.) The Credit Agreement does not define what is meant by a "Lender . . . that would be affected thereby" (hereafter, "Affected Lender").

12.    The Credit Agreement contains a Severability clause that states:

> In case any provision in or obligation hereunder or under any other Credit Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(CA § 10.11.)

13.    The Credit Agreement, Third Amendment and Fourth Amendment each contain provisions stating the Credit Agreement (and the relevant Amendments) "are governed by, and shall be construed and enforced in accordance with" New York law. (*See* Plaintiffs' SOF ¶ 13.)

8

The CA also contains a clause which states, consistent with governing New York law (and with Georgia law) that the parties' various respective obligations under those documents are independent covenants and not conditions, stating: "All covenants hereunder shall be given independent effect . . . ." (*See* Plaintiffs' SOF ¶ 13.)

### III.    The Third Amendment

14.    Around April 2008, CIT, as Administrative Agent, coordinated passage of Amendment No. 3 To Credit Agreement and Consent (the "Third Amendment" or "3A.") (*See* Plaintiffs' SOF ¶ 14.) The Third Amendment amended the Credit Agreement to permit Yucaipa to purchase Allied's first-lien debt, but also imposed certain restrictions on Yucaipa's purchases. (*See* Third Amendment.) Under the Credit Agreement, as amended through the first two amendments, Yucaipa was not permitted to own Allied's first-lien debt. (*See* Plaintiffs' SOF ¶ 14.) This proscription was contained in the definition of the term "Eligible Assignee," which in the original Credit Agreement precluded any Lender from assigning its first-lien debt to Yucaipa. (*See* Plaintiffs' SOF ¶ 14.) It is undisputed that unanimous consent is not required to amend the term Eligible Assignee, which, like the language of TLE, was amended by the Third Amendment without unanimous consent. (*See* Plaintiffs' SOF ¶ 14.)[2]

15.    The Third Amendment was executed on April 17, 2008 and passed merely with Requisite Lender consent.    Despite CIT's implication in its Counterclaims that all Lenders consented to the Third Amendment's passage, *the Third Amendment was not passed with unanimous Lender consent.* (*See* Plaintiffs' SOF ¶ 15.) Lenders collectively holding sixty-two (62%) percent of the outstanding first-lien debt, including CIT, consented to passage of the Third

---

[2] Indeed, this fact highlights the specious nature of CIT's argument that the Credit Agreement requires unanimous consent to any amendment to the term TLE.  If the Credit Agreement allows the parties to amend the term Eligible Assignee to allow Yucaipa to purchase first lien debt without unanimous consent, it would be inconsistent that the Credit Agreement would then require unanimous consent to remove the Third Amendment's restriction on Yucaipa's right to vote any debt it purchased, as CIT argues.

Amendment. (*See* Plaintiffs' SOF ¶ 15.) CIT's officers testified that, based on CIT's counsel's advice, in the days leading up to the Third Amendment vote they advised other Lenders that only Requisite Lenders approval was required pass the Third Amendment. (*See* Plaintiffs' SOF ¶ 15.) They also admitted CIT was aware Yucaipa and other Lenders would rely on the Third Amendment's validity as passed with only Requisite Lender approval. (*See* Plaintiffs' SOF ¶ 15.) Term Loan Lenders holding only about 60% of the outstanding Term Loans approved the Third Amendment. (*See* Plaintiffs' SOF ¶ 15.)

16.    CIT has expressly admitted that only Requisite Lender consent was necessary to pass the Third Amendment, and that satisfaction of the more restrictive provisions of CA § 10.5 (b) and (c), including the provisions requiring consent of all "Affected Lenders," was not required. (*See* Plaintiffs' SOF ¶ 16.) On April 11, 2008, Barbara Coffin, the CIT Vice-President who consulted with CIT's counsel, coordinated passage of the Third Amendment and executed it on CIT's behalf, informed a Lender representative in the days before the Third Amendment vote: "As far as the current requested amendment [*i.e.*, the Third Amendment], there is a "Requisite Lender" requirement for this amendment to be executed." (*See* Plaintiffs' SOF ¶ 16.) Michael F. Aliberto, III of CIT ("Aliberto") admitted, while testifying as CIT's 30(b)(6) designee, that CIT agreed the Third Amendment required only Requisite Lender consent to be effective. (*See* Plaintiffs' SOF ¶ 16.)

17.    The Third Amendment contained a provision that purported to modify a defined term of the Credit Agreement, namely, "Term Loan Exposure" ("TLE"). (*See* 3A § 2.1(c).) This provision purportedly changed TLE by adding language that would have that excluded any Allied debt owned by Yucaipa from calculations of TLE. *See id.*

18.    The Third Amendment contains a Severability clause which states:

> In case any provision in or obligation hereunder shall be invalid, illegal or
> unenforceable in any jurisdiction, the validity, legality and enforceability of the
> remaining provisions or obligations, or of such provision or obligation in any
> other jurisdiction, shall not in any way be affected or impaired thereby.

(3A § 7.2.) This provision is the same as that contained in the Credit Agreement, except that the Credit Agreement's severability clause is more expansive because its coverage extends to "any other Credit Document."

19.     In February 2009, ComVest Investment Partners III, L.P. ("ComVest") acquired the majority of Allied's first-lien debt, including a majority of both the First Lien Term Loans and LC Commitments. (See Plaintiffs' SOF ¶ 19.) As a result, CIT admits that ComVest became Requisite Lender in February 2009 and remained Requisite Lender until August 21, 2009. (See Plaintiffs' SOF ¶ 19.)

## IV.     The Fourth Amendment And The Provisions At Issue In This Motion

20.     On August 21, 2009, Allied and ComVest, as Requisite Lender, executed Amendment No. 4 to Credit Agreement (the "Fourth Amendment" or "4A.") as authorized by CA § 10.5(a). (See Fourth Amendment; see also CIT SMF ¶ 35.)

21.     As described in the following paragraphs, the Fourth Amendment removed certain restrictions the Third Amendment had placed on Yucaipa's ability to obtain Allied first-lien debt. (See Fourth Amendment; see also CIT SMF ¶¶ 38-41.) The Fourth Amendment also removed any restrictions on Yucaipa's ability to acquire first lien debt and thereby become Requisite Lender under the Credit Agreement. See id.

22.     Among its changes, the Fourth Amendment modified the language of Term Loan Exposure by deleting the language the Third Amendment had purportedly added to that term and thereby restored the language as it existed prior to the Third Amendment's enactment. (See CA § 1.1; see also 3A, p. 3; 4A, p. 2.)

23.     Specifically, the Third Amendment modified the TLE language contained in the
original form of the Credit Agreement (*see* Plaintiffs' SOF ¶ 10.) and added the emphasized
clause below:

> "Term Loan Exposure" means, with respect to any Lender, as of any date of
> determination, the outstanding principal amount of the Term Loans of such
> Lender plus during the Term Loan Commitment Period, the unfunded Term Loan
> Commitment of such Lender; provided, at any time prior to the making of the
> initial Term Loans, the Term Loan Exposure of any Lender shall be equal to such
> Lender's Term Loan Commitment; *provided further that with respect to any
> provisions of this Agreement relating to the voting rights of Lenders (including
> the right of Lenders to consent or take any other action with respect to any
> amendment, modification, termination or waiver of any provision of this
> Agreement or the other Credit Documents, or consent to any departure by any
> Credit Party therefrom), the aggregate outstanding principal amount of the Term
> Loans of all Restricted Sponsor Affiliates shall be disregarded for purposes of this
> definition of "Term Loan Exposure".*

(3A § 2.1(c)) (emphasis added.)

24.     The Fourth Amendment simply removed the Third Amendment's addition,
restoring the language to its original reading in the Credit Agreement:

> "Term Loan Exposure" means, with respect to any Lender, as of any date of
> determination, the outstanding principal amount of the Term Loans of such
> Lender plus during the Term Loan Commitment Period, the unfunded Term Loan
> Commitment of such Lender; provided, at any time prior to the making of the
> initial Term Loans, the Term Loan Exposure of any Lender shall be equal to such
> Lender's Term Loan Commitment.

(4A § 2.1(b) (emphasis in original; *see also* Plaintiffs' SOF ¶ 10; *compare* CA § 1.1.)

25.     The Fourth Amendment contains a Severability clause with wording identical to
the Severability clause contained in the Third Amendment. (*See* 3A § 7.2; 4A § 6.2.)

26.     Neither the Third Amendment nor the Fourth Amendment changed the wording
of the definition of "Requisite Lenders." (*See generally,* 3A; 4A.)

27.    CIT explicitly admitted that changing the Third Amendment's change to the TLE language only required Requisite Lender approval. (*See* CIT SMF ¶ 18; *see also* Plaintiffs' SOF ¶ 27.)

**V.    Yucaipa Becomes Requisite Lender**

28.    Upon the Fourth Amendment's passage, on August 21, 2009, ComVest sold all of its majority holdings of Allied first-lien debt to Yucaipa. (*See* Plaintiffs' SOF ¶ 28.) These holdings consisted of $114,712,088.66 of Term Loans and $30,400,458.40 of LC Commitments, totaling $145,112,547.06 of the $265,000,000 maximum first-lien loans authorized by the Credit Agreement. *See id.*

29.    Under the terms of the CA as amended, Yucaipa became Requisite Lender upon its acquisition of ComVest's holdings on August 21, 2009, as that acquisition gave Yucaipa at least 54.76% ownership of Allied's first lien debt. (*See* Plaintiffs' SOF ¶ 29.)

30.    Shortly after the Fourth Amendment was executed and Yucaipa became Requisite Lender, CIT prepared one of its monthly internal strategy documents (known as a "Credit Surveillance Report" ("CSR"). (*See* Plaintiffs' SOF ¶ 30.) In its August 25, 2009 CSR, CIT admitted that Yucaipa became Requisite Lender when it acquired the ComVest's majority debt position in Allied, ComVest, stating:

> On August 21, 2009, ComVest as Required Lenders executed the 4th Amendment to the Allied loan documents to allow Yucaipa (Allied's Equity Sponsor) to purchase ComVest's commitments in the Allied Facilities. Simultaneous with the execution of the 4th Amendment, ComVest sold its position in Allied to Yucaipa. ***Yucaipa is now the Required Lenders in the Facility.***

(*See* Plaintiffs' SOF ¶ 30.) The August 25, 2009 CSR was the first in a series of CSRs and other internal strategy documents in which Yucaipa had acquired a Requisite Lender position. (*See* Plaintiffs' SOF ¶ 30.)

13

31.    CIT is a state and federally regulated bank. (*See* Plaintiffs' SOF ¶ 31.) Its regulators include The United States Treasury Department, The Office of the Comptroller of the Currency, the Federal Reserve, the SEC, the FDIC and various state regulators. (*See* Plaintiffs' SOF ¶ 31.)

32.    CSRs are documents that are distributed widely within CIT to middle and upper level management. (*See* Plaintiffs' SOF ¶ 32.) CSRs are used within CIT's management, accounting, regulatory, risk management, administrative and legal divisions as evidence of the status of CIT's portfolio holdings (in this case, CIT's interest in the Allied revolver facility). (*See* Plaintiffs' SOF ¶ 32.) CSRs also are available to CIT's regulators, auditors and taxing authorities. (*See* Plaintiffs' SOF ¶ 32.)

33.    In particular, CIT uses portions of the Allied CSRs to calculate and justify FASB reserves and charge-offs attributable to the Allied account to comply with the Federal Reserve's stringent requirements. (*See* Plaintiffs' SOF ¶ 33.)

34.    The CSRs regarding Allied and Yucaipa are prepared by CIT's portfolio managers who managed CIT's holding in Allied's debt, Michael Aliberto and Vincent Belcastro. (*See* Plaintiffs' SOF ¶ 34.) CIT repeatedly admits in its CSRs that its claimed "first out" distribution priority under the "waterfall" is subject to successful legal challenge by term loan lenders and that CIT expects those lenders to launch a challenge to CIT's claimed priority. (*See* Plaintiffs' SOF ¶ 34.) CIT's high level of concern, combined with Yucaipa's admitted Requisite Lender status, in August 2009 led CIT's Commercial and Industrial business unit's Senior Loan Officer and Vice-President, Stuart Nectow, and the head of CIT's Problem Loan Management Group and Rule 30(b)(6) designee, Vincent Belcastro, to recommend to CIT's most senior management that CIT create a FAS 114 reserve of $23,000,000 against CIT's $35,000,000

14

revolving loan facility to Allied as of September 30, 2009 to comply with Federal Reserve accounting requirements. (*See* Plaintiffs' SOF ¶ 34.) Mr. Nectow recommended this FAS 114 reserve in part because Yucaipa was now the Requisite Lender. (*See* Plaintiffs' SOF ¶ 34.)

35.    After Yucaipa became Requisite Lender on August 21, 2009, CIT, through its then counsel, Patton Boggs LLP, sent four letters to Allied and/or Yucaipa's counsel which included vague reservation of rights statements regarding the Fourth Amendment. (*See* Plaintiffs' SOF ¶ 35.) CIT never stated Yucaipa was not the Requisite (or Required) Lender until after Plaintiffs sued it in this litigation for breaches of the Credit Agreement and various business torts. (*See id.*)

## ARGUMENT

### I.    Standard On Summary Judgment Motions.

"To obtain summary judgment, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law." *Talbot County Bd. of Comm'rs v. Woodall*, 275 Ga. 281, 282 (2004); *see also* O.C.G.A. § 9-11-56(c); *Great Southwest Express Co. v. Great Am. Ins. Co.*, 665 S.E.2d 878, 879 (Ga. App. 2008); *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459, 459, 486 S.E.2d 684, 685 (1997) (The Court must "view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.").

A defendant moving for summary judgment may accomplish this by showing the court through documents, depositions and other evidence that there is no evidence sufficient to create a genuine issue of fact as to an essential element of the plaintiff's claim. *See Lau's Corp., Inc. v. Haskins*, 261 Ga. 491, 405 S.E.2d 474 (1991). However, a defendant who will not bear the burden of proof at trial need not affirmatively disprove the nonmoving party's case, "but may

discharge his responsibility by showing an absence of evidence to support the nonmoving party's case." *Id.*; *see also Solomon v. Barnett*, 281 Ga. 130, 132 (2006) ("The law is well established that . . . the non-movant [is] not required to produce any counter evidence or materials in affirmative support of his side of the issue until [the movant] carrie[s] the burden placed upon him as the movant for summary judgment.") If the moving party meets this responsibility in his motion for summary judgment, the nonmovant "cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue." *Id.*

## II.    Choice Of Law.

Plaintiffs do not dispute CIT's contention that New York law governs construction and enforcement of the Credit Agreement because the CA, and the Third and Fourth Amendments all contain choice of law provisions that select New York law.[3] "In the absence of contrary public policy, [Georgia] courts normally will enforce a contractual choice of law provision. *Manderson & Assocs., Inc. v. Gore*, 193 Ga. App. 723, 725 (Ga. App. 1989).

While it is undisputed that New York law governs the contractual interpretation of the Credit Agreement, under the rule of *lex fori*, procedural or remedial questions are governed by the law of the forum (in this case, Georgia, as the state in which the action is brought). *Menendez v. Perishable Distrib.*, 254 Ga. 300, 329 S.E.2d 149 (Ga. 1985); *Bagnell v. Ford Motor Co.*, 297 Ga. App. 835, 678 S.E.2d 489, 492 (Ga. App. 2009) ("Questions involving procedure or the appropriate remedy, however, are decided using the law of the state where the action was filed.").

Georgia law also governs equitable doctrines such as estoppel despite the existence of contractual choice of law provisions. *See Simpson Consulting v. Barclays Bank Plc*, 227 Ga.

---

[3] *See* CIT's Brief, p. 10; Plaintiffs' SOF ¶ 13; *see also* Amended Compl. ¶ 116.

App. 648, 657, 490 S.E.2d 184, 193 (1997) ("While the alleged contracts were under New York law, promissory estoppel is a Georgia equity doctrine, so that Georgia case law applies as a matter of conflict of law.") (overruled on other grounds by *Williams Gen. Corp. v. Stone*, 279 Ga. 428, 431, 614 S.E.2d 758, 761 (2005)).

III.   **CIT's Motion Fails Even If Unanimous Consent Were Required To Amend The Definition Of Term Lender Exposure.**

CIT's Motion fails even assuming *arguendo* that CIT were correct in arguing that unanimous lender consent is required for any modification to the term TLE (and it is not). This result obtains because the Fourth Amendment's provision at issue here merely deleted that portion of TLE's language that was entirely added by the Third Amendment, and thereby restored TLE's language to read as it existed in the original Credit Agreement. (*See* Plaintiffs' SOF ¶¶ 10, 23-24.) However, if unanimous consent to the Fourth amendment were required to *remove* this language through the Fourth Amendment, as CIT argues, then logically it must have been required to *add* the same language in the first place through the Third Amendment. As noted above and demonstrated by the evidence cited herein, CIT admittedly did not require or obtain unanimous Lender consent when the Third Amendment was passed.[4] Instead, it made clear to other Lenders in contemporaneous communications that the Third Amendment required — and hence CIT obtained — only Requisite Lender consent to the Third Amendment.[5] Thus, if (as CIT argues) unanimous consent were required, the Third Amendment's modification to the definition of TLE was invalid — and, pursuant to the severability clauses in the Credit Agreement and Third Amendment, this modification would be ineffective and therefore severed from the

---

[4] *See* Plaintiffs' SOF ¶¶ 15-16.

[5] *See id.*

Third Amendment.[6]  Without the Third Amendment's modification, the definition of TLE would read as it did in the original Credit Agreement -- a reading which does not prohibit Yucaipa from becoming Requisite Lender, and which is identical to the reading in the Fourth Amendment.  In other words, the issue of the Fourth Amendment's validity is effectively moot, as the only possible outcome of this case, even if CIT's contractual argument had merit (which it does not), is that Yucaipa is the Requisite Lender.[7]

**IV.    CIT Is Estopped From Arguing That The Fourth Amendment's Change In The Language Of TLE Requires More Than Requisite Lender Consent.**

Under the undisputed facts, CIT is estopped from arguing that the Fourth Amendment's deletion of the Third Amendment's change to the language of TLE required unanimous consent of Affected Lenders.  CIT argues that the Fourth Amendment's modification of the language of TLE constituted a change to the definition of Requisite Lender that required unanimous consent of all Affected Lenders pursuant to CA § 10.5(b)(ix).  (*See* CIT's Brief, pp. 11-14.)  The relevant provision states in pertinent part:

> (b)    <u>Affected Lenders' Consent</u>.  Without the written consent of each Lender (other than a Defaulting Lender) that would be affected thereby, no amendment, modification, termination or consent shall be effective if the effect thereof would:

---

[6] *See* Plaintiffs' SOF ¶¶ 12, 18, 25.

[7] In the alternative, CIT's Motion should be denied as moot because the Court lacks subject matter jurisdiction under the Declaratory Judgment Act, O.C.G.A. § 9-4-1, *et seq.*  Georgia Courts are only empowered to grant declaratory relief when there is an actual, justiciable controversy between the parties.  *Baker v. City of Marietta*, 271 Ga. 210, 213, 518 S.E.2d 879 (1999).  Where the rights of the parties have already accrued and the party seeking the declaratory judgment does not risk taking future undirected action -- as in the present case where the issue raised by CIT's Motion is moot -- a declaratory judgment would be improperly "advisory."  *Id.* at 214; *see also In re I. B.*, 219 Ga. App. 268, 271, 464 S.E.2d 865, 868 (1995) ("Judicial jurisdiction does not encompass moot issues.").  "[A] case is moot when its resolution would amount to the determination of an abstract question not arising upon existing facts or rights, and that mootness is a mandatory ground for dismissal."  *Collins v. Lombard Corp.*, 270 Ga. 120, 121 (1998) (quoting *Chastain v. Baker*, 255 Ga. 432, 433 (1986)).  There are only two outcomes to CIT's Motion: (1) either the Third Amendment's modification of TLE is declared ineffective and the Credit Agreement's original definition of TLE controls, or (2) the Third Amendment's and Fourth Amendment's modifications of TLE are both valid and the Fourth Amendment's definition of TLE controls.  Since in either case the language of TLE is the same, and that language allows Yucaipa to be Requisite Lender, there is no outcome under which CIT's Motion can succeed.  As a result, CIT's Motion does not pose a justiciable question, and should be denied as moot.

18

(ix)    amend the definition of "Requisite Lenders" or "Pro Rata Share"; . . . .

CA § 10.5(b) (ix) (emphasis in original.)

CIT's argument ignores the fact that CIT admittedly, knowingly and intentionally required and effected mere Requisite Lender passage of the Third Amendment, which added the exact the same language that the Fourth Amendment later removed.

Georgia statutory law regarding estoppel provides in pertinent part:

(a) Conclusive presumptions of law are termed estoppels; averments to the contrary of such presumptions shall not be allowed. Estoppels are not generally favored.

(b) Estoppels include presumptions in favor of:

. . .

(7) Solemn admissions made in judicio;

(8) Admissions upon which other parties have acted, either to their own injury or to the benefit of the persons making the admissions.

O.C.G.A. § 24-4-24.

Under the principle of equitable estoppel, a party should be "estopped from questioning the existence or effect of a contract, the existence of which he has asserted to the other party, to his own benefit or the injury of the other." *Rieves v. Smith*, 184 Ga. 657, 664 (1937) (internal citations omitted).[8]

To establish equitable estoppel, a party must show:   "First, a false representation or concealment of facts; second, it must be within the knowledge of the party making the one or concealing the other; third, the person affected thereby must be ignorant of the truth; fourth, the

---

[8] "Where the facts relied on to establish the estoppel do not unequivocally show an estoppel in pais, the jury, and not the judge, should determine whether the facts constitute such an estoppel." *Eiberger v. West*, 247 Ga. 767, 769 (1981). Thus, while the foregoing undisputed admission of fact plainly estop CIT from arguing the Fourth Amendment's change to the language of TLE required more than requisite Lender consent, if the Court were to find that the foregoing facts do not conclusively establish an estoppel, a triable, genuine issue of fact remains precluding an award of summary judgment.

person seeking to influence the conduct of the other must act intentionally for that purpose; and, fifth, persons complaining shall have been induced to act by reason of such conduct of the other." *Noons v. Holiday Hospitality Franchising, Inc.*, 2010 Ga. App. LEXIS 922, at *4 (Sep. 30, 2010). All of these elements are present here, and CIT is therefore equitably estopped from asserting the Third Amendment or the Fourth Amendment's change to the TLE language required unanimous Affected Lender consent.[9]

CIT's own officers have testified that, having consulted with Hunton & Williams, they recommended to their senior management that CIT approve the Third Amendment because it provided caps on Yucaipa's debt ownership and voting rights that afforded CIT desirable protections to its claimed priority payout under the CA's "waterfall" provision in liquidation proceedings.[10] They also testified that CIT had consulted with Hunton & Williams regarding the validity and required passage rate for the Third Amendment, and that, based on counsel's advice, they expressly advised other Lenders that the Third Amendment required only Requisite Lender,

---

[9] Although Georgia's estoppel law applies here, New York's equitable estoppel law is consistent with Georgia law. *See Simpson Consulting*, 227 Ga. App. at 657, 490 S.E.2d at 193; *see also B. Reilman Blacktop, Inc. v. Missirlian*, 52 A.D.3d 752, 753-54 (N.Y. App. Div. 2d Dep't 2008) (enforcing an oral modification, under equitable estoppel, when the parties' conduct was "unequivocally referable to the . . . modification."); *Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 344 (N.Y. 1977) (holding that once a party to a written agreement, through its conduct, has "induced another's significant and substantial reliance upon" a modification, then the party may be estopped from challenging the validity of the modification).

[10] *See* Plaintiffs' SOF ¶ 15. Yucaipa and, on information and belief, other first lien lenders dispute CIT's claim to "first out" distribution rights under any circumstances. CIT repeatedly admits in its CSRs that its claimed "first out" distribution priority under the "waterfall" is subject to successful legal challenge by term loan lenders and that CIT expects those lenders to launch a challenge to CIT's claimed priority. (*See* Plaintiffs' SOF ¶ 34.) The severity of CIT's concern, in combination with Yucaipa's admitted Requisite Lender status, in August 2009 led CIT's Commercial and Industrial business unit's Senior Loan Officer and Vice-President, Stuart Neclow, and the head of CIT's Problem Loan Management Group and Rule 30(b)(6) designee, Vincent Belcastro, to recommend to CIT's most senior management that CIT create a FAS 114 reserve of $23,000,000 against CIT's $35,000,000 revolving loan facility to Allied as of September 30, 2009 to comply with Federal Reserve accounting requirements. (*See id.*) For reasons that are unclear, CIT's senior management ignored this recommendation, but Mr. Belcastro was so certain of its propriety (and, by implication, the validity of Yucaipa's Requisite Lender status) that he immediately again insisted in a subsequent email that the $23,000,000 FAS 114 reserve and charge-off be instituted as of December 31, 2009. (*See id.*).

and not unanimous, Affected Lender approval to be validly enacted.[11]   CIT's officers also testified that CIT passed the Third Amendment in its entirety by merely a 62% Requisite Lender vote, not unanimous consent.[12]   Moreover, they testified that CIT never thought the Third Amendment required such unanimous consent, never sought unanimous consent and has never maintained that it did since its passage.[13]   CIT's officers further admitted they knew and expected at the time the Third Amendment was passed that other Lenders – including but limited to Yucaipa – would rely on it and that others did in fact justifiably rely on its enactment by mere Requisite Lender consent.[14]   Thus, CIT admittedly does not believe the Third Amendment required unanimous consent, nor did CIT obtain unanimous consent to the Third Amendment, including its provision that added the language to TLE's calculation.  These admissions against interest of record and *in judicio* estop CIT from arguing that the Third Amendment's provision regarding TLE required unanimous Affected Lender consent.  Because the Fourth Amendment deleted exactly the same provision of TLE as the Third Amendment inserted, CIT is likewise estopped to now argue that the Fourth Amendment's said modification required any greater consent than did the Third Amendment's.

CIT's solemn admissions against interest *in judicio* are not limited to its officers' extensive deposition testimony.  CIT appears to acknowledge in its Verified Answer and Counterclaims that Requisite Lender approval governed the Third Amendment, stating: "In

---

[11] *See* Plaintiffs' SOF ¶¶ 15-16.

[12] *See* Plaintiffs' SOF ¶¶ 15-16.

[13] *See* Plaintiffs' SOF ¶¶ 15-16.  CIT has also admitted in response to Requests for Admissions that the Third Amendment passed with less than unanimous consent of all Term Loan Lenders. *See id.*

[14] Indeed, Yucaipa itself relied on the validity of the Third Amendment when it purchased over $140 million in Allied's first-lien debt in accordance with the provisions of the Fourth Amendment, which was drafted upon the assumption, not contradicted by any party, including CIT, that the Third Amendment was valid. *See* Plaintiffs' SOF ¶ 28.

Amendment No. 3, the Lenders and CIT agreed to certain changes . . . ."[15] Because it is undisputed that the Third Amendment passed by only Requisite Lender approval, the quoted passage constitutes CIT's admission in its pleadings that mere Requisite Lender consent was effective to pass the Third Amendment, including its change to the TLE language.[16] CIT has also admitted in its pleadings and in CIT's Motion that the Third Amendment was validly passed and that the Third Amendment contained modifications to the TLE language which were reversed by the Fourth Amendment.[17]

Accordingly, under the New York and Georgia rules set forth above, CIT is estopped by its admissions *in judicio* to deny that the Third Amendment's change to the TLE language required only Requisite Lender approval and, logically, from asserting that the Fourth Amendment's change to the exact same language required a greater level of approval. *See In re McCool*, 267 Ga. App. 445, 448, 600 S.E.2d 403, 406 (2004); *see also* O.C.G.A. § 24-4-24 (b)(7).[18] Therefore the Court should deny the Motion because CIT cannot meet its Rule 56 burden of proving the Fourth Amendment's provision in issue required unanimous consent.

V.    **CIT Is Not Entitled To Judgment As A Matter Of Law Because The Fourth Amendment Did Not Amend The Definition Of Requisite Lender.**

    A.    **By Its Plain Language, The Credit Agreement Did Not Require Unanimous Lender Consent To Modifications To The Definition Of Term Loan Exposure.**

CIT premises its motion on the purely conclusory assertion that a modification of the definition of "Term Loan Exposure" results in an amendment to the definition of "Requisite

---

[15] *See* Plaintiffs' SOF ¶ 15; CIT's Verified Answer and Counterclaims ¶¶ 14.

[16] The only alternative to CIT's statement being an admission *in judicio* is that CIT attempted to mislead the Court by implying that all Lenders approved the Third Amendment in its Verified Answer and Counterclaims. (*See* Plaintiffs' SOF ¶ 15; CIT's Verified Answer and Counterclaims ¶¶ 14.)

[17] Plaintiffs' SOF ¶ 15; CIT's Verified Answer and Counterclaims ¶¶ 14; *see* CIT's Brief, p. 12.

[18] At a minimum, even if the Court were to find that further proceedings were necessary regarding estoppel, the Court should therefore it should hold that there exist genuine issues of material fact and deny CIT's Motion.

Lender," and therefore the unanimous consent of all affected Lenders was necessary rather than just Requisite Lender consent. (*See* CIT's Brief, pp. 11-12.) CIT fails to include any legal or evidentiary support for this theory. (*See generally* CIT's Brief.)[19]

New York's law of contract construction does not end with the superficial principals cited by CIT. New York law makes it clear that when a contract lists specific items that are covered by a provision, other items that are not listed should be excluded. *See, e.g., RJE Corp. v. Northville Industries Corp.*, 329 F.3d 310, 314-15 (2nd Cir. 2003) (holding a contract's failure to include "environmental liabilities" when it listed several other assets and liabilities, resulted in the exclusion of environmental liabilities from those certain assets and liabilities for determination of fair market value); *see also MacMillan v. Provident Mut. Life Ins. Co.*, 32 F. Supp. 2d 600, 608 (W.D.N.Y. 1999) (holding that when an insurance policy listed several forms of compensation to be excluded from an income calculation, the failure to list renewal commissions among those exclusions meant renewal commissions were not intended to be excluded from the calculation).

By its plain language, CA § 10.5(b) contains just such a limited list of terms the amendment of which require unanimous consent. That section states: "Without the written consent of each Lender (other than a Defaulting Lender) that would be affected thereby, no amendment, modification, termination or consent shall be effective if the effect thereof would . . . . (ix) amend the definition of "Requisite Lenders" or "Pro Rata Share" . . . ."[20] The Credit

---

[19] The CA's choice of law provision holds that the contract's construction is governed by New York law. *See* Plaintiffs' SOF ¶ 13; *see also* CA § 10.14; 3A § 7.6; 4A § 6.5. However, CIT's only argument regarding contract construction is merely a recital of New York cases standing for the general proposition – which provides no meaningful guidance in this case -- that contracts should be construed in accordance with the plain meaning of their terms unless the contract's language is ambiguous. (*See* CIT's Brief, p. 10.) CIT then makes a few purely conclusory statements regarding that contract's supposedly plain meaning, but provides absolutely no material, supporting facts or authority. (*See* CIT's Brief, pp. 10-14.)

[20] *See* Plaintiffs' SOF ¶ 11.

Agreement contains no requirement that a change to the definition of TLE needs the unanimous consent of Affected Lenders (which group CIT argues includes all Lenders; *see* CIT's Brief, pp. 13-14.). Thus, under the authority cited above, changes to the language of TLE do not require unanimous consent because TLE is not in the list of terms to which that requirement refers.[21] This result comports with common sense: if the parties to the highly-detailed CA had intended to list "Term Loan Exposure" among the other definitions in CA § 10.5(b), they would have done so.

By way of example, and further highlighting the specious nature of CIT's argument, the term "Requisite Lender" itself contains four embedded terms, including TLE. In defining those embedded terms, the Credit Agreement refers to twelve additional embedded terms. And the definitions of those twelve new terms in turn include thirteen more embedded terms. (*See* CA § 1.1.) It simply cannot be reasonably argued that the Credit Agreement's unanimity requirement for amending the term "Requisite Lender" applies by extension to these 29 terms as well, when its plain language lists none of them. *See, e.g., RJE Corp.,* 329 F.3d at 314-15.[22] CIT's theory

---

[21] Although the current, incomplete record contains no evidence as to why the parties to the Credit Agreement provided that the definition of "Requisite Lenders" cannot be amended without the approval of all Affected Lenders, it is not difficult to see why all the Lenders sought and obtained that protection. For example, no Lender would want to permit the other Lenders to disenfranchise it by excluding an entire class of Lenders from the definition of "Requisite Lenders." Certain Lenders might not want the threshold for "Requisite Lenders" to be changed above or below 50%, impacting the ability of various Lenders to exercise the powers of the Requisite Lenders. Whatever the parties intended by requiring unanimous Affected Lender consent for any amendment to the definition of "Requisite Lenders", they did not intend to require unanimous Lender consent for Yucaipa to become a Lender or the Requisite Lender; otherwise, they would have placed such a unanimous consent requirement on changes to the definitions of "Eligible Assignee" or "Term Loan Exposure."

[22] CIT tries to bolster its suggestion that unanimous Lender consent would be required before Yucaipa could become Requisite Lender with a false and unsupported hypothesis of the supposed harm from having Yucaipa as a Requisite Lender. According to CIT, Yucaipa would be able to "waive a host of defaults under the Credit Agreement." (CIT Brief at 13-14). If this were true, it would at least add a surface appeal to CIT's attempt to re-write the Credit Agreement to give itself or any other minority Lender veto power over changes to the Third Amendment which were not even approved by all Affected Lenders. But CIT offers no support for this assertion, and it is incorrect. The Credit Agreement does not state that the Requisite Lenders can "waive defaults" – on the contrary, consent from all Lenders is required to waive Allied's defaults. (*See generally* CA §§ 10.5(b)(ii), (vi), (viii).) Furthermore, Yucaipa has never purported to waive Allied's default – rather, as the portion of the First Amended Complaint upon which CIT relies states, Yucaipa has waived a no-default condition to the issuance of replacement Letters of Credit. (Am. Compl. ¶ 44.) Sections 2.4(b) and 3.2(a)(v) of the Credit Agreement, along with this Section 8.1, allow the

24

similarly fails as a matter of common sense when applied to the broader scope of the entire Credit Agreement. The Credit Agreement's Definitions section is forty-five (45) pages long, takes up over one-quarter of the entire Credit Agreement, and contains three hundred eleven (311) defined terms. (*See* CA § 1.1.)

In the face of these overwhelming facts, CIT woodenly asserts – with no legal or evidentiary support – that because the definition of Requisite Lenders references TLE, a change to this embedded term is also prohibited without unanimous Affected Lender consent. (*See* CIT's Brief, pp. 11-12.) Neither the drafters nor the parties to the Credit Agreement indicate that such was their intent within the Credit Agreement. If such had been their intent, they should have included language indicating that changes to embedded terms also required unanimous Affected Lender consent. They did not do so.

Following CIT's contrived logic, any change to any of the nested terms of the definitions of Requisite Lender or Pro Rata Share (or the defined terms embedded within those nested terms) would require unanimous Affected Lender consent, which is absurd. The parties to the Credit Agreement would not have bothered to expressly list defined terms that could not be amended without unanimous Lender approval if they intended to indirectly imply other defined terms could not be amended without unanimous Lender approval. As CIT stated in its motion: "In interpreting a contract, the court should construe the contract reasonably, in light of what reasonable business people would have intended. Interpretations that lead to absurd results should be rejected." (CIT's Brief, p. 10 (*citing Lipper Holdings, LLC v. Trident Holdings, LLC,* 766 N.Y.S.2d 561, 562 (N.Y. App. Div. 1st Dep't 2003).) Accordingly, CIT's interpretation

---

Requisite Lender to waive the no-default condition to the issuance of replacement Letters of Credit so that the new Letters of Credit can be issued. Waiving a condition to the issuance of Letters of Credit, however, is hardly the same as waiving a borrower's defaults. To waive Allied's defaults, consent from all Lenders is required, and CIT's suggestion that Yucaipa has waived Allied's defaults or that it could do so in the future is incorrect.

should be rejected. By the plain language of CA § 10.5(b)(ix), only changes to the definitions of two specific terms -- Requisite Lenders and Pro Rata Share -- required unanimous consent of Affected Lenders; not changes to any of the bevy of embedded terms extending down through numerous layers. If the parties to the Credit Agreement had intended otherwise, they would have stated so within the contract. Therefore, CIT's Motion should be denied as a matter of law.

**B.      Alternatively, If The Terms Of The Credit Agreement Are Ambiguous, Then Parol Evidence Is Required To Supply Their Meaning And The Court Should Deny CIT's Motion.**

Alternatively, if the Court finds it is unclear whether modification of the definition of an embedded term within the definition of Requisite Lenders or Pro Rata Share may also require unanimous Affected Lender consent, then there exists an ambiguity within the contract. "To the extent that any of [an] agreement's terms may be ambiguous, indefinite or uncertain, it is well settled that extrinsic or parol evidence is admissible to determine their meaning." *Korff v. Corbett*, 794 N.Y.S.2d 374, 377 (N.Y. App. Div. 1st Dep't 2005). *See also Weiner v. Anesthesia Assocs. of W. Suffolk, P.C.*, 610 N.Y.S.2d 606, 608 (N.Y. App. Div. 2d Dep't 1994) ("[W]here . . . a court determines that the terms of the agreement are ambiguous and the intent of the parties becomes a matter of inquiry, parol evidence is permitted to determine that intent."). Thus, when a court determines that an ambiguity exists within the four corners of an agreement, summary judgment is improper because the fact finder may need to consider extrinsic evidence to establish the intent of the parties. *See Sound Distrib. Corp. v. Richmond*, 213 A.D.2d 178, 179 (N.Y. App. Div. 1st Dep't 1995) (finding guaranty ambiguous and admitting parol evidence to ascertain parties' intent); *see also Legg v. Stovall Tire & Marine*, 245 Ga. App. 594, 596, 538 S.E.2d 489, 491 (2000) (Holding that in some cases "the circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual

assent to an agreement. Where such extrinsic evidence exists and is disputed, the question of whether a party has assented to the contract is generally a matter for the jury.")

Contract language is unambiguous where it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Care Travel Co. v. Pan Am. World Air.*, 944 F.2d 983, 988 (2d Cir. 1991) (*quoting Hunt Ltd. v. Lifshultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) (*in turn quoting Breed v. Insurance Co. of North Am.*, 46 N.Y.2d 351, 355 (1978)). By contrast, "[c]ontract language is ambiguous if it is reasonably susceptible of more than one interpretation, and a court makes this determination by reference to the contract alone." *Burger King Co. v. Horn & Hardart Co.*, 893 F.2d 525, 527 (2d Cir. 1990); *see also Nautilus Insurance Co. v. Matthew David Events, Ltd.*, No. 1080, 603742/07, 2010 N.Y. App. Div. LEXIS 319 at **12 (1st Dep't Jan. 14, 2010). When a contractual provision is susceptible to more than one reasonable interpretation, its construction presents a triable issue of fact to be resolved by the fact finder, and not disposed of by the court upon a motion for summary judgment. *See Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 574 (2d Cir. 1993) (noting that under New York law "[r]esolving an ambiguous term in a written contract through extrinsic evidence remains squarely within the province of the trier of fact . . . For that reason, summary judgment in such circumstances is inappropriate") (citations omitted); *Leon v. Lukash*, 121 A.D.2d 693, 694 (N.Y. App. Div. 2d Dep't 1986) ("When the language of a contract is ambiguous, its construction presents a question of fact which may not be resolved by the court on a motion for summary judgment") (citations omitted); *see also Enzo Biochem v. Johnson & Johnson*, 1992 U.S. Dist. LEXIS 15723 at *10 (S.D.N.Y. Oct. 14, 1992) ("Summary judgment normally is inappropriate when a contractual term is ambiguous because a triable issue of fact

exists as to its interpretation."); *see also Legg,* 245 Ga. App. at 596-597, n. 5, 538 S.E.2d at 491-492, n. 5 (The "fact that [a party] contested whether there was [a] meeting of the minds on [a] material contract term required that the issue be presented to the jury.")

Plaintiffs respectfully submit that the CA is unambiguous in allowing Requisite Lender consent to amend the definition of TLE. But, alternatively, if the Court finds the parties' intent is not clear from the face of the Credit Agreement, then the Credit Agreement is ambiguous regarding whether amendment of the definition of a term embedded within Requisite Lenders also requires unanimous Affected Lender consent. Therefore, parol evidence is necessary to determine the parties' and drafters' intent and, since CIT has presented no such evidence, having merely conclusorily asserted that the parties' intent should be obvious (*see generally* CIT's Brief),[23] there exist genuine issues of material disputed fact.[24]    Accordingly, CIT's Motion should be denied.

## CONCLUSION

Pursuant to the foregoing argument and authorities, Plaintiffs have established CIT is not entitled to partial summary judgment as a matter of law and because there exist genuine issues of material fact. Therefore, CIT's Motion for Summary Judgment should be denied in its entirety.

---

[23] In fact, the parties' intent *is* obvious, but not in the way CIT would have it -- the parties manifested their intent through the Credit Agreement's restriction of definitional amendments to only two specific, defined terms: Requisite Lenders and Pro Rata Share. If the original Credit Agreement parties and drafters had intended to required unanimous Affected Lender consent (itself an ambiguous term) to changes to embedded, defined terms (such as TLE) or any other defined terms, they would have expressly stated that intent within the four corners of the contract. Even CIT does not contend they did so in this case. Moreover, CIT neglects to point out the parties' intent as demonstrated by the fact the Credit Agreement expressly provides for the Requisite Lender to amend the Credit Agreement except in certain narrow circumstances delineated in CA § 10.5 (b) and (c). Thus, the parties to the Credit Agreement clearly intended for the contract to be amendable and none of the parties to the Credit Agreement ever attempted to further constrain the Requisite Lenders' ability to make such amendments.

[24] CIT filed the instant motion months before the scheduled conclusion of discovery. Accordingly, if the Court holds the Credit Agreement is ambiguous such that parol evidence is necessary to determine the parties' intent, there remains time to conduct the requisite discovery.

Respectfully submitted this 18th day of February, 2011.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

By: _____
David E. Spalten
Georgia Bar No. 669010
Daniel A. Cohen
Georgia Bar No. 173474
Paul G. Williams
Georgia Bar No. 764925

One Midtown Plaza - Suite 1150
1360 Peachtree Street, N.E.
Atlanta, Georgia 30309                     *Attorneys for Plaintiffs Yucaipa American Alliance*
Telephone: 404-260-6080                    *Fund I, LP and Yucaipa American Alliance*
Facsimile: 404-260-6081                    *(Parallel) Fund I, LP*

TROUTMAN SANDERS LLP

By: _____
Michael E. Johnson
Georgia Bar No. 395039
(by David E. Spalten with express permission)

5200 Bank of America Plaza
600 Peachtree Street, N.E.
Suite 5200
Atlanta, GA 30308-2216
Telephone:    (404) 885-3000
Telecopy:     (404) 885-3900            *Attorneys for Plaintiff Allied Systems Holdings, Inc.*

29

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

ALLIED SYSTEMS HOLDINGS, INC.,          )
YUCAIPA AMERICAN ALLIANCE FUND I,       )
LP, and YUCAIPA AMERICAN ALLIANCE       )
(PARALLEL) FUND I, LP,                  )
                                        )
                    Plaintiffs,         )          Civil Action No. 2009-CV-177574
                                        )
v.                                      )
                                        )
THE CIT GROUP/BUSINESS CREDIT, INC.,    )
                                        )
                    Defendant.          )

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a true and exact copy of the foregoing *Plaintiffs' Joint Brief In Opposition to Defendant The CIT Group/Business Credit, Inc.s' Motion for Partial Summary Judgment* upon all parties to this action by U.S. Mail, with sufficient postage affixed thereto, as follows:

Douglas Flaum, Esq.                     H. Lamar Mixson, Esq.
Israel David, Esq.                      Lisa R. Strauss, Esq.
Janice Goldberg, Esq.                   Bondurant Mixson & Elmore, LLP
Fried, Frank, Harris, Shriver           1201 West Peachtree St. NW, Ste. 3900
   & Jacobson LLP                       Atlanta, GA 30309
One New York Plaza
New York, NY 10004

Michael E. Johnson, Esq.
Troutman Sanders LLP
5200 Bank of America Plaza, Ste 5200
600 Peachtree Street, N.E.
Atlanta, GA 30308-2216

This 18th day of February, 2011.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

By: _____

David E. Spalten
Georgia Bar No. 669010
Daniel A. Cohen
Georgia Bar No. 173474
Paul G. Williams
Georgia Bar No. 764925

One Midtown Plaza - Suite 1150
1360 Peachtree Street, N.E.
Atlanta, Georgia 30309
Telephone: 404-260-6080
Facsimile: 404-260-6081

*Attorneys for Plaintiffs Yucaipa American Alliance*
*Fund I, LP and Yucaipa American Alliance*
*(Parallel) Fund I, LP*